Riley T. Orloff (RO4865)
McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173-1922
rorloff@mwe.com

John J. Dabney (admitted *pro hac vice*)
Mary D. Hallerman (admitted *pro hac vice*)
Katie Bukrinsky (admitted *pro hac vice*)
Rebecca H. Duttry (admitted *pro hac vice*)
McDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
jdabney@mwe.com, mhallerman@mwe.com,
kbukrinsky@mwe.com, rduttry@mwe.com

*Attorneys for Defendants/Counterclaimants*
*Lotte International America Corp. and*
*Lotte Confectionery Co., Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EZAKI GLICO KABUSHIKI KAISHA, d/b/a EZAKI GLICO CO., LTD., and EZAKI GLICO USA CORPORATION, | : : : Civil Action No. 15-5477-MCA-LDW |
| Plaintiffs/Counterdefendants. | : : |
| v. | : District Judge Madeline Cox Arleo |
| LOTTE INTERNATIONAL AMERICA CORP. and LOTTE CONFECTIONERY CO. LTD. | : Magistrate Judge Leda Dunn Wettre : : |
| Defendants/Counterclaimants. | : |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.   Glico's Alleged Trade Dress Is Functional. ...................................................3

A.   A Functional Product Configuration Cannot Be Afforded
Trade Dress Protection. .........................................................................4

B.   The Pocky Product Configuration is Functional. ................................7

1.   The Pocky Product Configuration is Essential to
Its Use or Purpose and Affects Its Cost and/or
Quality. ........................................................................................9

a.   Glico Has Admitted that the Pocky Product
Configuration is Functional. ...........................................9

b.   Glico Touts the Benefits of the Pocky
Product Configuration in Advertising and
Promotion. ....................................................................13

(i)   The "Handle" Enables Consumers to
Avoid Getting Mess on Their Hands. .................13

(ii)   The Elongated, Thin, Straight,
Cylindrical Shape Makes Pocky Easy
to Eat, Share and Transport, and
Assists in Packaging of the Product. ...................15

2.   Glico's U.S. Utility Patent and Japanese Utility
Model Reveal that the Pocky Product
Configuration is Functional. .....................................................16

a.   Glico's U.S. Utility Patent. ...........................................16

(i)   Glico's Patent Claims the Pocky Ultra
Slim Product Configuration. ...............................17

(ii)   Glico Disclosed the Utilitarian
Advantages of the Pocky Product
Configuration in the '428 Patent. .........................18

i

          (iii)    The Pocky Product Configuration Results from Practicing the Methods in Glico's Utility Patent.........................................22

       b.    Glico's Japanese Utility Model Also Discloses Utilitarian Benefits of the Pocky Product Configuration. ...................................23

    3.    Third-Party Utility Patents Show the Pocky Product Configuration is Functional.........................................24

          (i)    The "Pretzel Stick Snack Item" Patent.................24

          (ii)    The "Clean Finger" Patent. ..................................25

    4.    Affording Trade Dress Protection to the Pocky Product Configuration Would Put Competitors at a Significant, Non-Reputation-Related Disadvantage...........................................................27

II.    GLICO ABANDONED ANY TRADE DRESS RIGHTS IN THE POCKY PRODUCT CONFIGURATION THROUGH UNCONTROLLED LICENSING. ..................................................................29

    A.    Glico Has a Duty to Control the Quality of ███'s Licensed Products.........................................................30

    B.    Glico Has Failed to Control the Quality of ███'s Licensed Products.........................................................31

       1.    Glico Has No Right to Control the Quality of ███'s Products Under the ███ License Agreement...........................................................31

       2.    Glico Has Played No Meaningful Role in the Quality of ███'s Licensed Products. ......................................34

III.    GLICO WAITED DECADES TO BRING ITS CLAIMS...........................37

    A.    Legal Standard for Laches.....................................................37

    B.    Laches Bars Glico's Claims. .................................................39

1.   Glico's Claims Are Presumptively Barred ...............................39

2.   Glico's Delay Was Inexcusable. ...............................................40

    a.   Glico's decades of silence following its demand letters signaled that it would not sue. ..................................................................................40

    b.   The doctrine of progressive encroachment does not excuse Glico's delay. .......................................42

3.   Lotte Has Suffered Economic and Evidentiary Prejudice.....................................................................................44

    a.   Lotte Suffered Economic Prejudice...............................44

        (i)   If Enjoined, Lotte Will Lose the Benefits of the Investments it Made in Pepero in the United States. .................................45

        (ii)   Lotte Faces Substantially Increased Monetary Exposure Due to Glico's Decades of Delay...................................................47

    b.   Lotte Suffered Evidentiary Prejudice . ...........................47

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*,
280 F.3d 619 (6th Cir. 2002) ...............................................................27

*Adams Mfg. Corp. v. Rea*,
Civil Action No. 12-1430, 2014 WL 978116 (W.D. Pa. Mar. 12,
2014) .................................................................................................12

*Am. Diabetes Assn. v. Friskney Fam. Tr., LLC*,
177 F. Supp. 3d 855 (E.D. Pa. 2016) ........................................36, 37, 38

*Am. Greetings Corp. v. Dan-Dee Imports Inc.*,
807 F.2d 1136 (3d Cir. 1986) ...........................................5, 7, 12, 13

*Amscan Inc. v. Shutter Shades, Inc.*,
Case No. 13-cv-1112 (CS), 2015 U.S. Dist. LEXIS 180647
(S.D.N.Y. Apr. 30, 2015).................................................29, 30, 31

*Anheuser-Busch, Inc. v. Du Bois Brewing Co.*,
175 F.2d 370 (3d Cir. 1949) ...............................................................43

*Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc.*,
289 F.3d 589 (9th Cir. 2002) ........................................29, 35, 36

*In re Becton Dickinson*,
675 F.3d at 1375 .................................................................24, 25

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
269 F.3d 270 (3d Cir. 2001) ...............................................................28

*In re Dippin' Dots Patent Litigation*,
249 F. Supp. 2d 1346 (N.D. Ga. 2003), *aff'd sub nom*, *Dippin'
Dots, Inc. v. Frosty Bites Distribution, Inc.*, 369 F.3d 1197 (11th
Cir. 2004) ......................................................................................15, 19

*Dippin' Dots v. Frosty Bites Distrib. LLC*,
369 F.3d 1197 (11th Cir. 2004) ...........................................11, 21, 27

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
158 F.3d 1002 (9th Cir. 1998) ....................................................................8, 14, 16

*Doeblers' Pa. Hybrids, Inc. v. Doebler*,
442 F.3d 812 (3d Cir. 2006) .......................................................................29, 30

*Eva's Bridal Ltd. v. Halanick Enters.*,
639 F.3d 788 (7th Cir. 2011) .................................................................29, 32, 35

*First Interstate Bancorp v. Stenquist*,
No. C-89-4106 MHP, 1990 U.S. Dist. LEXIS 19426 (N.D. Cal.
July 13, 1990)............................................................................................33

*FMC Corp. v. Guthery*,
CIV A 07-5409, 2009 WL 1033663 (D.N.J. Apr. 17, 2009)........................45, 48

*Franek v. Wal-Mart Stores, Inc.*,
Case No. 08-CV-0058, 2009 U.S. Dist. LEXIS 20361 (N.D. Ill.
Mar. 13, 2009), *aff'd sub nom*, Jay Franco & Sons, Inc. v. Franek,
615 F.3d 855 (7th Cir. 2010) .............................................................................12

*Freecycle Sunnyvale v. Freecycle Network*,
626 F.3d 509 (9th Cir. 2010) .......................................................................29, 36

*Georgia Pacific Consumer Prods. LP v. Kimberley-Clark Corp.*,
647 F.3d 723 (7th Cir. 2011) ..............................................................................5

*H.G. Shopping Centers, L.P. v. Birney*,
H-99-0622, 2000 WL 33538621 (S.D. Tex. Nov. 29, 2000) ...........................40

*Halo Mgmt., LLC v. Interland, Inc.*,
No. C-03-1106 MHP, 2004 U.S. Dist. LEXIS 15563 (N.D. Cal.
Aug. 9, 2004) ........................................................................................32, 33

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
191 F.3d 813 (7th Cir. 1999) .......................................................................37, 40

*Jay Franco & Sons, Inc. v. Franek*,
615 F. 3d 855 (7th Cir. 2010) .....................................................................*passim*

*Jt. Stock Socy. v. UDV N.A., Inc.*,
53 F. Supp. 2d 692 (D. Del. 1999), *aff'd,* 266 F.3d 164 (3d Cir.
2001) ............................................................................................................*passim*

v

*Kaufhold v. Caiafa*,
  872 F. Supp.2d 374 (D.N.J. 2012) .................................................................37

*Kellogg Co. v. Nat'l Biscuit Co.*,
  305 U.S. 111 (1938).........................................................................................21

*Kepner-Tregoe, Inc. v. Exec. Dev., Inc.*,
  79 F. Supp. 2d 474 (D.N.J. 1999), *aff'd*, 276 F.3d 577 (3d Cir.
  2001) ...............................................................................................................48

*Kohler Co. v. Honda Giken Kogyo K.K.*,
  125 U.S.P.Q.2d 1468 (T.T.A.B. 2017) ...........................................................23

*Leatherman Tool Group, Inc. v. Cooper Indus.*,
  199 F.3d 1009 (9th Cir. 1999) ........................................................................12

*Malaco Leaf AB v. Promotion in Motion, Inc.*,
  287 F. Supp. 2d 355 (S.D.N.Y. 2003) ............................................................11

*Mycone Dental Supply Co. v. Creative Nail Design*,
  Civil Action No. 11-4380, 2012 U.S. Dist. LEXIS 116924 (D.N.J.
  Aug. 17, 2012) ................................................................................................28

*N.J. Physicians United Reciprocal Exch. v. Privilege Underwriters,
  Inc.*,
  No. 15-6911, 2016 U.S. Dist. LEXIS 143745 (D.N.J. Oct. 18,
  2016) ...............................................................................................................37

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159 (1995)...........................................................................................3

*S. Texas Neon Sign Co., Inc. v. Ixtapa, Inc.*,
  5:08-CV-116, 2009 WL 10695794 (S.D. Tex. Aug. 14, 2009).......................40

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
  401 F.3d 123 (3d Cir. 2005) ....................................................................*passim*

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
  627 F. Supp. 1096 (N.D. Cal. 2008)................................................................49

*Stanfield v. Osborne Indus., Inc.*,
  52 F.3d 867 (10th Cir. 1995) .........................................................31, 32, 33, 34

*Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*,
     655 F. App'x 103 (3d Cir. 2016) .............................................................4, 5, 6, 9

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*,
     465 F.3d 1102 (9th Cir. 2006) .......................................................................41, 42

*TrafFix Devices v. Mktg. Displays*,
     532 U.S. 23 (2001).......................................................................................*passim*

*Wal-Mart Stores v. Samara Brothers*,
     529 U.S. 205 (2000)..........................................................................................6, 7

*Wisconsin Cheese Grp, Inc. v. V & V Supremo Foods, Inc.*,
     537 F. Supp. 2d 994 (W.D. Wis. 2008) ...............................................41, 45, 46

*Yurman Design, Inc. v. PAJ, Inc.*,
     262 F.3d 101 (2d Cir. 2001) .................................................................................4

**Statutes**

1,986,404.15 U.S.C. §§ 1064(3), 1119 ..................................................................36

15 U.S.C. § 1064(3) .................................................................................................4

15 U.S.C. § 1115.......................................................................................................5

15 U.S.C. § 1119.....................................................................................................28

N.J.S.A. §56:4 ........................................................................................................28

**Other Authorities**

1 MCCARTHY ON TRADEMARKS § 8:6.50 (5th ed.) ................................................27

3 Louis Altman, CALLMANN ON UNFAIR COMPETITION, TRADEMARKS
     & MONOPOLIES § 19:7 (4th ed. 2003)...............................................................26

Catherine Sun, ed., *Intellectual Property Protection in Asia* § 5:16 ......................22

2 GILSON ON TRADEMARKS § 6.04[4][b][i] (2018) ...............................................29

1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR
     COMPETITION § 7:77 (5th ed.)...............................................................................5

DM_US 155740580-2.097931.0011

This case stands the proverb "better late than never" on its head. Never is often better than late. And this lawsuit is one of those times.

Glico waited a quarter century after learning of Lotte's sale of Pepero biscuit sticks to file this action to enforce alleged trade dress rights in its Pocky biscuit stick. During that delay, Glico inexplicably went about eviscerating the validity of the trade dress that it suddenly seeks to enforce here. To begin with, Glico obtained a utility patent claiming the Pocky trade dress as a useful invention and touted the benefits of that trade dress. Either of those things render Glico's trade dress functional and invalid as a matter of law.

But Glico's self-destructive behavior did not stop there. Glico licensed the Pocky trade dress to a third-party, ███, but never bothered to control the quality of the licensed products, despite having a legal duty to do so. Although Glico has long considered ███'s licensed products to be shoddy and substandard, Glico has done absolutely nothing to convey that or any other concern to ███. Indeed, Glico has not communicated with ███ about the licensed products since the day the license became effective ████████████. By uncontrolled licensing, Glico has abandoned any rights in the Pocky trade dress. Finally, Glico's 25-year delay in filing suit against Lotte is inexcusable and has caused extreme prejudice to Lotte. Laches bars Glico's claims as a matter of law.

1

The Court should award summary judgment to Lotte on each of these three independent grounds (functionality, abandonment, and laches) and dismiss Glico's Second Amended Complaint with prejudice.

## ARGUMENT

To prevail on its claims, Glico must prove that its Pocky product configuration trade dress is valid and Lotte's use of its Pepero product configuration causes a likelihood of confusion. *See, e.g.*, *Am. Greetings Corp. v. Dan-Dee Imps., Inc.*, 807 F.2d 1136, 1142 (3d Cir. 1986). Lotte can defeat Glico's claims as a matter of law if it proves that Glico's Pocky product configuration is functional. *See, e.g.*, *Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*, 655 F. App'x 103, 109 (3d Cir. 2016). Lotte can also defeat Glico's claims if it proves either that Glico has abandoned its Pocky product configuration through uncontrolled licensing or that Glico unreasonably delayed in bringing suit and thereby caused Lotte to suffer prejudice. *See, e.g.*, *Eva's Bridal Ltd. v. Halanick Enters*., 639 F.3d 788, 791 (7th Cir. 2011); *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005).

The undisputed evidence shows that Lotte is entitled to summary judgment on all of the counts alleged in Glico's operative Complaint for three separate and independent reasons. First, as shown in Section I below, Glico's Pocky product configuration trade dress is functional and thus invalid as a matter of law. Second,

2

as discussed in Section II, Glico has abandoned its Pocky product configuration trade dress through naked licensing. And third, as explained in Section III, Glico's claims are barred by laches due to Glico's decades-long delay in bringing suit.

## I.     GLICO'S ALLEGED TRADE DRESS IS FUNCTIONAL.

Glico claims trade dress in a biscuit stick partially coated with chocolate or cream. SUMF ¶1. Glico owns two relevant registrations for its alleged Pocky product configuration trade dress, *id.*:

| Reg. No. | Registered Trade Dress Configuration | Glico's Description of the Trade Dress Configuration | Goods |
|---|---|---|---|
| 1,527,208 | | "The mark comprises an elongated rod comprising biscuit or the like, partially covered with chocolate." | "Chocolate covered candy stick" |
| 2,615,119 | | "The mark consists of the configuration of the applicant's goods, which are biscuit sticks, covered with chocolate or cream and almonds." | "Biscuit stick partially covered with chocolate or cream in which are mixed crushed pieces of almond." |

3

In this litigation, Glico has defined its Pocky product configuration trade dress as follows:

1.    An elongated, thin, straight, cylindrical rod-shaped biscuit;

2.    With more than half, but not all, of the biscuit coated with chocolate and/or cream or a cream-like coating that fully covers and extends from one end of the biscuit over halfway to the other end, but terminates short of the other end;

3.    With coated portion of the biscuit having a rounded end

4.    And the uncoated portion having a generally flat end.

SUMF ¶ 2.



SUMF ¶ 3.

**A.    A Functional Product Configuration Cannot Be Afforded Trade Dress Protection.**

4

The law of functionality prevents a company from using the trademark laws to obtain a monopoly over a useful product. As the Supreme Court has stated, "[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995). "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 34 (2001).

Unlike patent law, which "bestow[s a] limited period[] of protection," trade dress protection can last forever. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001). Courts "exercise particular caution" before affording trade dress protection to a product configuration because doing so is "more likely to preclude competition" by "creat[ing] a monopoly in the goods themselves." *Id.* at 114-15. The functionality doctrine "polices the division of responsibilities between patent and trademark law by invalidating marks on useful designs" and thereby ensures that useful product configurations are available for consumers. *Jay Franco & Sons, Inc. v. Franek*, 615 F. 3d 855, 857 (7th Cir. 2010).

A functional product configuration is invalid trade dress as a matter of law, regardless of whether it is registered with the U.S. Patent and Trademark Office

5

("PTO"). *See* 15 U.S.C. § 1064(3); *Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*, 655 F. App'x 103, 109 (3d Cir. 2016). If a product configuration trade dress is functional, evidence of likelihood of confusion is irrelevant, and a plaintiff's infringement claim fails as a matter of law. *See, e.g., Sweet St. Desserts,* 69 F. Supp. 3d 530, 550 n.9., *aff'd* 655 F. App'x 103 (3d Cir. 2016). As the Third Circuit held, "[w]hen a feature or combination of features is found to be functional, **it may be copied and the imitator may not be enjoined from using it, even if confusion in the marketplace will result**." *Am. Greetings Corp. v. Dan-Dee Imports Inc.*, 807 F.2d 1136, 1141 (3d Cir. 1986) (emphasis added).[1]

Glico's Principal Register registrations for the Pocky product configuration afford Glico a presumption of non-functionality.15 U.S.C. § 1115. But that presumption quickly evaporates because, as shown below, Lotte presents "strong evidence of functionality." *Georgia Pacific Consumer Prods. LP v. Kimberley-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011). Glico then must meet a "heavy burden of showing that feature is not functional, for instance by showing that it is merely an ornamental, incidental or arbitrary aspect of the device," in order to avoid summary judgment. *Id*. (quoting *TrafFix*, 532 U.S. at 30).

---

[1] If a product configuration is functional, so too is the image of that configuration on a package or advertisement for the product. *See* 1 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 7:77 (5th ed.).

6

The Third Circuit and other courts have repeatedly found that the presumption of non-functionality afforded to a federally registered product configuration has been defeated and entered summary judgment for the defendant. *See, e.g.*, *Sweet St. Desserts*, 655 F. App'x at 109 (affirming summary judgment that product configuration in the form of a single-serve, apple pie in the shape of a flower blossom was functional and cancelling registration); *Jay Franco,* 615 F.3d at 857 (affirming summary judgment that a product configuration in the form of a round beach towel was functional). The Court should do the same here.

### B.   The Pocky Product Configuration is Functional.

The Pocky product configuration is indisputably functional as a matter of law under both of two tests used by this Court to assess functionality.

The first test asks whether the Pocky product configuration is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices v. Mtkg. Displays*, 532 U.S. 23, 32 (2001). *Accord Sweet St. Desserts*, 655 F. App'x at 109. The second test asks whether affording trade dress protection to the Pocky product configuration would put "competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32-33. *Accord Sweet St. Desserts,* 655 F. App'x at 109.

If the first functionality test is met, summary judgment must be entered for Lotte. *See, e.g., Sweet St. Desserts*, 655 F. App'x at 109. At that point, as the

DM_US 155740580-2.097931.0011

Supreme Court held in *TrafFix*, there is no need for a court "to proceed further to consider if there is a competitive necessity for the feature," or "engage . . . in speculation about other design possibilities" that would satisfy the functional purpose of the feature. *TrafFix*, 532 U.S. at 33-34.

The Supreme Court in *TrafFix* adopted these functionality tests only a year after its decision in *Samara Brothers*, another case involving product configuration trade dress. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 213 (2000). Although *Samara Brothers* answered a question that is not relevant to this motion, the Supreme Court's observations there about the intrinsic nature of a product configuration trade dress are directly relevant to understanding the background in which *TrafFix* was decided and to assessing functionality under that precedent.

"**Almost invariably**," the *Samara Brothers* Court explained, "**even the most unusual of product designs**, such as a cocktail shaker shaped like a penguin, **is intended** not to identify the source" of the product, "but **to render the product itself more useful** or **more appealing**." *Id.* (emphasis added). The Supreme Court justified its holding there, which made it more difficult to protect product configuration trade dress, on the ground that "[c]onsumers should not be deprived of the benefits of competition with regard to **the utilitarian and esthetic purposes that product design ordinarily serves[.]**" *Id.* (emphasis added).

8

With that background, as shown below, the undisputed evidence shows that the Pocky product configuration is functional under both of the *TrafFix* tests.

### 1. The Pocky Product Configuration is Essential to Its Use or Purpose and Affects Its Cost and/or Quality.

Under the first test, the key question is whether the Pocky product configuration "is part of the function served, or whether the primary value of a particular feature is the identification of the provider." *Am. Greetings*, 807 F.2d at 1142. A product configuration that "produces a benefit other than source identification is functional" and thus invalid as a matter of law. *Jay Franco*, 615 F.3d at 857; *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1007 (9th Cir. 1998) ("A product feature need only have *some* utilitarian advantage to be considered functional."). As shown below, Glico has conceded that the Pocky product configuration trade dress is essential to the use and purpose of the product and affects the cost and quality of the product in its own documents, in its advertising and promotional materials, and in its U.S. utility patent claiming the Pocky product configuration and in its Japanese Utility Model.

### a. *Glico Has Admitted that the Pocky Product Configuration is Functional.*

Glico's own documents establish that the Pocky product configuration is essential to the use and purpose of the product and affects its cost and quality. SUMF ¶¶ 3, 25-28.

9



SUMF ¶ 27  (emphasis added).  *See, e.g.*, *Sweet St. Desserts*, 655 F. App'x at 109

(trade dress owner's account of creation of trade dress proved the configuration

was functional as a matter of law). ████████████████████████████

████████████████████████████████████████████ SUMF ¶ 8.

████████████████████████████████████████████████

10



As shown in the table below and explained *infra*, it is undisputed that each feature of Glico's Pocky product configuration is functional.

| Claimed Feature of Pocky Product Configuration | The Utilitarian Advantages of That Feature |
|---|---|
| An elongated, thin, straight, cylindrical rod-shaped biscuit | • Convenient. SUMF ¶¶ 5, 29, 31-33, 45<br>• Easy to consume. SUMF ¶¶ 5, 7, 20-22<br>• Enables a quantity of Pocky sticks suitable for sharing to be placed in package. SUMF¶¶ 5, 7, 34<br>• Reduces packaging costs. See, e.g., SUMF ¶¶ 20, 22, 34.<br>• ███████████████ |

| | |
|---|---|
| | • ████████████████████████ ████████████████████. See, e.g., SUMF ¶¶ 49, 52-60. |
| With more than half, but not all, of the biscuit coated with chocolate and/or a cream or cream-like coating, that fully covers and extends from one end of the biscuit over halfway to the other end but terminates short of the other end[2] | • Uncoated portion is a "handle" to facilitate end user consumption because user does not get chocolate on his hands. See, e.g., SUMF ¶¶ 10, 27-28<br><br>• ████████████████████████ ████████████████████████ ████████████████ See, e.g., SUMF ¶ 11.<br><br>• ████████████████████████ ████████████████████████ See, e.g., SUMF ¶¶ 12-17.<br><br>• Coating strengthens biscuit stick which makes breakage more difficult. SUMF ¶¶ 18, 68. |
| With the coated portion of the biscuit having a rounded end[3] | • ████████████████████████ ████████████░░░░░░████████<br>█ ████████████████████████ |
| And the uncoated portion having a generally flat end.[4] | • ████████████████████████ ████████████████████ |

The evidence is also undisputed that Glico's Pocky product configuration

considered as a whole is functional. As the Ninth Circuit explained, "where the

---

[2] The use of crushed almonds on the Pocky Almond Crush product configuration serves to indicate the almond flavor of the product and thus that feature is functional as a matter of law. *See, e.g.*, *Dippin' Dots v. Frosty Bites Distrib. LLC*, 369 F.3d 1197, 1205-06 (11th Cir. 2004) (color of ice cream is "essential to the purpose of the product and affects its quality" and thus functional because it is "indicative of flavor").

[3] This feature is not eligible for trade dress protection because it is a "functional result" of manufacture. *Malaco Leaf AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 366 (S.D.N.Y. 2003).

[4] This feature is not eligible for trade tress protection. *See Malaco*, 287 F. Supp. at 366.

whole is nothing other than an assemblage of functional parts . . . it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is nonfunctional." *Leatherman Tool Group, Inc. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999).

### b. *Glico Touts the Benefits of the Pocky Product Configuration in Advertising and Promotion.*

For decades, Glico has promoted the advantages of the Pocky product configuration to consumers, retailers, and distributors. Glico's marketing of the utilitarian benefits of the Pocky product configuration is "**strong evidence** of its functionality," *Am. Greetings*, 807 F.2d at 1142 (emphasis added), and "renders a finding of the functional purpose of the [configuration] **inescapable**," *Adams Mfg. Corp. v. Rea*, Civil Action No. 12-1430, 2014 WL 978116, at *12 (W.D. Pa. Mar. 12, 2014) (emphasis added) (granting summary judgment in TTAB appeal).

### (i) *The "Handle" Enables Consumers to Avoid Getting Mess on Their Hands.*

Glico's advertising and promotional materials are filled with statements about the benefit of the "handle" on the Pocky stick.[5] SUMF ¶¶ 29-32, 35-36, 38. According to decades of advertising by Glico, the "handle" on Pocky allows for "multitasking without getting chocolate on [one's] hands." SUMF ¶ 35. To this

---

[5] Glico must believe that the "capabilities inherent" in the Pocky product configuration "encourage sales . . . or [it] would not have so conspicuously included that language in the advertisements" for Pocky. *Franek v. Wal-Mart Stores, Inc.*, Case No. 08-CV-0058, 2009 U.S. Dist. LEXIS 20361, at *48 (N.D. Ill. Mar. 13, 2009), *aff'd sub nom*, *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855 (7th Cir. 2010).

13

day, Glico touts the handle as a "useful benefit" in advertising Pocky. SUMF ¶ 38.

*See Am. Greetings*, 807 F.2d at 1143 (trade dress functional based on "plaintiff's



SUMF ¶ 39. Further, Glico packages Pocky so that the uncoated portion is at the

top of the package when opened, thus urging end users to remove the sticks by the

handle without touching the coated portion:

14



SUMF ¶ 40. *See, e.g., Disc Golf Ass'n*, 158 F.3d at 1009 (affirming summary judgment where functionality was "implicit" in advertising).

**(ii)** ***The Elongated, Thin, Strai ▮ Cylindrical Shape Makes Pocky Easy to Eat, Share and Transport, and Assists in Packaging of the Product.***

Glico also promotes the benefits of the shape of the Pocky product configuration. SUMF ¶¶ 29- 31, 33 In promoting the product to retailers and distributors, for example, ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████

Further, Pocky's elongated, thin, straight shape ███████████████ ██████████████████████ ██████████████████████ ██████████████████████

DM_US 155740580-2.097931.0011

*See, e.g.*, *In re Dippin' Dots Patent Litigation*, 249 F. Supp. 2d 1346, 1372 (N.D. Ga. 2003) (granting summary judgment based on functionality because size and shape of ice cream beads "has an effect on its packaging and shipping qualities"), *aff'd sub nom*, *Dippin' Dots, Inc. v. Frosty Bites Distribution, Inc.*, 369 F.3d 1197 (11th Cir. 2004).

## 2. Glico's U.S. Utility Patent and Japanese Utility Model Reveal that the Pocky Product Configuration is Functional.

Glico's utility patent and Japanese Utility Model each prove that the Pocky product configuration trade dress is essential to the use and purpose and the cost and quality of the product.

### a. *Glico's U.S. Utility Patent.*

Less than a year before filing this suit, Glico received a U.S. utility patent, U.S. Patent No. 8,778,428 ("Glico's utility patent") concerning the same product configuration trade dress that it asserts against Lotte here. Glico's utility patent is entitled "**Stick-Shaped Snack** and Method for Producing the Same," SUMF ¶¶ 47-69. (emphasis added), and that patent serves as an "excellent cheat sheet[] for [determining functionality] because any design claimed in a patent is supposed to be useful." *Jay Franco*, 615 F.3d at 857.

As the Supreme Court held in *TrafFix*, a utility patent has "vital significance in resolving a trade dress claim, for a utility patent is **strong evidence** that the features therein claimed are functional." *TrafFix*, 532 U.S. at 23 (emphasis added).

16

The Court should give that evidence particularly great weight here because the utility patent is owned by Glico. SUMF ¶¶ 47, 61. Glico cannot contradict here its own assertions of functionality that it made to the PTO in connection with its utility patent. *See, e.g., Disc Golf Ass'n,* 158 F.3d at 1008 (affirming summary judgment that product configuration trade dress was functional).[6]

### (i) *Glico's Patent Claims the Pocky Ultra Slim Product Configuration.*

Glico has defined its Pocky product configuration trade dress to cover its Pocky products, including the Pocky Ultra Slim product configuration. SUMF ¶ 3. But it is undisputed that Glico's utility patent, by its own terms, also covers the Pocky Ultra Slim product configuration. SUMF ¶ 67. Specifically, Glico's utility patent covers Pocky product configurations that have a cross-sectional width after baking of between 2.5 and 3.5mm, like Pocky Ultra Slim, which has a cross-sectional width after baking of approximately 3.0 mm.  SUMF ¶¶ 62, 69.

By Glico's own admission, therefore, its utility patent discloses and **claims the identical product configuration** (Pocky Ultra Slim) that Glico's Pocky product configuration trade dress encompasses (Pocky Ultra Slim). That admission alone requires the Court to award summary judgment to Lotte and find that Glico's trade dress is functional as a matter of law. *See, e.g., TrafFix*, 532 U.S. at 29-32

---

[6] A utility patent's evidentiary significance does not depend on whether or not the patent is in force or has expired. *See, e.g., Jay Franco,* 615 F.3d at 859.

(fact that plaintiff's utility patent claimed a product configuration that was very similar – not identical—to the product configuration encompassed by plaintiff's trade dress meant that plaintiff's trade dress was functional as a matter of law).

> **(ii)** ***Glico Disclosed the Utilitarian Advantages of the Pocky Product Configuration in the '428 Patent.***

Glico disclosed the utilitarian advantages of the Pocky product configuration throughout the prosecution of its utility patent application. SUMF ¶¶ 48-55.

Glico's patent application did **<u>not</u>** limit all of its claims to baked biscuit sticks having a cross-sectional width 2.5mm and 3.5mm. SUMF ¶ 56. Therefore, Glico represented to the PTO in its application that **<u>all</u>** of the Pocky products (not just Pocky Ultra Slim) covered by the Pocky product configuration trade dress possess the utilitarian benefits disclosed in the application. Those benefits include the following:

**Elongated, thin, cylindrical rod-shaped biscuit makes consumption easy**. Glico told the PTO that the elongated, thin Pocky biscuit stick makes the product "easy to eat" and "creates an enjoyable new texture, encouraging consumers to buy them." SUMF ¶ 50. *See TrafFix*, 532 U.S. at 32 ("statements made in the patent applications demonstrate the functionality of the design"). The evidence is undisputed that the elongated, thin, cylindrical, rod-shape of all of the Pocky products encompassed in the Pocky product configuration trade dress, including

Pocky Chocolate and Pocky Ultra Slim, makes consumption of the product easier. SUMF ¶¶ 51.

**Straightness of Pocky results in manufacturing efficiencies.** In its patent, Glico recognized that partially coated, stick-shaped snacks "are produced by holding one end of a baked stick-like shaped dough with a clip or like holder and immersing the other end of the baked stick-like shaped dough into a container of liquid chocolate." SUMF ¶ 48. But Glico noted that baking stick-shaped snacks often led to warping and bending, causing "problem[s] and inconvenience in the manufacturing process. SUMF ¶ 49.

Bent stick-shaped snacks are "difficult to roll" by an alignment conveyer before coating. SUMF ¶ 52. Bent stick-shaped snacks are also "difficult to firmly hold by the holder, resulting in production problems such as the baked shaped dough rotating or dropping during the coating operation." SUMF ¶ 53. The straightness of the Pocky product configuration solves both of these problems by enabling efficient alignment of the stick-shaped snacks at "regular intervals" in preparation for the coating of the sticks with chocolate or cream and by reducing the dropping of the sticks during coating. SUMF ¶ 52.

As disclosed in Glico's utility patent, the straightness of the Pocky product configuration also reduces waste by enabling the coating of the biscuit sticks without touching each other:

Further, when the holder **61** holds the ends of the stick-shaped pastries **40**, if the stick-shaped pastries **40** are warped at the end, the alignment may fail as the ends of adjacent stick-shaped pastries **40** (the ends on the side not held by the holder **61**) may approach or come into contact with each other. In such a case, the adjacent stick-shaped pastries **40** may be joined via the coating material on the stick-shaped pastries **40**. However, using the method for producing a stick-shaped snack according to this embodiment, straight stick-shaped pastries **40** can be produced, and the above inconvenience can thus be reliably avoided, making it possible to efficiently produce stick-shaped snacks coated with a coating material.

SUMF ¶ 54. *See, e.g.*, *In re Dippin' Dots Patent Litigation*, 249 F. Supp. 2d at 1372 (granting summary judgment – shape of ice cream beads was functional because it reduced waste in manufacturing), *aff'd sub nom*, *Dippin' Dots, Inc. v. Frosty Bites Distrib., Inc.*, 369 F.3d 1197 (11th Cir. 2004).

The evidence is undisputed that the relative straightness of all of the Pocky products encompassed in the Pocky product configuration trade dress, including Pocky Chocolate and Pocky Ultra Slim, provides manufacturing benefits and cost savings.   SUMF ¶¶ 48-54, 68.

**Partial coating increases the strength of the Pocky stick**. Glico further disclosed in its '428 patent that coating "at least part of" the biscuit stick in "chocolate, cream, or like coating material" produced a stick-shaped snack that is "strong and does not easily break." SUMF ¶ 55. The evidence is undisputed that the partial coating on all of the Pocky products encompassed in the Pocky product

20

configuration trade dress, including Pocky Chocolate and Pocky Ultra Slim, increases the strength of the stick against breakage. SUMF ¶¶ 18, 55.

Glico's own expert testified that many of the benefits of the Pocky product configuration disclosed in Glico's utility patent (i.e., Pocky Ultra Slim) are shared by the configurations of the other Pocky products (e.g., Pocky Chocolate, etc.) encompassed by the Pocky product configuration trade dress. SUMF ¶ 68. And Glico itself admits that many of the functional benefits associated with the product configuration of Pocky Ultra Slim are also associated with the product configuration of Pocky Chocolate and all of the other products encompassed by the Pocky product configuration trade dress. SUMF ¶ 3.

That is not surprising because the only difference between Pocky Ultra Slim and those other Pocky products (e.g., Pocky Chocolate, etc.) is that the baked, uncoated portion of Pocky Ultra Slim has a cross-sectional width of approximately 3 mm, whereas the baked, uncoated portion of the other Pocky products such as Pocky Chocolate have a cross-sectional width of approximately 4 mm. SUMF ¶ 69. Indeed, Glico's expert testified ███████████████████████ ████████████████████████████████████████ (SUMF ¶ 68), which is immediately obvious by the photograph below depicting Pocky Chocolate on the top and Pocky Ultra Slim on the bottom.

21



### (iii) *The Pocky Product Configuration Results from Practicing the Methods in Glico's Utility Patent.*

The Pocky product configuration results from practicing certain methods in Glico's utility patent. SUMF ¶¶ 63-65 A product that necessarily results from a patented process is functional as a matter of law. *See, e.g., Dippin' Dots,* 369 F.3d at 1206 n. 10 (shape of ice cream bead "functional result" of plaintiff's patented process); *see also Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 119-120 (1938).

If one practices the claimed methods of Glico's utility patent, a stick-shaped snack—an "elongated, thin, straight, cylindrical rod-shaped biscuit"—which is partially coated "with more than half, but not all . . . with chocolate and/or a cream or cream-like coating, which fully covers and extends from one end of the biscuit over halfway to the other end but terminates short of the other end" will result. SUMF ¶¶ 2, 63. When comparing the Glico utility patent's figure of a "holding device" to coat the stick-shaped snacks to Glico's asserted Pocky product

22

configuration, it is indisputable that the Pocky product configuration results from the methods claimed and disclosed in Glico's utility patent:



| "Holding Device" Shown in Glico's Utility Patent | Pocky product configuration shown in Reg. No. 1,527,208 |
|---|---|

### b. *Glico's Japanese Utility Model Also Discloses Utilitarian Benefits of the Pocky Product Configuration.*

Shortly after launching Pocky in Japan, Glico obtained a Japanese Utility Model for a biscuit stick partially coated with chocolate. SUMF ¶ 41.

In Japan, a utility model is a "creation of a technical idea . . . but . . . limited to those involved in the shape, construction, or a combination thereof of goods." Catherine Sun, ed., *Intellectual Property Protection in Asia* § 5:16 (Matthew Bender). The Court should examine Glico's Japanese Utility Model for "claims and disclosures . . . [which] show the utilitarian advantages of the design sought to be registered as a trademark." *See Kohler Co. v. Honda Giken Kogyo K.K.*, 125

23

U.S.P.Q.2d 1468, 1478 (T.T.A.B. 2017) (admissions in Japanese utility model application demonstrated that trade dress was functional).

Glico's Japanese Utility Model contains numerous admissions establishing that the Pocky product configuration is functional. The Japanese Utility Model states that the partially coated biscuit stick was "**devised so that it can be easily eaten**." SUMF ¶ 42 (emphasis added). The uncoated portion of the biscuit stick "serves its so-called purpose as a handle, and **chocolate does not adhere to the hand**." SUMF ¶ 44 (emphasis added). Indeed, the "**elongated shape**" of the partially coated biscuit stick makes it easy to eat and "**very convenient**." SUMF ¶ 45 (emphasis added).

### 3.   Third-Party Utility Patents Show the Pocky Product Configuration is Functional.

Third-party utility patents also show that the Pocky product configuration is "essential to the use or purpose" of the product and "affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32-33. Third-party utility patents are evidence of functionality. *See, e.g., Jay Franco*, 615 F.3d at 857-58. Such patents do not need to "claim the exact configuration for which trademark protection is sought in order to undermine a [trade dress claimant's] assertion" that the claimed trade dress is functional. *In re Becton Dickinson*, 675 F.3d at 1375.

### (i)    *The "Pretzel Stick Snack Item" Patent*

24

Like the Pocky product configuration, the "Pretzel Stick Snack Item" patent, U.S. Reg. No. 6,242,021, discloses a partially coated stick-shaped snack which "can be held by the fingers of one hand and bitten off." SUMF ¶ 71.  The patentee stated that an object of the invention was "to provide a snack item which can be **conveniently held at one end by a consumer**, and the other, free end either bitten off or licked by the consumer." SUMF ¶ 72.

The Pretzel Stick Snack Item patent expressly claims an uncoated "handle": "the pretzel stick includes at least **one end portion extending outwardly** from the adjoining cereal rings. SUMF ¶ 73.  Glico's own proffered expert on functionality,

███████████████████████████████████████████████████████

██████████████████ SUMF ¶ 74 (Levine Rebuttal Report ¶¶ 68-70).

Again, "[p]atents serve as excellent cheat sheets because any design claimed in a patent is supposed to be functional." *Franek*, 615 F.3d at 857. Like the uncoated portion of the Pocky product configuration, the Pretzel Stick Snack Item patent includes "a handle" with the stated purpose of making the snack item easier to hold and consume. SUMF ¶¶ 71-75.  The useful purpose served by the handle claimed and disclosed in the Pretzel Stick Snack Item patent serves the **identical purpose** of the Pocky product configuration: to make the product easier to consume. See, e.g., SUMF ¶¶ 28, 42.

(ii)     <strong><em>The "Clean Finger" Patent.</em></strong>

Another third-party patent—Coated Edible Article with Holding Member to Prevent Finger Soiling, U.S. Patent No. 4,889,729 (the "Clean Finger patent")—is proof that the Pocky product configuration is ineligible for trade dress protection.

The Clean Finger patent "relates to a coated edible article which includes means by which the article can be held while being consumed without soiling the fingers. . . . The invention has application in a wide range of edible articles. . . which are comprised or are covered with a coating which melts when held in the hand and is subjected to body heat." SUMF ¶¶ 76-78. Objects of the invention specified in the Clean Finger patent include "a means for grasping the article **without soiling the fingers**." SUMF ¶¶ 79- 81 (emphasis added). This is one of the same purposes of the uncoated portion of the Pocky product configuration and is "equally strong evidence of functionality" of that feature. *See In re Becton, Dickinson & Co.*, 675 F.3d at 1375 (citing *TrafFix*, 532 U.S. at 32-33, 34-35).

*     *     *

The Pocky product configuration is not an arbitrary design—"it is the reason the [product] works" as an easily consumable, shareable, and portable snack, and it also affects the cost and quality of the product. *TrafFix*, 532 U.S. at 34. It is thus functional under the first test of functionality, and the Court should enter summary judgment in favor of Lotte, regardless of whether Lotte satisfies the second *TrafFix* test, discussed below. *See id.* at 32-34.

26

4. **Affording Trade Dress Protection to the Pocky Product Configuration Would Put Competitors at a Significant, Non-Reputation-Related Disadvantage.**

The Pocky product configuration is also functional under the second test of functionality. Giving Glico exclusive rights to a biscuit stick partially coated with chocolate or cream "would put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32.

"Granting a producer the exclusive use of a basic element of design (shape, material, color, and so forth) impoverishes other designers' palettes." *Jay Franco*, 615 F.3d at 860 (holding that a circular-shaped towel is functional as a matter of law). The Pocky product configuration is a thin biscuit stick partially coated in chocolate, which Glico itself recognized in its utility patent as being "conventionally known." SUMF ¶48; *see id.* ("[T]he more rudimentary and general the element [claimed as trade dress] . . . the more likely it is that restricting its use will significantly impair competition.").

If Glico is allowed exclusive rights in this basic shape, food manufacturers would be significantly impeded from competing in the biscuit stick market. *See* 3 Louis Altman, CALLMANN ON UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 19:7 (4th ed. 2003) ("the doctrine of functionality is intended to preserve competition within the narrow bounds of each individual product market"); *Dippin' Dots,* 369 F.3d at 1203 n.7 (rejecting argument that defendant could

27

simply make a differently configured ice cream—the defendant "does not want to compete in the ice cream business; it wants to compete in the *flash-frozen ice cream* business").

As the leading trademark scholar has stated, "no one seller should be able to monopolize as 'my trademark' a familiar and commonly used shape of a food item. For example, no one seller could claim the shape of a common ice cream cone as its trademark or an Easter rabbit made of chocolate as its trade dress." 1 MCCARTHY ON TRADEMARKS § 8:6.50 (5th ed.). Preventing competitors from selling a commonly-used shape like a stick that is partially coated in chocolate or cream affords Glico a non-reputational-related competitive advantage in the biscuit stick market and disadvantages its competitors. *See, e.g.*, *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 643 (6th Cir. 2002) (affirming summary judgment where trade dress rights in basic clothing designs "prevent[s] effective competition in the [casual clothing] market").

The Court should find that the Pocky product configuration is functional and grant summary judgment to Lotte on all of the counts Glico's Second Amended Complaint and Count 1 of Lotte's counterclaims. Because the Pocky product configuration trade dress is invalid, the Court should grant Count III of Lotte's counterclaims and cancel Glico's registrations for the Pocky product configuration. *See* 15 U.S.C. § 1119.

28

## II.    GLICO ABANDONED ANY TRADE DRESS RIGHTS IN THE POCKY PRODUCT CONFIGURATION THROUGH UNCONTROLLED LICENSING.

There is a second, independent reason why Lotte is entitled to summary judgment on Glico's claims: Glico abandoned any trade dress rights in the Pocky product configuration through its uncontrolled license with ███████████ ███████.[7]

Since ███████████, Glico has licensed ███████ to use the Pocky product configuration in the United States. SUMF ¶¶ 82-83. Under the ███████████ ███████ ("MLA"), ███████████████████████ bearing the Pocky product configuration have been sold throughout the United States. SUMF ¶ 92. Indeed, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

But it is undisputed that Glico has not controlled the quality of █████s licensed products. SUMF ¶¶ 95-100. In fact, it is undisputed that Glico has not communicated with ██████ about the licensed products in nearly two decades. SUMF ¶¶ 95-97.

-------

[7] A claim for trade dress infringement or unfair competition requires that plaintiff owns valid trade dress. *E.g.*, *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001); *Mycone Dental Supply Co. v. Creative Nail Design*, Civil Action No. 11-4380, 2012 U.S. Dist. LEXIS 116924, at *18 (D.N.J. Aug. 17, 2012) ("The elements of unfair competition under N.J.S.A. §56:4 and New Jersey common law are the same as those required under the Lanham Act.").

29

## A.   Glico Has a Duty to Control the Quality of ███████ Licensed Products.

A trademark licensor has a duty to control and supervise the quality of the licensed products. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823-24 (3d Cir. 2006). "Trademark law requires that decisionmaking authority over quality [of the licensed goods] remains with the owner of the [trade dress]." *Eva's Bridal Ltd. v. Halanick Enters.*, 639 F.3d 788, 791 (7th Cir. 2011). Otherwise, the licensor will be held to have abandoned its trade dress. *See, e.g.*, *Doeblers'*, 442F.3d at 823; *Eva's Bridal*, 639 F.3d at 790-91.

Although a license agreement that lacks quality control provisions is evidence of an uncontrolled (or "naked") license, *see, e.g.*, *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010), the law is well settled that even "mere paper control—a quality control provision in the license agreement **without actual control**—is insufficient." 2 GILSON ON TRADEMARKS § 6.04[4][b][i] (2018) (emphasis added). To avoid a finding of abandonment, a licensor must actually play a "meaningful role" in holding its licensee's products to a standard of quality. *See, e.g., Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc.*, 289 F.3d 589, 597-98 (9th Cir. 2002) (affirming summary judgment that mark was abandoned); *Amscan Inc. v. Shutter Shades, Inc.*, Case No. 13-cv-1112 (CS), 2015 U.S. Dist. LEXIS 180647, at *19 (S.D.N.Y. Apr. 30, 2015) (granting summary judgment to defendant).

30

Although Lotte bears a "high" burden of proof, *Doeblers'*, 442 F.3d at 824, Lotte easily meets that burden here by Glico's admissions and "the absence of evidence of quality control produced by [Glico] in response to [Lotte's] discovery requests or otherwise present in the record," *Amscan*, 2015 U.S. Dist. LEXIS 180647, at *19 n.14 (granting summary judgment).

**B.      Glico Has Failed to Control the Quality of ███████ Licensed Products.**

As shown below, the MLA lacks the hallmarks of quality control and, most importantly, Glico's conduct under the MLA proves as a matter of law that Glico plays no role, let alone a meaningful role, in holding the licensed goods sold under the MLA to a standard of quality.

**1.      Glico Has No Right to Control the Quality of ██████ Products Under the ████████**

On December 13, 1996, Glico and ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████



*See, e.g.*, *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 871 (10th Cir. 1995) (affirming summary judgment where agreement lacked quality control because it failed to give licensor an express right to inspect licensee's operations and gave licensee sole discretion in the design of the mark on products); *Amscan*, 2015 U.S. Dist. LEXIS 180647, at *15 (granting summary judgment where license did not permit licensor to dictate product specifications).

DM_US 155740580-2.097931.0011

██████████████████████████████████████ations. *See* SUMF ¶ 87.

*See, e.g., Halo Mgmt., LLC v. Interland, Inc.*, No. C-03-1106 MHP, 2004 U.S. Dist. LEXIS 15563, at *13-14 (N.D. Cal. Aug. 9, 2004) (a license that lacks "explicit or definite quality control terms" or "objective, enforceable terms [to] guide (or limit) [the licensee's] use of the mark" is a naked license).

███████████████████████████████████████████

███████████████████████████   SUMF ¶ 89. *See, e.g., Stanfield*, 52 F.3d at 871 (abandonment found as matter of law where license lacked express provision to "inspect or supervise [licensee's] operations in any way"); *Eva's Bridal*, 639 F.3d at 789-90 (naked license found where "written agreement . . . did not give the licensor any power of supervision over how the business was conducted"); *Halo*, 2004 U.S. Dist. LEXIS 15563, at *14 (same where "no express contractual right to inspect or to supervise [licensee's] conduct").[8]

Simply put, "no explicit or definite quality control terms appear anywhere in the two-page licensing agreement; no objective, enforceable terms guide (or limit)" ██████ use of the Pocky product configuration. *Halo*, 2004 U.S. Dist. LEXIS

---

[8] The MLA does require ███████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████ *See id.* Thus, this "inherently amorphous" provision places no "distinct or cognizable restriction" on the quality of the licensed goods and is not evidence of quality control. *Halo*, 2004 U.S. Dist. LEXIS 15563, at *14 (license requiring licensee to "employ reasonable commercial efforts to maintain positive business value" was uncontrolled on its face).

33

15563, at *15 (granting summary judgment). Indeed, there is no express provision

giving Glico the ████████████████████████████████████

████████████████████████████████████████

████████████████ SUMF ¶ 86. *See id.* at *14 (uncontrolled licensing where

license had no termination provision).

### 2.    Glico Has Played No Meaningful Role in the Quality of ████ Licensed Products.

Glico's admitted failure to control the quality of ████ licensed products

entitles Lotte to summary judgment.

Glico—by its own admission—has not communicated with ████ about the

licensed products since the effective date of the MLA. SUMF ¶¶ 95-97. In fact,

Glico has not communicated with ████ about anything relating to the MLA since

████ – nearly 20 years ago. SUMF ¶¶ 95-97. *See, e.g.*, *Stanfield*, 52 F.3d at 871

(naked license found where "no contact" after execution of license agreement);

*Halo*, 2004 U.S. Dist. LEXIS 15563, at *24-28 (two emails over six months

requesting to review samples of licensed products were "minimal efforts"

insufficient as a matter of law to show quality control); *First Interstate Bancorp v.*

*Stenquist*, No. C-89-4106 MHP, 1990 U.S. Dist. LEXIS 19426, at *11 (N.D. Cal.

July 13, 1990) (granting summary judgment where even "numerous [informal]

contacts" concerning the business fell short of the "supervision and inspection"

required by the licensor).

Glico has not and does not control the quality of ███████ licensed products. SUMF ¶¶ 98-100. The evidence is undisputed that Glico has never communicated with ████████████████████████████████████████████ that the MLA has been in existence. SUMF ¶ 100. Glico testified that ████████ ████████████████████████████████████████████ SUMF ¶¶ 94, 97. These substandard licensed products are sold in the same channels of trade as Pocky and on the same shelves as Pocky to this very day. SUMF ¶ 91. Nevertheless, Glico has not communicated the substandard quality of the licensed products to ██████ or requested a change in how the licensed products are manufactured, stored, or distributed. SUMF ¶ 97; *see Stanfield*, 52 F.3d at 871 (an uncontrolled license is "inherently deceptive" because consumers believe that the quality is being controlled by the licensor when in fact it is not).

In fact, since the effective date of the MLA, Glico has ████████████████ or its affiliate and cooperating companies for the sources of the raw ingredients or the recipes that are used to make licensed products. SUMF ¶ 99. Glico does not know whether or how those raw ingredients and recipes have changed during the decades that the MLA has been in effect. *Id.*

Glico has never inspected the facilities where the licensed products are manufactured and packaged. SUMF ¶ 89. Glico cannot even be sure of the parties (other than ██████) that have manufactured licensed products since the MLA took

35

effect ███████. SUMF ¶ 100. Glico does not know whether ████ or its affiliate and cooperating companies have engaged in quality control themselves in manufacturing the licensed products, let alone what any such quality control consisted of or how it has changed while the MLA has been in effect. *Id.*



Although the MLA ████████████████████████████. SUMF ¶ 98. The evidence is undisputed that Glico has ███████████████████████████████████████████████████████████████████. SUMF ¶ 97.

Even after filing this lawsuit, Glico has not attempted to control the quality of the licensed products or to secure evidence from ████ regarding any alleged quality control efforts by Glico. SUMF ¶¶ 97-100. *See, e.g.*, *Eva's Bridal*, 639 F.3d at 780 (granting summary judgment where licensor "had, and exercised, no authority" over licensee). It is undisputed that Glico has played absolutely no role, let alone a "meaningful role," in controlling the quality of the licensed products sold by ███████████████████████████████. *See, e.g., Barcamerica*, 289 F.3d at 597-98 (affirming summary judgment; licensor played

36

no "meaningful role . . . in holding the wine to a standard of quality – good, bad, or otherwise").

The Court should award summary judgment to Lotte on all of Glico's claims. *See, e.g.*, *Freecycle*, 626 F.3d at 516 (trade dress owner who abandoned rights is "estopped from asserting [those] rights" against alleged infringers). The Court should also grant summary judgment in favor of Lotte on Count III Lotte's Counterclaims, which seeks to cancel Glico's registrations on the ground of abandonment, and order the PTO to cancel those registrations.15 U.S.C. §§ 1064(3), 1119; *see, e.g.*, *Barcamerica*, 289 F.3d at 598.

## III.   GLICO WAITED DECADES TO BRING ITS CLAIMS.

In addition to Lotte's complete defenses of functionality and abandonment, the Court should also grant summary judgment in favor of Lotte based on laches dues to Glico's inexcusable delay in filing suit.

### A.   Legal Standard for Laches

"In the Third Circuit, laches will serve to bar both monetary and injunctive relief in the face of (1) an inexcusable delay in bringing suit which results in (2) severe prejudice to the party defending the claims brought against it." *Jt. Stock Socy. v. UDV N.A., Inc.*, 53 F. Supp. 2d 692, 712–13 (D. Del. 1999), *aff'd,* 266 F.3d 164 (3d Cir. 2001) (laches barred both Lanham Act and analogous state law claims). *Accord Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d

123, 138 (3d Cir. 2005). Laches bars both Lanham Act **and** analogous state law claims. *Jt. Stock Socy.*, 53 F. Supp. 2d at 712-13; *Am. Diabetes Assn. v. Friskney Fam. Tr., LLC*, 177 F. Supp. 3d 855, 883 (E.D. Pa. 2016) (granting summary judgment to defendant on state-law unfair competition claim based on laches).

The Lanham Act does not have a statute of limitations. Thus, to determine whether a plaintiff's delay in filing an infringement claim is inexcusable, courts look to the most analogous state statute of limitations. *Santana*, 401 F.3d at 135. Here, Glico alleges claims for infringement and unfair competition arising under the Lanham Act and state law. *See* Dkt. 102. These claims are properly analogized to New Jersey's six-year fraud statute of limitations. *See, e.g., Kaufhold v. Caiafa*, 872 F. Supp.2d 374, 379 (D.N.J. 2012). The six-year period runs "from the time that [Glico] knew or should have known about its potential cause of action." *N.J. Physicians United Reciprocal Exch. v. Privilege Underwriters, Inc.*, No. 15-6911, 2016 U.S. Dist. LEXIS 143745, at *9 (D.N.J. Oct. 18, 2016).

The Third Circuit holds that, "[o]nce the statute of limitations has expired, **the defendant enjoys the benefit of a presumption of inexcusable delay and prejudice**." *Santana*, 401 F.3d at 138 (emphasis added); *accord Am. Diabetes Assn.*, 177 F. Supp. 3d at 883 (presumption of laches triggered as to unfair competition claim because delay exceeded applicable statute of limitations). When the presumption arises, the plaintiff must prove *both* that the delay was excusable,

38

*and* that the delay did not prejudice the defendant. *Santana*, 401 F.3d at 138-139. Otherwise, the court must award summary judgment to the defendant. *See, e.g.*, *id.*; *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 827 (7th Cir. 1999) (affirming summary judgment for defendant in a Lanham Act case based on laches); *Am. Diabetes Assn.*, 177 F. Supp. 3d at 883 (same—state law unfair competition claim).

### B.    Laches Bars Glico's Claims.

As shown below, the undisputed evidence of Glico's decades-long delay creates a presumption that Glico's claims are barred by laches. Glico cannot rebut that presumption. Thus, the Court should enter summary judgment for Lotte on all counts in Glico's Second Amended Complaint and on Count V of Lotte's counterclaims.

### 1.    Glico's Claims Are Presumptively Barred

It is undisputed that Glico had actual knowledge since at least ███████ that Lotte was selling Pepero in retail stores in the United States. SUMF ¶ 133. █ ███████████████████████████████████████████████ SUMF ¶¶ 135-140. Glico knew in at least 1995 and every year thereafter that Lotte continued to sell Pepero in the United States despite receipt of Glico's letters. SUMF ¶¶ 143. Yet, Glico did not contact Lotte again about this matter until it filed this action in July 2015, more than 21 years after its last letter to Lotte in May 1994. SUMF ¶ 141.

39

Glico's delay in filing suit—whether measured from ███████████

███—is more than three times longer than the analogous New Jersey statute of

limitations of 6 years. Thus, Glico's claims are presumptively barred by laches.

Unless Glico can create genuine disputes of material fact that (i) its delay was

excusable **and** (ii) that Lotte was not prejudiced by the delay, the Court must grant

summary judgment to Lotte. *See, e.g.*, *Santana*, 401 F.3d at 139-140 (reversing

with instructions to enter summary judgment against plaintiff in a Lanham Act

case because it failed to create a genuine factual issue that its delay was excusable).

### 2. Glico's Delay Was Inexcusable.

Glico cannot meet its burden to prove that its decades-long delay in bringing

suit was excusable.

### a. *Glico's decades of silence following its demand letters signaled that it would not sue.*

Based on its August 13, 2018 letter to Magistrate Judge Wettre (Dkt. 212 at

8-9), Glico may argue that the cease and desist letters ███████████████

███████████████ tolled the laches period and render its delay

excusable. But there is no merit to any such argument.

After ██████████████ Glico did not contact Lotte again until more

than 21 years later when it filed this suit in July 2015. SUMF ¶ 139. ██████████

████████████████████████████████████████████

████████████████████████████████████████████

40

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ SUMF ¶ 137. But Pepero sales continued with Glico's actual knowledge for more than two decades before Lotte heard from Glico again in 2015 when Glico filed this action. SUMF ¶ 143.

Therefore, contrary to Glico's possible contention, Glico's letters did not put Lotte on notice of infringement and toll the laches period. Rather, if anything, Glico's letters followed by Glico's two decades of silence in the face of continuous Pepero sales served only to convey the message that Glico had effectively withdrawn its infringement claim and would **not** sue. *See, e.g.*, *H.G. Shopping Centers, L.P. v. Birney*, H-99-0622, 2000 WL 33538621, at *8-9 (S.D. Tex. Nov. 29, 2000) (summary judgment for defendant in Lanham Act case; plaintiff's failure to sue until 20 years after demand letter created impression that plaintiff had withdrawn claim and would not sue); *S. Texas Neon Sign Co., Inc. v. Ixtapa, Inc.*, 5:08-CV-116, 2009 WL 10695794, at *9 (S.D. Tex. Aug. 14, 2009) (same – seven years between demand letter and filing of suit).

Glico cannot rebut the presumption of inexcusable delay. *See Santana*, 401 F.3d at 139. Glico has no evidence that it pursued settlement negotiations with Lotte or otherwise followed up on its letters between ███████████████████ and the launching this suit in July 2015, more than 21 years later. SUMF

41

¶¶ 141-143. *See Hot Wax,* 191 F.3d at 824 (affirming summary judgment for defendant in Lanham Act case—"Hot Wax's sparse letter writing campaign can hardly be characterized as a serious attempt to resolve its concerns regarding Turtle Wax's products and advertising.").

> **b.**  *The doctrine of progressive encroachment does not excuse Glico's delay.*

Based on its August 13, 2018 letter to the Court (Dkt. 211 at 9), Glico may argue that its decision to wait decades to file this lawsuit was excusable under the doctrine of progressive encroachment.[9] There is no merit to this argument.

Progressive encroachment can affect the scope of injunctive relief if a defendant redirects its business to compete with the plaintiff. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1110 (9th Cir. 2006). But the doctrine does not apply if defendant's product *always* competed with plaintiff's product. *Wisconsin Cheese Grp, Inc. v. V & V Supremo Foods, Inc.*, 537 F. Supp. 2d 994, 1003 (W.D. Wis. 2008). "A junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Id.* at 1002; *Tillamook*, 465 F.3d at 1110.

Glico's attempt to excuse its delay under the doctrine of progressive encroachment would be futile. Pepero has competed with Pocky from the moment

---

[9] As Glico has conceded, the Third Circuit has not adopted to the doctrine of progressive encroachment. *See* Dkt. No. 212 at 9 n.3.

DM_US 155740580-2.097931.0011

Pepero was first sold in the United States in 1987. Indeed, Pepero and Pocky have been sold on the **same shelves** in the **same stores** to the **same class of customers** since the 1980s. SUMF ¶¶ 103, 106, 108.   Glico itself ███████████████

████████████████████████████████████████████████

████████████████████████. SUMF ¶ 133.

Nor can Glico, as it also suggested in its letter to Magistrate Judge Wettre, excuse its delay by showing that Lotte's Pepero business only became substantial in the last few years. ████████████████████████████████████████

████████████ SUMF ¶¶ 128-129. Lotte's Pepero sales continued to grow gradually in the 2000s, ██████████████████████which is still over six years before Glico sued in 2015. Id. Lotte's Pepero sales were significant for decades before Glico brought this case and Lotte's natural growth over that time cannot constitute progressive encroachment as a matter of law. *See Tillamook,* 465 F.3d at 1110 (summary judgment to defendant—meat company's decision to start selling products in supermarket was not "progressive encroachment," but instead natural growth of business).

Glico can point to no evidence to satisfy its burden to prove that its decades-long delay is excusable. In reality, Glico watched for decades as Lotte built its Pepero business and now Glico seeks not only treble the profits that Lotte made from that business but also an injunction to destroy that business. That is

manifestly inequitable, as the Third Circuit explained long ago in denying monetary and injunctive relief to a plaintiff in a Lanham Act case:

> It cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished.

*Anheuser-Busch, Inc. v. Du Bois Brewing Co.*, 175 F.2d 370, 375 (3d Cir. 1949).

### 3.   Lotte Has Suffered Economic and Evidentiary Prejudice.

Glico also cannot meet its burden to prove that Lotte has not been prejudiced by Glico's decades-long delay in filing suit. Because Glico's delay exceeds six years, Lotte is presumed to have suffered prejudice from it. *See, e.g.*, *Santana*, 401 F.3d at 138. Thus, to avoid dismissal of its claims based on laches, Glico must show that its delay did **not** prejudice Lotte. *See id.* Prejudice may be "economic **or** evidentiary." *Jt. Stock Socy.*, 53 F. Supp. 2d at 717 (emphasis in original).

#### a.   *Lotte Suffered Economic Prejudice*

"Economic prejudice arises when a defendant will **either** lose the significant monetary investments it made in a product or project over time **or** incur significant monetary penalties as a result of conduct which could have been altered by an earlier lawsuit." *Jt. Stock Socy.*, 53 F. Supp. 2d at 717 (emphasis in original). Economic prejudice is shown by evidence that the defendant invested resources in advertising and promoting its products under the disputed mark during the delay, thus increasing its sales. *Id.* (finding such evidence sufficient to show economic

44

prejudice). Alternatively, evidence that plaintiff's delay has exposed defendant to increased damages is independently sufficient to show economic prejudice. *Id.*

### (i) *If Enjoined, Lotte Will Lose the Benefits of the Investments it Made in Pepero in the United States.*

Between 1987 and 2015, Lotte Confectionary and, later, Lotte America gradually grew the marketing and sales of Pepero in the United States. In 2000, Lotte America, a U.S.-based company, took up the business of marketing and distributing Pepero in the United States—work that had previously been performed by third-party distributors. SUMF ¶ 113. In the 2000s, as Lotte America dedicated more and more resources to market Pepero to distributors, sales of Pepero grew and Pepero became Lotte America's second-best selling product. SUMF ¶ 116, 119.

In 2006, Pepero's growing popularity caused another large investment: Lotte America expanded its business from selling solely to wholesalers to selling to both wholesalers and retailers. SUMF ¶ 118. Lotte America moved its operations to the West Coast to facilitate expansion to retailers there, leased a warehouse, and began to sell Pepero and other snacks directly to retail customers and smaller distributors. SUMF ¶ 118. At the same time, Lotte America retained an employee on the East Coast to manage its robust wholesale business to its existing customers. SUMF ¶121.

DM_US 155740580-2.097931.0011

Pepero's popularity grew through the decades as Lotte America promoted Pepero to consumers and expended significant employee time and resources to develop new customers. SUMF 122-127. Lotte America has expended hundreds of thousands of dollars to promote Pepero since 2000, and has introduced hundreds of thousands of new customers and consumers to the product. Id.

Lotte's decades of investment and promotion has paid off: Over that time, Lotte Confectionary has ███████████████████████ from sales of Pepero in the United States, excluding sales made to Lotte America. SUMF ¶ 129. In the time Lotte America has sold Pepero (2000 to present), ███████████████ ██████ SUMF ¶ 128. This investment would be lost if Lotte is enjoined from selling Pepero in the U.S. *See, e.g. Jt. Stock Socy.*, 53 F. Supp. 2d at 717 (summary judgment for defendant based on economic prejudice); *FMC Corp. v. Guthery*, CIV A 07-5409, 2009 WL 1033663, at *5 (D.N.J. Apr. 17, 2009) (same); *Wisconsin Cheese*, 537 F. Supp. 2d at 1004 (same—"investment of resources, coupled with increased sales, properly constitutes economic prejudice as a matter of law").

Indeed, an injunction would jeopardize Lotte America's entire snack business. Pepero's popularity allows Lotte America to get its foot in the door with many retailers who otherwise would not be interested in stocking Lotte snack products. SUMF ¶ 130. Without Pepero, those retailers will likely stop selling

46

Lotte snacks altogether. *Id.* Moreover, the loss of Pepero would make it cost-prohibitive to ship other snack items from Korea to the U.S. as Lotte America would be unable to order enough product to fill the overseas shipping containers. SUMF ¶ 131-132. An injunction against the sale of Pepero would thus cause enormous damage to Lotte America, who would be forced either to import partially-empty containers from Korea at a significant loss or to shutter its snack business altogether with the accompanying loss of revenues and employees. *Id.*

      **(ii)**     ***Lotte Faces Substantially Increased Monetary Exposure Due to Glico's Decades of Delay.***

Lotte's revenues from sales of Pepero in the United States from 2009 (6 years prior to the filing of the Complaint) through 2017 ███████████████████ ███████████ which Glico seeks in damages. By comparison, Lotte's revenues from the sale of Pepero from 1987 until March 1989 when Glico obtained actual knowledge of the alleged infringement ████████████████████████ ███████████████████████████████████████████████████████ ████████ Glico cannot rebut the extreme economic prejudice in the form of substantially increased monetary damages exposure that Lotte has suffered on account of Glico's delay in filing suit.

      **b.**     ***Lotte Suffered Evidentiary Prejudice .***

Glico also cannot show that Lotte has not suffered evidentiary prejudice from Glico's delay. "Evidentiary prejudice arises when a defendant cannot 'present

a full and fair defense on the merits due to the loss of records, the death of witnesses, or the unreliability of memories of long past events.'" *Jt. Stock Socy.*, 53 F. Supp. 2d at 717 (finding evidentiary prejudice on summary judgment where witnesses with knowledge about the parties' respective rights were unavailable) (quoting *Wanlass v. General Elec. Co.,* 148 F.3d 1334, 1337 (Fed.Cir.1998)).

Lotte has suffered extreme evidentiary prejudice from Glico's delay. Lotte Confectionary personnel who created Pepero back in the early 1980s are no longer employed by Lotte and are unavailable. SUMF ¶ 101. Many documents regarding the creation of Pepero have been discarded in the ordinary course of business. SUMF ¶ 101. Thus, Lotte cannot explain how Pepero was initially created over 35 years ago in Korea, and cannot properly defend against Glico's accusations that it copied the Pocky product.

Further, no person at Lotte has any knowledge ████████████████ ████████████████████████████████████████████████ nor what, if any, actions were taken as a result of those letters. SUMF ¶ 141-142. Indeed, no person employed by Lotte was even aware of the existence of those letters prior to Glico's production of them during discovery, and Lotte has no documents regarding this matter. SUMF ¶ 141-142. Thus, Lotte cannot fully defend itself against Glico's assertion that it disregarded Glico's trademark rights after receipt of Glico's cease and desist letters.

In addition, Lotte no longer has complete records documenting its sales and marketing of Pepero in the United States in the 1980s and 1990s, and thus cannot prove, for example, the full extent and scope of its sales of Pepero to show the extent to which Glico's two-decade delay in filing suit has prejudiced Lotte. SUMF ¶¶ 109-111.

Furthermore, **Glico's** witnesses with knowledge about Pepero sales in the United States during the 1980s and 1990s are now unavailable or their memories of those facts completely faded. Most critically, ███████████████████████ ████████ ████████████████████████████████ ████ s unavailable. SUMF ¶ 134. ████████ likely had actual knowledge of the Pepero sales back to 1987, earlier than the ██████ that Glico claims it first learned of such sales. *See id.* ████████████████████████████ and likely had knowledge about the nature and scope of Pepero sales, the communications between Glico and Lotte in ████████ relating to the dispute, and the reasons why Glico did not sue Lotte in the 1980s or 1990s. *See id.* Indeed, many of Glico's employees who once had knowledge of the sales of Pepero in the U.S. in the 1980s and 1990s are unavailable or their memories relating to such sales have become badly faded over the course of the last 30 years that Lotte has been selling Pepero in the United States. *Id.*

These gaps in information caused by Glico's decades-long delay constitute evidentiary prejudice as a matter of law. *See, e.g.*, *Jt. Stock Socy.*, 53 F. Supp. 2d at 717; *FMC Corp.*, 2009 WL 1033663, at *5 (evidentiary prejudice found because key witness and documents were no longer available); *Kepner-Tregoe, Inc. v. Exec. Dev., Inc.*, 79 F. Supp. 2d 474, 490 (D.N.J. 1999), *aff'd*, 276 F.3d 577 (3d Cir. 2001) (same where evidence regarding key events including how the allegedly infringing material was created was no longer available); *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 1096, 1118 (N.D. Cal. 2008) (same where defendant's financial records regarding its sales and marketing of the disputed mark had become unavailable).

Again, Glico's claims are presumptively barred due to its decades-long delay. Glico cannot overcome that presumption, and the Court should award summary judgment in favor of Lotte on all of Glico's claims and on Count V of Lotte's Counterclaims.

## **CONCLUSION**

For the foregoing reasons, Lotte asks that its Motion for Summary Judgment be granted.

Dated: September 21, 2018                Respectfully submitted,


                                         /*Riley T. Orloff*/_____
                                         Riley T. Orloff (N.J. Bar No. 128672015)
                                         MCDERMOTT WILL & EMERY LLP
                                         340 Madison Avenue
                                         New York, NY 10173-1922
                                         Email: rorloff@mwe.com
                                         Tel: 212.547.5683
                                         Fax: 212.547.5444

                                         /John J. Dabney/_____
                                         John J. Dabney (admitted *pro hac vice*)
                                         Mary Hallerman (admitted *pro hac vice*)
                                         Katie Bukrinsky (admitted *pro hac vice*)
                                         Rebecca Duttry (admitted *pro hac vice*)
                                         MCDERMOTT WILL & EMERY LLP
                                         500 North Capitol Street, N.W.
                                         Washington, D.C. 20001
                                         Email: jdabney@mwe.com
                                         Tel: 202.756.8000
                                         Fax: 202.756.8087
                                         *Attorneys for Defendants/Counterclaimants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon the following counsel of record via email on this 21st day of September, 2018:

Roy H. Wepner, Charles P. Kennedy, Natalie S. Richer
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Email: rwepner@lernerdavid.com; ckennedy@lernerdavid.com;
nricher@lernerdavid.com

Steven Levitan
HOGAN LOVELLS US LLP
4085 Campbell Avenue, Suite 100
Menlo Park, CA 94025
Email: steve.levitan@hoganlovells.com

Birte Hoehne Mahyera
HOGAN LOVELLS US LLP
3 Embarcadero Center, Suite 1500
San Francisco, CA 94111
Email: birte.hoehne-mayhera@hoganlovells.com

Aaron S. Oakley, Katherine Nelson
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
E-mail: aaron.oakley@hoganlovells.com,
Katherine.nelson@hoganlovells.com

Anna Kurian Shaw, Katherine Bastian Phillips, Lauren B. Cury
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Email: anna.shaw@hoganlovells.com, katherine.bastian@hoganlovells.com,
lauren.cury@hoganlovells.com

s/<i>Mary D. Hallerman</i>