Riley T. Orloff (RO4865)
McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173-1922
rorloff@mwe.com

John J. Dabney (admitted *pro hac vice*)
Mary D. Hallerman (admitted *pro hac vice*)
Katie Bukrinsky (admitted *pro hac vice*)
Rebecca H. Duttry (admitted *pro hac vice*)
McDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
jdabney@mwe.com, mhallerman@mwe.com,
kbukrinsky@mwe.com, rduttry@mwe.com

*Attorneys for Defendants/Counterclaimants*
*Lotte International America Corp. and*
*Lotte Confectionery Co., Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EZAKI GLICO KABUSHIKI KAISHA, d/b/a EZAKI GLICO CO., LTD., and EZAKI GLICO USA CORPORATION, | : : : |
| | : : Civil Action No. 15-5477-MCA-LDW |
| Plaintiffs/Counterdefendants. | : |
| | : District Judge Madeline Cox Arleo |
| v. | : |
| | : Magistrate Judge Leda Dunn Wettre |
| LOTTE INTERNATIONAL AMERICA CORP. and LOTTE CONFECTIONERY CO. LTD. | : : : |
| | : |
| Defendants/Counterclaimants. | : |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# I. THE POCKY PRODUCT CONFIGURATION IS FUNCTIONAL

## A. The Pocky Product Configuration Trade Dress

1. Glico claims trade dress in a biscuit stick partially coated with chocolate or cream, and in some cases, crushed almonds (the "Pocky product configuration"). Glico owns two relevant trademark registrations for its configuration:

| Reg. No. | Registered Configuration | Glico's Description of the Configuration | Goods |
|---|---|---|---|
| 1,527,208 |  | "The mark comprises an elongated rod comprising biscuit or the like, partially covered with chocolate." | "Chocolate covered candy stick" |
| 2,615,119 |  | "The mark consists of the configuration of the applicant's goods, which are biscuit sticks, covered with chocolate or cream and almonds." | "Biscuit stick partially covered with chocolate or cream in which are mixed crushed pieces of almond." |

Dkt. 102 at Exs. 1, 3. Glico filed the application for the configuration shown in Registration No. 1,527,208 on December 16, 1987, which was later registered on February 28, 1989. *Id.* Ex. 1. Glico filed the application for Registration No.

2,615,119 on October 10, 2001, and it registered on September 3, 2002. *Id.* at Ex. 3.

    2.    Glico has defined its Pocky product configuration trade dress as:

    (1)  An elongated, thin, straight, cylindrical rod-shaped biscuit;

    (2) With more than half, but not all, of the biscuit coated with chocolate and/or a cream or cream-like coating that fully covers from and extends from one end of the biscuit over halfway to the other end but terminates short of the other end;

    (3) With the coated portion of the biscuit having a rounded end;

    (4) And the uncoated portion having a generally flat end.

Exhibit 1 (Glico Response to Lotte America Revised Rog. No. 6). With respect to its Pocky Almond Crush product, Glico defines the Pocky product configuration the same way, except with the addition of "almond pieces" to the coated portion of the biscuit stick. *Id.*

    3.    The Pocky product configuration trade dress as defined by Glico in this case encompasses a variety of Pocky products, including Pocky Chocolate and Pocky Ultra Slim. *See, e.g.*, Exhibit 2 at EZAKI0004790:



4.      All of the Pocky products depicted here, including the Pocky Chocolate product (the first product shown in the picture) and Pocky Ultra Slim (the second product shown below) are encompassed by the Pocky product configuration trade dress as defined by Glico in this case. Here is a photograph depicting a Pocky Chocolate stick and a Ultra Slim Pocky Chocolate stick:



4

Exhibit 3.



7.      In fact, Glico's functionality expert, Dr. Leon Levine, does not dispute



Exhibit 6 (Levine Deposition) 160:15-161:2. The Pocky product

configuration is  7

(Latella Deposition) 276:14-277:4.



5

### 1.    The Pocky Handle

9.    ████████████████████████████████████████

████████████████████████████████.   Exhibit 6 (Levine Dep.)

100:10-101:13.

10.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

11.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

12.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

6

DM_US 155760680-2.097931.0011

13. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

14. ██████████████████████████████████████

████████████████████████████████

15. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

16. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████

17. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

7

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

### 2.    The Coating

18.   ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

█   ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

### 3.    "Thin, Straight, Elongated Rod-Shaped, Stick"

20.   ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

8

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████

21.   ███████████████████████████████

███████████████████████████████████████████

████████

██   ███████████████████████████████████

█████████████████████████

**4.   Rounded Coated End**

23.   The Pocky product configuration's rounded , coated end which Glico

claims as a feature of its trade dress ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

**5.   Flat Uncoated End**

24.   ███████████████████████████████

███████████████████████████████████████████

████████████████████████████

**B.   Glico has Admitted the Pocky Configuration is Functional**

25.   ███████████████████████████████

███████████████████████████████████████████

9

26.

10

11

██████████████████████████████████████████

██████████████████████████████████████████

█████████████

### C. Glico's Advertising Touts the Functional Aspects of the Pocky Configuration

29.     Glico touts the Pocky product configuration as ████████████

██████████████████████████████████████████

█████   Glico advertises its Pocky product configuration as an "innovation." Exhibit 17 (website capture of Glico website in 2016); *see also, e.g.*, Exhibit 18 (Glico website).

30.     ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

12



31.     Glico promotes the "convenient design" and "tiny" size of the Pocky product configuration in its advertising of Pocky, including to retailers. *See,.e.g*, Exhibit 20 (Pocky advertising).

32.

33.     Glico touts the "convenient design" and "tiny" size of the Pocky product configuration in its promotion of Pocky, including to retailers. *See,.e.g*, Exhibit 20. The design is well-suited to easy-to-carry packaging, which Glico also promotes in its Pocky advertisements. *See, e.g.*, Exhibit 21.

13

34. Glico has promoted that the Pocky configuration allows many Pocky sticks to be "packed close together" in a "compact box" meaning the quantity in the box is suitable for sharing. See, e.g., Exhibit 19 at EZAKI0151761-62.

35. Glico advertises Pocky on its web sites as:

- Having a "no-mess handle"

- An "easy-to-handle stick that keeps chocolate off your hands"

- "The snack with a 'handle'"

- "A simple, yet innovative idea of leaving a portion uncoated"

- "Easy to 'handle'"

- "[I]n the beginning[,] . . . hand-dipped in chocolate, leaving one end of the stick (the 'handle') bare

Exhibit 9 (Glico's Resp. to Lotte America's RFA 11, 14, 17, 20, 23, 26, 29, 32, and 35).

36. In addition to expressly referring to the uncoated portion of the Pocky product configuration as the "handle," Glico shows the Pocky products being held by the uncoated portion in its advertising. *See, e.g.*, Exhibit 21:

14



*See also* Exhibit 22.

37.    Glico also promotes the thin width of its Pocky product configuration, touting the "snap" produced when broken or eaten. Exhibit 21:



38.    To this day, Glico promotes useful benefits of the Pocky product configuration on its website, such as:

15

> Great to have around the house. With the no mess handle of the Pocky stick, your kids won't have chocolate all over their hands.

> With plenty of sticks in each box, Pocky is the perfect snack for bringing people closer together and livening the mood. Or simply relax on the couch and share Pocky with that special someone.

Exhibit 23 (Glico website – "About Pocky").

39.



40.     Glico packages Pocky so that the uncoated portion is at the top of the package when opened, as shown below (Exhibit 26 (Glico website – "Pocky share happiness" page):

16



*See also* Exhibit 27.

### D. Glico's U.S. Utility Patent and Japanese Utility Model Reveal that the Pocky Product Configuration is Functional.

#### 1. Utility Model

41.     In 1966, the same year Pocky made its debut in Japan, Glico applied to register a Japanese Utility Model for a "Biscuit Coated With Chocolate." Exhibit 28. Glico's applied-for invention, depicted below, was eventually registered (Reg. No. 903255). *See id.*; Exhibit 9 (Glico Resp. to Lotte America RFA No. 76). The registration has since expired. Exhibit 9 (Glico Resp. to Lotte America RFA No. 77).



42.    Glico described the invention as a "chocolate covered biscuit, concerned with an invention relating to an improvement of a so-called finger biscuit, where in the surface of the biscuit is coated with chocolate so that it is difficult be separates, and moreover, **is devised so that it can be easily eaten**." Exhibit 28 at EZAKI0182365.

43.    Glico's claimed invention included "a construction of a chocolate coated biscuit, wherein biscuit part A forms an extreme **elongated column shape** . . . and is further **coated** with chocolate C so that **one part** D thereof exposes this biscuit part A." *Id.*

44.    As described in Glico's Japanese Utility Model, the exposed biscuit part "serve its so-called purpose as a handle, and chocolate does not adhere to the hands." *Id.*

18

45.     Glico represented that the "**entire shape**" of the chocolate covered biscuit enabled it to be "**easily eaten**," and it was "**very convenient**." *Id.*; *see* Exhibit 6 (Levine Dep.) 172:18-21; 173:5-15).

46.     Glico's functionality expert, Dr. Leon Levine, admitted that Glico's Japanese Utility Model ███████████████████████████████████████

███████████████████████████████████████████████ Exhibit 6 (Levine Dep.) 187:8-24).

### 2.     Utility Patent

#### a.     Prosecution of Glico's Patent Application

47.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

48.     In its application, Glico conceded that "stick-shaped snacks, such as stick-shaped pretzels, composite snacks prepared by coating such stick-shaped snacks with chocolate or the like, etc., are **conventionally known**." Exhibit 29 at LCON00009967. Glico further noted that these "conventionally known" snacks are generally "produced by holding one end of baked stick-like shaped dough with a clip or like holder, and immersing the other end of the baked stick-like shaped dough into a container of liquid chocolate, etc." *Id.*

19

49.     Glico recognized that problems can occur in the production of stick-shaped snacks—namely, that the ends of the baked stick-shaped snacks become "warped and deformed, making it difficult to produce straight stick-shaped snacks." *Id.* at LCON00009967-LCON00009968. As stated in Glico's utility patent application, these warped and deformed ends leads the holder of baked-stick shaped snack when coating the product to not be able to "firmly hold the baked shaped dough, resulting in production problems such as the baked shaped dough rotating or dropping during the coating operation." *Id.* at LCON00009968.  Glico's sought patent protection for its solution to these problems: a "**straight** stick-shaped snack and a method for producing same." *Id.*

50.     The Pocky product configuration created by methods claimed in Glico's utility patent results in a biscuit stick with a "maximum cross-sectional width of 2.5 to 3.5 mm [that] are thinner than conventional stick-shaped snacks, and thus are **very easy to eat** and have an enjoyable new texture, encouraging consumers to buy them." *Id.* at LCON00009973.

51.     ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

52.     As explained in Glico's utility patent application, the straight stick-shaped snacks enable efficient alignment of the straight stick-shaped snacks for

DM_US 155760680-2.097931.0011

coating. "[I]f the stick-shaped pastries are warped, the stick-shaped pastries are difficult to roll, thus making it difficult efficiently receive the stick-shaped pastries in the slots and thereby align the same." Exhibit 29 at LCON00009975.  If the stick-shaped snacks are **straight**, however, "the above problem can thus be reliably avoided," and a conveyer can align the stick-shaped snacks at regular intervals in preparation for coating (*Id.* at LCON00009975, LCON00009982):



53.     After aligning the straight stick-shaped snacks, the patent application discloses and claims a coating step, whereby the aligned straight stick-shaped snacks are coated in chocolate or other coating. *Id.* at LCON00009974-LCON00009975. The straightness of stick-shaped snack allows the holder of the straight stick-shaped snacks to "firmly hold one end of each of the stick-shaped pastries" so that they do not "rotat[e] or drop[] from the holder, thus enabling the efficient production of stick-shaped snacks coated with a coating material." *Id.*

21

54.     As explained in Glico's patent application, the straightness of the stick-shaped snacks also reliably avoids the inconvenience of the alignment of the stick-shaped pastries failing during the coating step, thereby causing the sticks to become "joined via the coating material." *Id.* at LCON00009975. The straightness of the stick-shaped snack "make[s] it possible to efficiently produce stick-shaped snacks coated with a coating material." *Id.*

55.     The coating of the stick-shaped snack with a coating material makes it possible to produce a thin stick-shaped—even as thin as 2.5 to 3.5 mm –that is strong and does not easily break. *Id.* at LCON00009976.

56.     Glico's utility patent application contained three claims, only one of which expressly included a specification of a maximum cross-sectional width:

> Claim 1:  "A method for producing a stick-shaped snack from a string-like dough . . . the method comprising, a cutting step of cutting the baked string-like dough at the cuts to thereby form stick-shaped pastries."
>
> Claim 2: "A method for producing a stick-shaped snack according to claim 1, further comprising, after the cutting step, a coating step of coating at least part of the stick-shaped pastries with a coating material."
>
> Claim 3: "A stick-shaped snack comprising a stick-shaped pastry and a coating material over the surface of the stick-shaped pastry . . . the maximum cross-sectional width of each stick-shaped pastry being 2.5 mm to 3.5 mm."

*Id.* at LCON00009977.

22

57.    In response to office actions from the PTO rejecting Claim 1 as obvious, Glico later amended Claim 1 to refer to "forming stick-shaped pastries having a maximum cross-sectional width of 2.5 mm to 3.5 mm." Exhibit 30; Exhibit 31.

58.    At a later point in prosecuting its patent application, Glico responded to an office action rejecting Claim 2, the coating step, by amending its application to include new dependent claims which specifically included "aligning" and "coating" steps that would result in coating a portion of the straight stick-shaped snack by holding one end of the stick-shaped snack. Exhibit 32 at LCON00009650:

> New dependent claims 9, 10, 13, 14, 18 and 19 further define <u>the rolling step includes rolling the solid dough between rollers while gradually reducing the distance between the rollers, an aligning step and that the coating step includes holding one end of the stick-shaped pastry while immersing the other end of each stick-shaped pastry in the coating material.</u> These aspects of applicants claimed invention are described in applicants' specification at page 4, line 27 to page 5, line 2; page 8, line 24 to page 9, line 4; and elsewhere.

59.    The patent examiner, too, rejected these claims as obvious, in light of prior art, and Glico appealed the rejection to the Board of Patent Appeals and Interferences. Exhibit 33. Glico argued that its invention was not obvious by linking the need for **<u>straight</u>** sticks—specifically, straight ends—to the coating step. *Id.* at LCON00009686. In the prior art, "warped and bent ends cannot be held

23

by a holder for further processing such as applying an additional chocolate coating . . . The Appellants discovered a method of making stick-shape snacks that are straight and not bent or warped at the ends thereof, thereby avoiding the problems of the conventionally made stick-shaped snacks." *Id.*

60.    Glico further argued that there was a "long felt but unresolved need" for "forming straight (i.e., warped and deformed) baked dough products." *Id.* at LCON00009702. Glico advocated that its invention was an improvement and worthy of patent protection:

> In the Specification, Appellants explain the difficulties in the prior art of forming straight (i.e., not warped and deformed) baked dough products having the thickness and width dimensions required in the claims on appeal (Spec. p. 1, l. 35 to p. 2, l. 3). In addition, the prior art stick-shaped snacks having warped and bent ends are difficult to further process, resulting in production problems such as the baked sticks rotating and dropping during a coating operation (Spec. p. 2, ll. 4-10). The invention claimed on appeal solves this long felt but unresolved need and failures of others in the past and therefore is patentable.

61.    Eventually, after additional office actions from the examiner and responses by Glico advocating that its applied-for claims were worthy of patent protection, the PTO issued Glico a registration, U.S. Patent No. 8,778,428, for "Stick-Shaped Snack and Method for Producing the Same." Exhibit 34.

### b.    Patent Claims

24

62.    In addition to all of the statements by Glico above in the patent application, *see supra* SUMF ¶¶ 49-61, the utility patent issued to Glico encompassed fourteen claims, including the following:

- <u>Claim 1</u>: "A method for producing a stick-shaped snack," using string-shaped dough of an unspecified width, "forming stick-shaped pastries having a maximum cross-sectional width of 2.5 mm to 3.5 mm," as further detailed in the patent;

***

- <u>Claim 5</u>: "A method for producing a stick-shaped snack," using string-shaped dough having a width of 2mm to 3 mm and resulting in stick-shaped pastries of an unspecified width, as further detailed in the patent.

- <u>Claim 6</u>: The method for producing a stick-shaped snack according to claim 5, further comprising, after the third cutting step, a coating step of coating at least part of the stick-shaped pastries with coating material.

- <u>Claim 7</u>: "The method for producing a stick-shaped snack according to claim 6, further comprising: prior to the third cutting step, an aligning step of aligning the stick-shaped pastries parallel to each other, wherein the coating step includes holding one end of each stick-shaped pastry while immersing another end of each stick-shaped pastry in the coating material."

***

- <u>Claim 10</u>: "A method for producing a stick-shaped snack," using string-shaped dough having a width of 2 mm to 3 mm and resulting in "stick-shaped pastries having a maximum cross-sectional width of 2.5 mm to 3.5 mm

***

25

- <u>Claim 13</u>: "The method for producing a stick-shaped snack according to claim 10, if further comprising: prior to the third cutting step, an aligning step of aligning the stick-shaped pastries parallel to each other, and after the third cutting step, a coating step of coating at least part of the stick-shaped pastries with a coating material, wherein the coating step includes holding one end of each stick-shaped pastry in the coating material."

- <u>Claim 14</u>: "A stick-shaped snack made by the method of claim 1."

Exhibit 34.

63.    According to Glico's own functionality expert, Dr. Leon Levine,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

64.    Indeed, by following Claims 5, 6, and 7 of Glico's utility patent, the Pocky product configuration will result. Claim 5 covers a method for producing a stick-shaped snack using dough with a thickness of 2 to 3mm. *See* Exhibit 34. Claim 6 includes the stick-shaped snack produced by the method of Claim 5 and the addition of "a coating step of coating at least part of the stick-shaped pastries with a coating material." *Id*. Claim 7 further specifies a method of coating the stick-shaped snack as stated in Claim 6: "**holding one end** of each stick-shaped

DM_US 155760680-2.097931.0011

pastry **while immersing another end** of each stick-shaped pastry **in the coating material**." *Id*.

65.    The same is true if one practices the steps of Claims 10 and 13. Claim 10 of the Glico Utility Patent covers a method for producing a stick-shaped snack which results in a baked stick-shaped snack having a cross-sectional width of 2.5 mm to 3.5 mm. *Id*. Claim 13 further claims a coating step where at least part of the baked stick-shaped snack is coated by "**holding one** end of each stick-shaped pastry **while immersing another end** of each stick-shaped pastry **in the coating material**." *Id*.

66.    █████████████████████████████████████████████████

█████████████████████████████████████████████. Exhibit 6

(Levine Dep.) 232:18 – 233:24; *see id.* 254:23-255:13 ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

██    ██████████████████████████████████████████

██████████████████████████████████

68. ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ Exhibit 12 (Levine Rebuttal) ¶¶ 47-48; Exhibit

6 (Levine Dep.) 213:14-214:14; 218:2-12; 225:6-16; 226:3-13; 235:25-236:5.

69. ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

DM_US 155760680-2.097931.0011

E.     **Third-Party Utility Patents Disclose the Utilitarian Advantages of Features of the Pocky Product Configuration**

1.     **The "Pretzel Stick Snack Item" Patent**

70.     The PTO previously issued a utility patent (U.S. Patent No. 6,242,021) entitled "Pretzel Stick Snack Item." Exhibit 36.

71.     The Abstract of the Pretzel Stick Snack Item Patent discloses a bite-sized snack food item that "can be held by the fingers of one hand, and bitten off . . . the stick may also be coated with candy or another contrasting food substance." *Id.* at LOTTE00005687.

72.     The Pretzel Stick Snack Item Patent describes the invention in part as a pretzel stick "that may be held **by one end** and the other end bitten off by a consumer." *Id.* at LOTTE00005690 (emphasis added).  An object of the invention was "to provide a snack item which **can be conveniently held at one end by a consumer**, and the other free end either bitten off or licked by the consumer." *Id.*

73.     The end of the snack item described in the Pretzel Stick Snack Item Patent is claimed in Claim 7 as "one end portion extending outwardly from the adjoining cereal rings," which partially coat the pretzel stick. *Id.* at LOTTE00005691.

74.     ████████████████████████████████████████

████████████████████████████████████████████████

29

██████████████████████████

████████████

75.    This handle also enables the coating of the Pretzel Snack Item by "**dipp[ing] [the pretzel stick with cereal rings] into a container of melted chocolate or similar candy jacketing composition by holding end in a holder** . . . and lifting the combination up and down until thoroughly coated," as shown in the figure below. Exhibit 36 at LOTTE00005691.



FIG. 5

### 2.    The "Clean Finger" Patent

76.    The PTO also previously issued a utility patent (U.S. Patent No. 4,889,729) entitled "Coated Edible Article with Holding to Prevent Finger Soiling. Exhibit 37 (the "Clean Finger Patent").

77.    The Clean Finger Patent "relates to a coated edible article which includes means by which the article **can be held while being consumed without soiling the fingers**. The invention has application in a wide range of edible articles

30

. . . which are comprised of or are covered with a coating which melts when held in the hand and is subjected to body heat." *Id.* at LOTTE00005707.

78.    The problem to be solved by the Clean Finger Patent is that when someone grabs a snack item such as a wafer bar "coated with a fat glaze, or other melting coatings," "the finger which is in contact with the glaze becomes soiled because the melting temperature of the coating is below normal body temperature." *Id*.

79.    The Clean Finger Patent states that an object of the invention is to "provide a holding member for a coated edible article, which holding means provides a decorative and attractive appearance to the article." *Id.*

80.    The holding member disclosed in the Clean Finger Patent is a "disc" on the outside of the coated snack product "to avoid melting the chocolate by holding it in the hand." *Id*.

81.    The holding member further is "the approximate size of a finger-end whereby it can be easily grasped and held by the thumb, index finger, or middle finger." *Id*. The Clean Finger Patent requires that the holding member must be:

> at least of a size large enough to be held by a fingertip but having a relatively small surface area in relation to the surface area of said coating so as not to affect the taste of the wafer sheet and coating assembly, said holding member being comprised of a substance which does not melt at or below body temperature, whereby the article can be handled without soiling the fingers.

*Id.* at LOTTE00005708 at 4:3-11.

31

## II.   GLICO ABANDONED ITS POCKY PRODUCT CONFIGURATION THROUGH UNCONTROLLED LICENSING TO ██████

### A.   The ██████ License Agreement

82.   Glico Japan and ███████████████████ ████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

83.   ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████. *Id.*

84.   ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████

85.   ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

DM_US 155760680-2.097931.0011

86. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

87. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██

88. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

33

████████████████████████████████████████

████████████████████████████████████████

████████

89.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

**B.   ████████   Sale Of Licensed Products Under The MLA**

90.   After the effective date of the MLA, ████ has sold licensed products bearing the Pocky product configuration in the United States. ████████

████████████████████████████████████████

████████████████████████████████████

34



91.  ██████ licensed products are sold in the same channels of trade as Pocky and on the same store shelves as Pocky. ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████

35

92.     Over the years, millions of dollars of licensed ████ products have

been sold in the United States and those products continue to be sold today. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

93.     In May 2015, Glico estimated that ████'s sales were twice those of

Pepero, and wrote that ████████████████████████████████

████████████████████████████████" Exhibit 45.

94.     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**C.     Glico Does Not Control the Quality of The Licensed Products**

95.     In discovery, Lotte requested that Glico produce "[a]ll documents sent

to or received from ████ concerning [the MLA]" and "all documents that [Glico]

contend[s] demonstrate that [Glico] exercised sufficient quality control over ███ use of the configuration shown in U.S. Registration No. 1,527,208 from the time the agreement was produced at EZAKI0170137 was executed until present." Exhibit 49 (Glico's Responses to Lotte Confectionery's Requests for Production Nos. 16 and 17). Glico responded that it would produce any responsive documents, subject to its objections. *Id.*

96. In response, Glico produced **no documents** reflecting communications between itself and ████████████ Hallerman Decl. ¶ 53. Although ███ is a licensee of the Pocky product configuration and has been selling products under that license for years, Glico chose not to serve a subpoena on ███ for any testimony or any documents. *Id.*

97. Since the effective date of the MLA, Glico has not actually supervised or controlled ███ advertising, promotion, or sale of the licensed products. *See* Exhibit 39 (Sato Dep.) 73:3-74:18; 89:5-91:19. Glico has not communicated with ███ or its affiliated or cooperating companies about the quality of the licensed products during the nearly ███ that the MLA has been in effect. *See id.* Thus, for example, although ████████████

████████████

████████████

37

DM_US 155760680-2.097931.0011

████████████████████████████████████████████. *See id.*; *see supra* ¶¶ 92-94.

98.    Glico has admitted it has never requested anything related to its obligations to control quality from ████████████████████████████████ ████████████████ *See* Exhibit 39 (Sato Dep.) 73:3-74:18; 89:5-91:19. For example, Glico has admitted it has never requested from ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. *Id.*

99.    Furthermore, following the effective date of the MLA, there is no evidence that Glico has ever asked ██████ ████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Exhibit 39 (Sato Dep.) 89:5-91:19. Glico thus does not know (nor has it ever known in the 22 years the MLA has been in effect) whether or how those raw ingredients and recipes have changed. *See id.*

100.   Since the effective date of the MLA, there is no evidence that Glico has ever asked ████████████████████████████████████████ ████████████████████████████████████████████████ that the MLA has been in effect and Glico does not know the identities of those parties. *See* Exhibit 39 (Sato Dep.) 89:5-91:19. There is no evidence that Glico knows (or has ever known while the MLA has been in effect) whether ██████ or its

DM_US 155760680-2.097931.0011

affiliated and cooperating companies have ever, in fact, engaged in quality control themselves in manufacturing the licensed products, let alone what that quality control consisted of or how it has changed over the course of the ██████████ that the MLA has been in effect. *See id.*

## III.   GLICO UNREASONABLY DELAYED IN FILING THIS LAWSUIT

### A.   Lotte Confectionery and its Pepero Products

101.   Lotte Confectionery, a Korean corporation, created Pepero biscuit sticks in the early 1980s. Exhibit 50 (Deposition of Jina Choi) 104:8-12. Due to the passage of time, no one at Lotte Confectionery has personal knowledge about how Pepero was created, and many documents relating to the creation were destroyed in the ordinary course of business long before Glico filed this lawsuit in 2015. Exhibit 51 (Deposition of Ja Young Hwang) 159:17-161:3.

102.   Lotte Confectionery sells Pepero in Korea, Japan, Europe and elsewhere. *See*, *e.g.*, Exhibit 52 at 1-22 (Lotte Confectionery's export records showing sales of Pepero to different countries between 1988 and 2001).

103.   Lotte Confectionery first sold Pepero in the United States in 1987. Exhibit 50 (Choi Dep.) 76:5-9; Exhibit 53 (██████  ████████████████ ████████████████████████ )). Images of Lotte's most popular Pepero products, Pepero Chocolate and Pepero Almond, are below. Exhibit 54:

---

[1] *See infra* note 3.

DM_US 155760680-2.097931.0011



104.    Lotte Confectionery's Pepero biscuit sticks have not materially changed in appearance since those products were first sold in the United States in 1987. *See, e.g.*, Exhibit 55 (chart depicting Pepero packages from 1983 through 2012, showing image of materially similar Pepero biscuit sticks on front of packaging)).

105.    Since 1987, the packaging of Lotte Confectionery's Pepero chocolate biscuit sticks has been a red, rectangular box featuring the Pepero brand and images of the chocolate cookie stick. *Id.*; Exhibit 56 (image of Pepero boxes on shelf in 2013)); Exhibit 57 (images of Pepero boxes on shelves between 2002 and 2009). *see also* Exhibit 58 (Lotte Confectionery's Response to Glico's Rog No. 2).

106.    Since the 1980s and continuing to date, Pepero and Pocky have been sold primarily in retail stores that cater to persons of Asian heritage. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

40

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

107.   In the 1980s and 1990s, Pepero was sold to distributors and in retail stores by way of those distributors, in California, Illinois, New York, and Maryland and many other states. *See, e.g.,* ████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████

108.   Since the 1980s, retailers in the United States have sold Pepero and Pocky side-by-side, on the same shelf, or in the same aisle and continue to do so today. *See, e.g.,* Exhibits 56-57, 66-72. *See also* ████████████████████████

██████████████████████████████████████████

DM_US 155760680-2.097931.0011

Some annotated examples are below.







**Exhibit 57**



2013, Camp Pendleton Commissary, CA

Pepero

Pocky

**Exhibit 56**

109.   Lotte Confectionery's business records concerning the advertising and sale of Pepero in the United States in the 1980s and 1990s were destroyed in the ordinary course of business long before Glico's filed this lawsuit in 2015. *See* Exhibit 58 (Lotte Confectionery's Supplemental Response to Rog No. 10). Lotte Confectionery subpoenaed the business records of its importers of Pepero into the United States during the 1980s and 1990s, including Rhee Bros, Hanmi, Inc., Seoul

43

Shik Poom Inc., and Jin Han International Inc., but none of these importers provided any documents from that time period. Hallerman Decl. ¶ 94.

110.   Lotte Confectionery has no personnel with knowledge of the sale or advertising of Pepero in the United States in the 1980s and 1990s, let alone personnel who could quantify such sales and advertising or identify all of the various states in which Pepero was being sold. Exhibit 50 (Choi Dep.) 209:15-209:25); Exhibit 51 (Hwang Dep.) 107:7-107:22. Despite Lotte Confectionery's efforts to identify and locate the prior employees, they are not available.  *See*, *e.g.*, Exhibit 51 (Hwang Dep.) 111:21-112:10; 159:17-161:3; 178:21-179:7; 180:21-181:20; 182:18-183:9.

111.   Due to the passage of time, Lotte Confectionery cannot prove the full extent and geographic scope of Pepero sales in the United States in the 1980s and 1990s. *See, e.g.*, SUMF ¶¶ 109-110, *supra*. ███████████████

███████████████████████████████████

███████████████████████████████████

███ Exhibit 52 (compilation exhibit of Lotte's Confectionery's summary import records showing sales of Pepero for the years 1989-1991, 1990-1992, 1993-1995, 1996, 1997, 1998, and 2000-2015). From the 1980s through 2000, Lotte Confectionery's total revenues from Pepero sales in the United States were approximately ███████. *See id.*

44

## B. Lotte America and Pepero Sales from 2000 to Date

112.   Lotte America is Lotte Confectionery's sister company. Declaration of Sung Sik Eum ("Eum Decl.") ¶ 2. Prior to 2000, Lotte America served as an import/export company for the Lotte conglomerate of companies, but it did not import food for Lotte Confectionery. *Id.*

113.   In 2000, Lotte America began to market, distribute, and sell Pepero in the United States. Eum Decl. ¶ 4; Exhibit 58 (Lotte Confectionery's Response to Glico's Rog No. 10). Since 2000, with very limited exception, Lotte Confectionery's sales of Pepero in the United States have been made through Lotte America. Exhibit 58 (Lotte Confectionery's Response to Glico's Rog No. 10).

114.   Since 2000, Lotte America has sold primarily four flavors of Pepero: chocolate, almond, white cookie, and nude.[2] Eum Decl. ¶ 5. Below are examples of these products and their packages (*id.*; *see also* Exhibit 73):

---

[2] Nude Pepero, which is the only variety of Pepero Glico does *not* contend infringes, ███████████████████████████████████. *See* Exhibit 74 (Lotte Confectionery's Response to Glico Rog No. 24 and Appendix A thereto).

45



115.   Lotte America also sells a variety of special Pepero flavors during a seasonal marketing event called "Pepero Day." Eum Decl. ¶ 6.

116.   Pepero has always been one of Lotte America's top-selling Confectionery items. Eum Decl. ¶ 7.

117.   Since 2000, Lotte America has marketed Pepero to distributors who sold to retail stores throughout the United States, including stores that cater to Asian communities and Hispanic communities, as well as mainstream retail stores like Walmart and 7-Eleven. Eum Decl. ¶ 8; *see also* Exhibit 75 (Lotte America's customer list); Exhibit 76 (Lotte America's distributor customers in 2002-2005). The vast majority of the Pepero is sold to retail stores that cater to the Asian community. Eum Decl. ¶ 11. Many of these stores also sell Pocky in the same aisle or on the same shelf as Pepero. *Id*.

118.   Initially, Lotte America was located on the East Coast and sold Pepero only to wholesalers and distributors who, in turn, would sell the product to retailers

46

throughout the United States. Eum Decl. ¶ 8. In 2006, due to the success of Pepero, Lotte America began to sell Pepero directly to retailers. *Id*. In 2006, Lotte America moved from New Jersey to California to be close to key retailers and expand distribution. *Id.* ¶ 9. Lotte leased a warehouse to store Pepero and other products so that it could deliver the products directly to retailers. *Id*. Since 2006, Lotte America has sold Pepero directly to hundreds of retailers located throughout California and up and down the entire West Coast as well as retailers located in many southern and western states such as Georgia, Texas, Arkansas, Arizona, and Nevada, and online retailers who ship their products nationwide. *Id*.

119.    Over the years, Lotte America has spent hundreds of thousands of dollars advertising and promoting Pepero in the United States. Eum Decl. ¶ 12; *see also* Exhibit 77 (Lotte America's estimated marketing expenditures for Pepero on an annual basis). In addition, Lotte America's employees invest thousands of hours each year to make trips throughout the United States to meet with existing distributors and retailers and to solicit new business. Eum Decl. ¶ 12.

120.    Since 2000, Lotte America also has continuously sold Pepero at wholesale to dozens of distributors located throughout the United States. Eum Decl. ¶¶ 8 10; Exhibit 75 (Lotte America's customer list including wholesale customers)); Exhibit 76 (Lotte's wholesale customer sales in 2002-2005)). Those

47

distributors, in turn, sell Pepero directly to retailers and smaller distributors across the country. Eum Decl. ¶¶ 8 10.

121.    Despite moving its main office to California, Lotte America retained a remote employee on the East Coast whose responsibility was to service Lotte America's distributor and wholesaler customers on the East Coast. Eum Decl. ¶ 10. Those distributors continued to sell Pepero to thousands of retailers up and down the East Coast as well as throughout the country. *Id*; Exhibit 75 at 7 (showing distribution area of Lotte America's major wholesale customers)).

122.    For more than a decade, Lotte America has invested in an annual promotional event for Pepero, "Pepero Day," which takes place every November 11. Eum Decl. ¶ 13. To promote this popular event, Lotte America takes out advertisements in newspapers, puts out marketing materials, and partners with universities to conduct social events on Pepero Day. *Id.*; *see also* Exhibit 78 (Images of Lotte's promotion events in connection with the 2007 Pepero Day, 2008 Pepero Day, and 2012 Pepero Day).

123.    Lotte America advertises its Pepero on social media, including Facebook and Instagram, where it has thousands of followers. Eum Decl. ¶ 14.

124.    Lotte America annually participates in snack food trade shows in the United States, where it meets retailers and distributors who are potential customers.

48

Eum Decl. ¶ 15; *see also e.g.* Exhibit 57 at 12 (images of Lotte's trade show booths).

125.   Lotte America has for decades conducted frequent in-store sampling events in retail stores throughout the country. Eum Decl. ¶ 16. Lotte America hires demonstration companies to provide samples of Pepero and Lotte's other snacks to consumers shopping in these stores. *Id.*; *e.g.* Exhibit 79 (photograph from in-store sampling event in 2013).

126.   Lotte America established relationships with ███████████ ███████████████████████████ who cater to the growing market of mainstream American consumers seeking snacks from foreign countries. Eum Decl. ¶ 17; Exhibit 75 (Lotte America's Customer List).

127.   Since 2000, Lotte America has introduced Pepero to hundreds of thousands of new customers and consumers throughout the country. Eum Decl. ¶ 18.

128.   Lotte America's revenues from the sale of Pepero have grown steadily from approximately ███████████████████████████ ██████████████████ *See* Exhibit 76 (showing Lotte America's approximate revenues for Pepero on an annual basis from 2000-2016); Exhibit 80 (Lotte America's Response to Glico's Rog. 33, Appendix A – revenues 2007-

2017). From 2000 through 2017, Lotte America earned over ████████████ ████████ from the sale of Pepero in the United States. *See id.*

129.   Over the last 30 years Lotte Confectionery ████████████████ ████████████████ from sales of Pepero in the United States, exclusive of sales made to Lotte America. Exhibit 52 (combined exhibit of early Lotte Confectionery export records); Exhibit 74 (Lotte Confectionery's Response to Glico Rog. No. 24 and Appendix A thereto – revenues 2005-2017).

### C.   Lotte Will Be Severally Damaged If It Cannot Sell Pepero

130.   The demand and popularity of Pepero allows Lotte America to persuade retailers to stock Lotte America's less well-known snack products. Eum Decl. ¶ 19. If Lotte America could no longer sell Pepero, the demand for many of its less well-known snacks would evaporate and it would lose many customers altogether. *Id.*

131.   Lotte America orders large quantities of Pepero from Lotte Confectionery both on behalf of its retail business and for its wholesale customers on a monthly basis. Eum Decl. ¶ 20. Lotte Confectionery ships the Pepero products along with other snacks in large containers to Lotte America or its wholesale customers. *Id.* Due to the significant costs involved in shipment and importation of a container, the containers are shipped full to justify the cost. *Id.* If Lotte America is prohibited from importing Pepero, it could no longer place orders of its less-

DM_US 155760680-2.097931.0011

popular snacks that are large enough to fill a container. *Id*. Lotte America would be required either to take a loss on each partially-filled container or stop importing Lotte Confectionery snack products altogether. *Id*.

132.  The prohibitive cost of importation, combined with the likely loss of customers who are primarily interested in Pepero rather than Lotte America's other snacks, would likely make it impossible for Lotte America to sustain its snack importation business. Eum Decl. ¶ 21. The loss of this business would have devastating effects on Lotte America, as Lotte America would likely need to lay off employees and relinquish its warehouse and trucking services. *Id.*

**D.    Glico Has Known of Lotte's Pepero Sales in the United States Since March 1989**

133.  Glico has known that Lotte was selling Pepero in the United States in competition with Pocky since at least March 1989. Exhibit 53; Exhibit 13 (Glico's Response to Lotte Confectionery's RFA 4).[3] ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████. *Id.*

134.  ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[3] While the English translation states March 20, 1990, Glico has admitted in response to a request for admission that this document is dated March 20, 1989, and Lotte thus uses that date.

51

Exhibit 81 (Glico's Response to Lotte Confectionery's Rog No. 10 ); Exhibit 63 (Fukumoto Dep.) 27:4-27:19. ████████████████████████████████████████

████████████ *Id.* Because the document is nearly 30 years old, Glico has no recollection of the document, including who, if anyone, reviewed or received the document, the purpose of the document or how or when the information relating to Pepero contained in the document was gathered. *See id.* Other Glico employees who would have had knowledge about sales of Pepero in the 1980s and 1990s and had other relevant knowledge are similarly unavailable or do not recall details. Exhibit 63 (Fukumoto Dep.) 82:8-83:18; 85:3-11, 107:2-12. Glico cannot state for a fact that it did not know of the sale of Pepero in the United States beginning in the autumn of 1987, ████████████████████████████████████████

████████████████

135.   There is no evidence that Glico sent a cease and desist letter to anyone—Lotte, distributors, or retailers—concerning Pepero until more than three years after the date of this ████████████████████████████████████████

document. *See* Exhibit 13 (Glico's Response to Lotte Confectionery's RFA 75).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████    ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████



136.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████

        ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

DM_US 155760680-2.097931.0011



141.   Mr. Park left Lotte Confectionery over 20 years ago and cannot be located. Exhibit 51 (Hwang Dep.) 56:12-57:24.  Lotte Confectionery's personnel do not have knowledge about any communications between Glico and Lotte or about whether there were communications between the parties after the August 19,

54

1994 letter or what the substance of those communications were if they did occur. *Id.* 33:3-33:24; 55:2-56:5; 62:12-64:15; 68:22-69:11; 69:18-71:1; 72:21-75:9; 76:5-77:12; 95:4-96:3); Exhibit 50 (Choi Dep.) 136:4-137:18; Exhibit 58 (Lotte Confectionery Response to Glico's ROG No. 10). ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

142.   Lotte did not have the 1993-1994 correspondence between the parties in its possession, custody or control and obtained it when Glico produced it in discovery in this case. Exhibit 51 (Hwang Dep.) 65:2-21; Exhibit 58 (Lotte Confectionery's Response to Glico's ROG No. 10.)  Lotte has no documents in its possession, custody or control about the 1993-1994 correspondence between the parties or actions that were or were not taken as a result of the parties' correspondence. *Id.* The same thing is true with respect to Glico – it is not aware of any documents dated after Mr. Park's August 19, 1994 letter relating to the matter. Exhibit 39 (Sato Dep.) 33:9-21, 34:4-35:6.

143.   Glico knew that Lotte Confectionery continued to sell Pepero in the United States after Lotte's August 19, 1994 letter and Glico continued to maintain that the sale of that product was infringing. ███████████████████

███████████████████████████. Exhibit 59; Exhibit 60. ███████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████)); Exhibit 13 (Glico's Responses to Lotte Confectionery's RFA 11-12, 30-32, 46-47, 57-58, 73-74 (█████████████████████████████████████████

█████████████████████████████████████████

████ )); Exhibit 90 (█████████████████████████

███████████████████████.)); Exhibit 63 (Fukumoto Dep.) 127:24-134:5 (█████████████████████████████

███████████████████████)).

144.   ██████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

DM_US 155760680-2.097931.0011

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

145.   Despite having continuous actual knowledge that Lotte was selling Pepero in the United States in competition with Pocky following its 1994 cease and desist letters, Glico did not file this lawsuit until July 10, 2015 – more than 25 years after learning of its infringement claims in March 1989 and more than 21 years after Glico sent its last cease and desist letter to Lotte in May 1994. Dkt. 1.

Dated: September 21, 2018            Respectfully submitted,


  /s/ Riley Orloff
Riley T. Orloff (N.J. Bar No. 128672015)
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173-1922
Email: rorloff@mwe.com
Tel: 212.547.5683
Fax: 212.547.5444

/s/ John Dabney
John J. Dabney (admitted *pro hac vice*)
Mary Hallerman (admitted *pro hac vice*)
Katie Bukrinsky (admitted *pro hac vice*)
Rebecca Duttry (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001

DM_US 155760680-2.097931.0011

Email: jdabney@mwe.com
Tel: 202.756.8000
Fax: 202.756.8087
*Attorneys for Defendants/Counterclaimants*

58

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing was served upon the following counsel of record via email on this 21st day of September, 2018:

Roy H. Wepner, Charles P. Kennedy, Natalie S. Richer
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Email: rwepner@lernerdavid.com; ckennedy@lernerdavid.com;
nricher@lernerdavid.com

Steven Levitan
HOGAN LOVELLS US LLP
4085 Campbell Avenue, Suite 100
Menlo Park, CA 94025
Email: steve.levitan@hoganlovells.com

Birte Hoehne Mahyera
HOGAN LOVELLS US LLP
3 Embarcadero Center, Suite 1500
San Francisco, CA 94111
Email: birte.hoehne-mahyera@hoganlovells.com

Aaron S. Oakley, Katherine Nelson
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
E-mail: aaron.oakley@hoganlovells.com,
Katherine.nelson@hoganlovells.com

Anna Kurian Shaw, Katherine Bastian Phillips, Lauren B. Cury
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Email: anna.shaw@hoganlovells.com, katherine.bastian@hoganlovells.com,
lauren.cury@hoganlovells.com

                                          *s/Mary D. Hallerman*