*PUBLIC VERSION*

Roy H. Wepner
Charles P. Kennedy
Natalie S. Richer
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel: 908.654.5000
Fax: 908.654.7866

**OF COUNSEL**
Steven M. Levitan (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
Tel: 650.463.4000
Fax: 650.463.4199

*Attorneys for Plaintiffs Ezaki Glico Kabushiki Kaisha,*
*d/b/a Ezaki Glico and Ezaki Glico USA Corp.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EZAKI GLICO KABUSHIKI KAISHA, d/b/a EZAKI GLICO CO., LTD., and EZAKI GLICO USA CORPORATION, | Civil Action No. 15-5477-MCA-LDW |
| Plaintiffs, | District Judge Madeline Cox Arleo Magistrate Judge Leda Dunn Wettre |
| v. | Return Date: November 5, 2018 Time: 10:00 a.m. |
| LOTTE INTERNATIONAL AMERICA CORP. and LOTTE CONFECTIONERY CO. LTD., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

*PUBLIC VERSION*

## <u>Table of Contents</u>

Supplemental Statement of Undisputed Facts ..................................................................1

I.      Background and Parties ....................................................................................1

II.     Prior legal proceedings ....................................................................................3

III.    Glico's Pocky product configuration trademarks. ............................................3

    A.    The Pocky product configuration and the Pocky Almond Crush product
       configuration...........................................................................................3

    B.    Federal registrations on the Principal Register.........................................4

       1.    The '208 Registration.....................................................................4

       2.    The '404 Registration.....................................................................6

       3.    The '119 Registration.....................................................................7

    C.    Consumer Knowledge and Perception of Pocky .......................................8

IV.     Sales of Pocky in the United States ..................................................................9

    A.    Continuous sales in the U.S. since 1978 ...................................................9

    B.    Steady growth of sales in the U.S. since 1978 ..........................................9

    C.    Sales of Pocky in Mainstream American Retailers ..................................10

    D.    Pocky Ultra Slim..................................................................................11

V.      Sales of Pepero in the United States ...............................................................12

    A.    Pepero sales volumes ...........................................................................12

    B.    Comparison with Pocky ........................................................................13

    C.    ███████████████████████████████████████
       █████████..................................................................15

    D.    ██████████████████████████████ ....................................16

    E.    ████████████████████████████████████████
       ███ 18

VI.     The Pocky product configuration trademarks are not functional. ...................20

    A.    Glico's expert witnesses.......................................................................20

    B.    The Pocky product configuration trademarks are unique. ........................20

    C.    Dr. Levine and Mr. Latella concluded that the Pocky product configuration is not
       essential to the use or purpose of a snack product, nor does it affect cost or quality.
       24

       1.    Dr. Levine concluded that the Pocky product configuration is not essential to the
          use or purpose of a snack product and does not affect the cost or quality of Pocky
          as a snack product. ...........................................................................24

*PUBLIC VERSION*

2.   Dr. Levine opined that exclusive use of the Pocky product configuration would not put competitors at a significant non-reputation-related disadvantage............27

3.   Mr. Latella concluded that there are numerous alternative snack product shapes and configurations.................................................................................32

D.   Dr. Levine and Mr. Latella concluded that the evidence Lotte cites does not show that the Pocky product configuration is functional.............................................38

1.   Dr. Levine concluded that the uncoated portion of the biscuit stick does not render the Pocky product configuration functional. ......................................38

2.   Dr. Levine concluded that Lotte's other purported "utilitarian advantages" of the Pocky product configuration do not render the Pocky product configuration functional. ............................................................................................38

a.   Convenience or ease of consumption is not evidence of functionality............39

b.   Ease of sharing or suitability for packaging in sharable quantities are not evidence of functionality. ...............................................................39

c.   The Pocky product configuration does not reduce packaging costs. ...............40

d.   The Pocky product configuration does not create a "unique texture" or "snap." 40

3.   Dr. Levine concluded that the '428 patent is not evidence that the Pocky product configuration is functional.............................................................40

a.   The '428 patent does not claim the Pocky product configuration ...................42

b.   The manufacturing methods claimed in the '428 patent do not necessarily result in the Pocky product configuration.................................................42

c.   The Pocky product configuration can be manufactured by other methods not disclosed or claimed in the patent..................................................44

d.   The purported utilitarian advantages Lotte claims as disclosed in the '428 patent are not evidence that the Pocky product configuration is functional......45

e.   At most the '428 patent discusses and claims methods that result in a biscuit stick that is 2.5 mm to 3.5 mm in cross-sectional width, which does not match the vast majority of embodiments of the Pocky product configuration. ...........48

4.   Dr. Levine concluded that the Japanese utility model is not evidence that the Pocky product configuration is functional ............................................49

5.   Dr. Levine concluded that the other two U.S. utility patents Lotte cites are not evidence that the Pocky product configuration is functional. .............................51

6.   Mr. Latella concluded that none of Glico's advertising or Lotte's other purported evidence shows that the Pocky product configuration is functional....................53

E.   At deposition, Lotte's expert Mr. Townley agreed with many of Glico's experts' conclusions. ....................................................................................57

*PUBLIC VERSION*

F.    Lotte attempted to register the Pocky product configuration as a trademark in the United States...................................................................................................58

G.    ██████████████████████████████████████████████

██████████. ...................................................................................59

VII.  ██████████████████████████.................................63

A.    Glico's trademarks....................................................................................63

B.    ██████████████████████████████████████████████64

C.    ██████████████████████████████████████████████67

D.    ██████████████████████████████████████████████69

VIII.  Glico did not unreasonably delay legal proceedings, nor did Lotte suffer any prejudice from the timing of this suit..............................................................71

A.    Glico diligently put Lotte on notice that Glico objected to the sale of Pepero ██.....71

B.    Lotte claims that it was anticipating litigation regarding its sales of Pepero in the U.S. throughout the 2000s until this suit was brought...............................72

C.    The alleged economic injury upon which Lotte relies supports the notion that Lotte carried on its business as usual without any significant or excessive change in promotion or advertising, which is not sufficient for a finding of laches.................73

D.    New evidence and arguments...................................................................74

IX.  Lotte is a willful infringer of Glico's Pocky product configuration trademarks...........77

A.    ██████████████████████████████████████..........................77

B.    ██████████████████████████████████.................................79

C.    ██████████████████████████████████.................................79

Response to Defendants' Statement of Undisputed Material Facts............................81

I.  The Pocky product configuration is not functional. ...................................81

A.    The Pocky Product Configuration Trade Dress.......................................81

1.    The uncoated portion of the biscuit stick is not essential, does not affect the cost or quality, and forms just a single part of the overall Pocky product configuration. 86

2.    Partial coating is not essential and does not affect cost or quality. ......................89

3.    The shape of the biscuit stick is not essential and does not affect cost or quality. 90

4.    Rounded Coated End ...................................................................91

5.    Flat Uncoated End.......................................................................92

*PUBLIC VERSION*

B. Glico has not admitted that the Pocky Configuration is functional. ......................... 92

C. Glico's advertising does not show that the Pocky product configuration is functional. 95

D. Glico's U.S. utility patent and Japanese utility model do not show that the Pocky Product Configuration is functional. ........................................................... 101

 1. Utility Model ...................................................................................... 101

 2. Utility Patent ...................................................................................... 104

  a. Prosecution of Glico's Patent Application ................................. 104

  b. Patent Claims ......................................................................... 111

E. Third-party utility patents are not evidence that the Pocky Product Configuration is functional. ...................................................................................................... 115

 1. The "Pretzel Stick Snack Item" Patent ............................................. 115

 2. The "Clean Finger" Patent ................................................................ 118

II. ██████████████████████████. ....................... 120

 A. ████████████████ ........................................................ 120

 B. ███████████████████ ................................................ 127

 C. ███████████████████████ ........... 130

III. Glico brought suit upon discovering ████████████████ ███████████████ ........................................... 135

 A. Lotte Confectionery and its Pepero Products ........................................ 135

 B. ███████████████████████████ ................................. 141

 C. ██████████████████████ ....................... 146

 D. ███████████████████████████████ ████. ................................................................... 147

*PUBLIC VERSION*

In accordance with Local Rule 56.1(a), Plaintiffs Ezaki Glico Kabushiki Kaisha *d/b/a* Ezaki Glico Co., Ltd. ("**Glico Japan**") and Ezaki Glico USA Corporation ("**Glico USA**"; collectively "**Glico**") hereby set forth this supplemental statement of material facts as to which there exists no genuine issue, in opposition to Defendants Lotte International America Corp.'s ("**Lotte America's**") and Lotte Confectionery Co. Ltd.'s ("**Lotte Korea's**"; collectively, "**Lotte's**") motion for summary judgment on its affirmative defenses of functionality, abandonment, and laches.

## **SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS**

**I.    Background and Parties**

1.    Glico Japan is a global confectionary company headquartered in Osaka, Japan.  *See* Dkt. 149-1, ¶ 5.

2.    Glico Japan manufactures and sells numerous confectionary items, snack foods, ice cream, processed foods, and soft drinks and does business across thirty-four countries and regions, including North America, Asia-Pacific, and Europe, through various subsidiaries.  *See* Dkt. 149-1, ¶ 5.

3.    In the United States, Glico Japan's wholly-owned subsidiary, Glico USA, located in Irvine, California, serves as the exclusive distributor for Pocky products.  Declaration of Aaron S. Oakley in Opposition to Defendants' Motion for Summary Judgment on Functionality, Abandonment, and Laches ("**Oakley Decl.**"), Ex. 1 (Glico's Second Supp. Objections & Responses to Defendant's Interrogatory Nos. 4, 12, 17, and 18) at 3.

4.    Since 1966, Glico Japan has manufactured and sold a biscuit stick product partially coated in chocolate and/or cream under the brand name Pocky.  Oakley Decl., Ex. 2 (Prosecution History of U.S. Reg. No. 1,527,208).

*PUBLIC VERSION*

5.    Defendant Lotte America is a New Jersey corporation headquartered in Los Angeles, California.  Dkt. 117 ¶ 1.  ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  Lotte America began distributing Pepero products—the products accused of infringement in this case—in the United States in or about 2000.  Oakley Decl., Ex. 4 (Lotte America's Fifth Supp. Objections and Responses to Pls.' Second Set of Interrogatories (Nos. 10-25)) at 4.

6.    Lotte Korea is a limited liability company founded in 1967 and headquartered in Seoul, South Korea.  Dkt. 117 ¶ 2.  Lotte Korea began selling a biscuit stick dipped in chocolate under the brand name Pepero in the Republic of Korea in 1983.  Dkt. 117 ¶ 7.

7.    ████████████████████████████████████████████████████

████████████████████████  Declaration of Mary D. Hallerman in Support of Defendants/Counterclaimants Motion for Summary Judgment, Dkt. 229 ("**Hallerman Decl.**"), Ex. 58 at 15.  ██████████████████████████████████████████████

███████████████████████████████████████████████  Declaration of John Hansen in Opposition to Defendants' Motion for Summary Judgment of Functionality, Abandonment, and Laches ("**Hansen Decl.**") ¶ 5.

8.    ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████

9.    ████████████████████████████████████████████

████████████████████████████

10. ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

## II.     Prior legal proceedings

11.    On November 11, 2014, Glico Japan filed a lawsuit against Lotte U.S.A., Inc. ("**Lotte**

**USA**"), a Michigan corporation located in Battle Creek Michigan.  Oakley Decl., Ex. 7 (Compl.

filed by Glico Japan against Lotte USA) ¶ 2, Ex. 8 (Lotte USA's Answer) ¶ 2.

12.    Glico Japan believed that Lotte USA was the main distributor of Pepero products in the

United States.  Oakley Decl., Ex. 7 ¶¶ 18–22.

13.    After the suit was filed Glico learned through communications with attorneys for Lotte

USA that Lotte USA is not responsible for distribution of Pepero products in the United States.

Oakley Decl., Ex. 9 (Letter from N. Saros dated June, 15 2015).

14.    Glico brought this suit against Defendant Lotte America on July 10, 2015, less than a

month after it received a letter from Lotte USA's counsel on June 15, 2015.  Dkt. 1; Oakley

Decl., Ex. 9.

## III.    Glico's Pocky product configuration trademarks.

### A.     The Pocky product configuration and the Pocky Almond Crush product configuration

15.    Glico manufactures and sells its Pocky products in a number of varieties, including,

among many others, chocolate, Almond Crush, strawberry, cookies & cream, and matcha green

tea.  Oakley Decl., Ex. 10 (Pls.' Supp. Objections and Reponses to Lotte America's Interrogatory

Nos. 7, 15, 18, 19 and 20) at Ex. A (Revised).

16.     The product configuration for Pocky products is comprised of

> an elongated, thin, straight, cylindrical rod-shaped biscuit with more than half, but
> not all, of the biscuit coated with chocolate and/or a cream or cream-like coating
> that fully covers and extends from one end of the biscuit over halfway to the other
> end, but terminates short of the other end, and with the coated portion of the
> biscuit having a rounded end and the uncoated portion of the biscuit having a
> generally flat end

(the "**Pocky product configuration**").  Hallerman Decl., Ex. 1 at 3-4.

17.     The Pocky Almond Crush product configuration is comprised of

> an elongated, thin, straight, cylindrical rod-shaped biscuit with more than half, but
> not all, of the biscuit coated with chocolate and/or a cream or cream-like coating
> and almond pieces that fully covers and extends from one end of the biscuit over
> halfway to the other end, but terminates short of the other end, and with the
> coated portion of the biscuit having a rounded end and the uncoated portion of the
> biscuit having a generally flat end

(the "**Pocky Almond Crush product configuration**").  Hallerman Decl., Ex. 1 at 3-4.

**B.     Federal registrations on the Principal Register**

*1.     The '208 Registration*

18.     On December 16, 1987, Glico filed Application Serial No. 73/701,323 to register the

Pocky product configuration with the United States Patent and Trademark Office ("**PTO**").

Oakley Decl., Ex. 2 at EZAKI0000042-44.

19.     The '323 Application claimed a date of first use in the United States at least as early as

August of 1978 and claimed in a declaration dated November 17, 1987, that the mark, pursuant

to Section 2(f) of the Trademark Act, had acquired distinctiveness based on five years of

substantially exclusive and continuous use.  Oakley Decl., Ex. 2 at EZAKI0000042-44.

*PUBLIC VERSION*

20.     On May 9, 1988, the Examining Attorney issued an office action requesting proof of Glico's substantially exclusive and continuous use of the mark to support its claim of acquired distinctiveness.  Oakley Decl., Ex. 2 at EZAKI0000042-44.

21.     Accordingly, on June 19, 1988, Glico filed a Section 2(f) affidavit with the PTO in which it set forth evidence of Pocky sales and advertising in the United States dating back to 1978.  Oakley Decl., Ex. 2 at EZAKI0000031-38, EZAKI0000118-119.

22.     Following receipt of Glico's evidence of sales and advertising of Pocky in the United States dating back to 1978, the PTO approved the '323 Application for publication on September 27, 1988.  Oakley Decl., Ex. 2 at EZAKI0000027.

23.     No third party, including Lotte, opposed the '323 Application once it was published.  Oakley Decl., Ex. 2.

24.     On February 28, 1989, the PTO issued U.S. Registration No. 1,527,208 (the "**'208 Registration**") which registered on the Principal Register a "chocolate covered candy stick" where "[t]he mark comprises an elongated rod comprising biscuit or the like, partially covered with chocolate."  Oakley Decl., Ex. 2 at EZAKI0000150.

25.     On April 19, 1994, Glico filed a Section 8 & 15 affidavit for the '208 Registration.  Oakley Decl., Ex. 2 at EZAKI0000023-25.

26.     The Section 8 affidavit, attesting to continued use of the mark, was accepted for the '208 Registration on November 17, 1994.  Oakley Decl., Ex. 2 at EZAKI00000002.

27.     A Section 15 affidavit was acknowledged on August 29, 1997, thereby providing the '208 Registration with incontestable status.  Oakley Decl., Ex. 2 at EZAKI00000002.

28.     On February 19, 2009, Glico filed a Section 8 and 9 affidavit and the '208 Registration was renewed on May 5, 2009.  [Oakley Decl., Ex. 2 at EZAKI0000013-18; EZAKI0000011.

*PUBLIC VERSION*

29.     The '208 Registration depicts the Pocky product configuration as follows:



Oakley Decl., Ex. 2 at EZAKI0000151.

### *2.     The '404 Registration*

30.     On July 17, 1995, Glico filed Application Serial No. 74/701,626 to register "a biscuit in the form of a stick, covered with chocolate or cream and almonds," i.e., the configuration of its Pocky almond crush product configuration, on the Supplemental Register.  Oakley Decl., Ex. 11 (Prosecution History of U.S. Reg. No. 1,986,404) at EZAKI0000198-199.

31.     The '626 Application claimed a date of first use in the United States of at least as early as March 1992.  Oakley Decl., Ex. 11 at EZAKI0000199.

32.     Glico provided an acceptable description of the mark and amended its identification of the goods in response to an Office Action issued for the '626 Application.  Oakley Decl., Ex. 11 at EZAKI0000213-214.

33.     U.S. Registration No. 1,986,404 (the "**'404 Registration**") issued on the Supplemental Register on July 9, 1996.  Oakley Decl., Ex. 11 at EZAKI0000227.

34.     Glico filed a Section 8 and 9 affidavit on June 9, 2006 and the affidavit was accepted and the '404 Registration was renewed on March 27, 2009.  Oakley Decl., Ex. 11 at EZAKI0000161, EZAKI0000190-191.

*PUBLIC VERSION*

35.    The '404 Registration became abandoned as of January 9, 2017.  *See* Dkt. 209-1.

***3.    The '119 Registration***

36.    On October 10, 2001, Glico filed Application Serial No. 76/323,612 to register the configuration of its Pocky Almond Crush product configuration on the Principal Register. Oakley Decl., Ex. 14 (Prosecution History of U.S. Reg. No. 2,615,119) at EZAKI0000296-EZAKI0000298.

37.    The mark in the '612 Application was for the same configuration featured in the '404 Registration.  Oakley Decl., Ex. 14 at EZAKI0000296-298.

38.    The '612 Application claimed a date of first use in the United States at least as early as March 1992 and claimed distinctiveness based on Glico's ownership of the '208 and '404 Registrations and five years of substantially exclusive and continuous use of the mark.  Oakley Decl., Ex. 14 at EZAKI0000297.

39.    The PTO did not issue any office action in connection with the prosecution of the '612 Application and it was approved for publication on December 21, 2001.   Oakley Decl., Ex. 14 at EZAKI0000264.

40.    No third party, including Lotte, opposed the '612 Application.  Oakley Decl., Ex. 14.

41.    U.S. Registration No. 2,615,119 (the "**'119 Registration**") for "biscuit sticks partially covered with chocolate or cream in which are mixed crushed pieces of almond" issued on September 3, 2002.  Oakley Decl., Ex. 14 at EZAKI0000292.

42.    On October 9, 2007, Glico filed a Section 8 & 15 affidavit that was accepted and acknowledged by the PTO on November 24, 2007, which provided the '119 Registration with incontestable status.  Oakley Decl., Ex. 14 atEZAKI0000258-59, EZAKI0000253.

*PUBLIC VERSION*

43.     On August 12, 2012, Glico filed a Section 8 & 9 affidavit which was accepted on August 29, 2012 and the '119 Registration was renewed.  Oakley Decl., Ex. 14 at EZAKI0000239-252, EZAKI0000238.

44.     The '119 Registration depicts the Pocky Almond Crush product configuration as follows:



Oakley Decl., Ex. 14 at EZAKI0000228.

### C.     Consumer Knowledge and Perception of Pocky

45.     Pocky has been a well-known product in the United States and Japan for decades. Declaration of Keiichiro Tsuji in Opposition to Defendants' Motion for Summary Judgment on Functionality, Abandonment, and Laches ("**Tsuji Decl.**") ¶ 15; Oakley Decl., Ex. 2 at EZAKI0000033.

46.     In 2018, Glico's survey expert, Dr. Bruce Isaacson, conducted a consumer survey using a "Teflon" design which found that consumers perceive the Pocky product configuration and Pocky Almond Crush product configuration as branded designs, not generic designs.  *See* Declaration of Dr. Bruce Isaacson in Opposition to Defendants' Motion for Summary Judgment on Functionality, Abandonment, and Laches (the "**Isaacson Decl.**"), ¶ 16.  In Dr. Isaacson's consumer survey, 62.6% of respondents who were shown a Pocky chocolate product classified this item as a branded design, while only 29.2% classified it as a common or generic design.  *Id.* at ¶ 13.  In Dr. Isaacson's consumer survey, among respondents shown a Pocky Almond Crush product, 50.4% classified it as a branded design, while 34.3% classified it as a common or generic design.  *Id.* at ¶ 13.

*PUBLIC VERSION*

47.    Lotte has not identified or produced any evidence regarding consumer perceptions of Glico's Pocky product configuration trademarks, nor has it offered any survey results or expert opinions on this topic.  Oakley Decl. ¶ 93.

48.    Lotte has not identified or produced any evidence that Glico's Pocky product configuration trademarks do not function as a source-identifier to consumers or have lost their trademark significance.  Oakley Decl. ¶ 94.

49.    Lotte never alleged, either in its Answer or in its contention interrogatory response regarding its basis for its abandonment defense, or elsewhere, that the Pocky product configuration trademarks have lost their trademark significance.  *See* Dkt 117, Fourteenth Affirmative Defense; Oakley Decl., Ex. 5 at 8–9

## IV.    Sales of Pocky in the United States

### A.    Continuous sales in the U.S. since 1978

50.    Glico began marketing and selling Pocky products in the United States at least as early as August of 1978.  Oakley Decl., Ex. 18 (Pls.' First Supp Objections & Responses to Lotte Korea's First Set of Interrogatories) at Exhibit B; Oakley Decl., Ex. 14.

51.    Glico has been continuously selling Pocky products bearing the Pocky product configuration in the United States from 1978 through the present, and has produced its annual sales figures from 1978 through 2017.  Oakley Decl., Ex. 10 at Revised Exhibit A, Ex. 14, Ex. 18 at Exhibit B.

### B.    Steady growth of sales in the U.S. since 1978

52.    █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

*PUBLIC VERSION*

53.  ███████████████████████████████████████████████████

███████████████████

54.  ███████████████████████████████████████████████████

██████████████████████████

55.  ███████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████

### C.    Sales of Pocky in Mainstream American Retailers

56.    Pocky has been sold in American mainstream (i.e., non-ethnic specialty) retail stores

since at least as early as the mid-2000's, and, in some cases, earlier.  ███████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████

57.    Pocky has been available in the following American mainstream outlets at least as early

as the date indicated:



| Retailer | Year | Evidence |
| --- | --- | --- |
|  |  |  |

*PUBLIC VERSION*



*See also* Hansen Decl., Table 1.

**D.    Pocky Ultra Slim**

58.    Glico has sold many varieties of Pocky in the United States since 1978.  Oakley Decl.,

Ex. 10.

59.    One variety of Pocky called "Ultra Slim" (translated in Japanese as Gokuboso) was

introduced in the United States in 2007.  Oakley Decl., Ex. 10.

60.    Pocky Ultra slim has a cross-sectional width that is thinner than regular Pocky Chocolate

and other Pocky products.  Declaration of Leon Levine in Opposition to Defendants' Motion for

Summary Judgment on Functionality, Abandonment, and Laches ("**Levine Decl.**"), Ex. B.

61.    ██████████████████████████████████████████████████████

██████████████████████████

62.    ████████████████████████████████████████████████

████████████████████████████████████

*PUBLIC VERSION*

63. ██████████████████████████████████████████████████████

██████████████████████████████████████████

## V.    Sales of Pepero in the United States

### A.    Pepero sales volumes

64. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

65. ██████████████████████████████████████████████████

██████████████████████████████████████████████

66. ██████████████████████████████████████████████████████

██████████████████████████████████████████████

67. ██████████████████████████████████████████████████████

████████████████████████████████████

68. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

69. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

*PUBLIC VERSION*

70.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

71.  ███████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

**B.      Comparison with Pocky**

72.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

*PUBLIC VERSION*



73.

74.

*PUBLIC VERSION*



**C.**

75.

76.

77.

78.

79.

*PUBLIC VERSION*



**D.**

80.

81.

82.

*PUBLIC VERSION*

*PUBLIC VERSION*



83.

84.

E.

85.

86.

87.

*PUBLIC VERSION*



88. ████████████████████████████████████████

████████████████████████████████

89. ████████████████████████████████████████

████████████████████████████████████████

90. ████████████████████████████████████

████████████

---

[1] Hallerman Decl., Ex. 74.
[2] Oakley Decl., Ex. 36.
[3] Oakley Decl., Ex. 37.
[4] Oakley Decl., Ex. 38.
[5] Oakley Decl., Ex. 39.
[6] Oakley Decl., Ex. 40.
[7] Oakley Decl., Ex. 41.
[8] Oakley Decl., Ex. 42.
[9] Oakley Decl., Ex. 43.
[10] Oakley Decl., Ex. 44.

*PUBLIC VERSION*

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

██████████████████████

91.     There is no evidence that ████████████████████ had any adverse effect on

Lotte America as a going concern.  Oakley Decl. ¶ 101.

**VI.     The Pocky product configuration trademarks are not functional.**

> **A.     Glico's expert witnesses**

92.     Glico engaged two experts—Dr. Leon Levine and Mr. George Latella—to examine the

evidence in this case regarding functionality of the Pocky product configuration and offer expert

opinions on whether the Pocky product configuration is functional.  Levine Decl. ¶ 2;

Declaration of George Latella in Opposition to Defendants' Motion for Summary Judgment on

Functionality, Abandonment, and Laches ("**Latella Decl.**") ¶ 2.

93.     Both Dr. Levine and Mr. Latella concluded that the Pocky product configuration is not

functional.  Levine Decl. ¶ 17; Latella Decl. ¶ 29.

94.     Although Lotte hired a professed food expert, Roger Townley, who was deposed, Oakley

Decl., Ex. 45 (Townley Dep.) at 11:13–19, Lotte did not submit any testimony from him in its

motion.  *See, generally*, DSF.

> **B.     The Pocky product configuration trademarks are unique.**

95.     Dr. Levine opined that, in his experience and opinion, the Pocky product configuration

has an unusual shape and appearance that is different than other snack products with which he is

familiar.  Levine Decl. ¶ 17; *see also* Fukumoto Decl. ¶ 9 (████████████████████

████████████████████████████████; Tsuji Decl. ¶ 7

*PUBLIC VERSION*

(same); Declaration of Lisa Merren In Opposition to Defendants' Motion for Summary Judgment on Functionality, Abandonment, and Laches (the "**Merren Decl**."), ¶ 6 (same).

96.     Mr. Latella opined that, based on his experience and knowledge of the snack industry, the Pocky product configuration is unique in the U.S. market because, although the basic components of the product are often combined – namely chocolate or cream and biscuit or cookie – the shape, dimensions, and proportions of the Pocky product are unusual and, as such, in combination, create a unique commercial impression in the marketplace. Latella Decl. ¶ 22; *see also id.* ¶¶ 23–28.

97.     There are many different product configurations in the snack field that are comprised of elements including a cookie, cracker, wafer or biscuit dipped or partially-coated in chocolate or cream.  But there is no category of "cookie sticks" or "biscuit sticks" that are coated in chocolate or cream.  For example, the figures below depict some common partially chocolate-dipped or coated cookies or biscuits currently available on the U.S. market.



*PUBLIC VERSION*





Latella Decl. 23.

98.     In Mr. Latella's opinion, the examples in Paragraph ¶ 97 above are competitive products

to the Pocky product because they include the same primary elements, namely a cookie, cracker,

wafer or biscuit and a chocolate or cream coating.  However, none of these examples are similar

*PUBLIC VERSION*

in appearance to Pocky because they differ as to the product shape, dimension, proportion of chocolate or cream coating, and placement of the chocolate or cream coating.  Latella Decl. ¶ 24.

99.     Most of the chocolate-coated cookie or biscuit products shown in Paragraph ¶ 97 above are circular, oblong, square, or rectangular in shape.  These are the most common shapes in the snack industry.  The thin stick-shape of Pocky, on the other hand, is uncommon in the U.S. market for chocolate or cream-coated biscuits or cookies.  Latella Decl. ¶ 25.  Even compared to the products that are rectangular or otherwise elongated in shape, the Pocky product's dimensions are distinctly thinner, rounder, and/or more cylindrical, giving the product a more delicate and distinctive appearance.  Latella Decl. ¶ 26.

100.    The Pocky product is also distinguished by the proportions and placement of its chocolate and/or cream coating.  As shown in Paragraph ¶ 97 above, it is common in the snack industry to partially coat or dip cookies or biscuits with chocolate or cream, but such coating is often confined to one side of the cookie or biscuit, or it fully covers the outside of the product.  Latella Decl. ¶ 27.

101.    Mr. Latella has concluded that the appearance of the Pocky product is therefore unique among snack products.  The only other products resembling Pocky that are sold in the United States of which Mr. Latella is aware are (1) ████████████████████████████, (2) infringing, such as Pepero, or (3) gray market goods with small, isolated and sporadic sales volumes.  Latella Decl. ¶ 28.

*PUBLIC VERSION*

> **C.      Dr. Levine and Mr. Latella concluded that the Pocky product configuration is not essential to the use or purpose of a snack product, nor does it affect cost or quality.**

*1.      Dr. Levine concluded that the Pocky product configuration is not essential to the use or purpose of a snack product and does not affect the cost or quality of Pocky as a snack product.*

102.    In Dr. Levine's opinion, the features comprising Glico's Pocky product configuration are not essential to the use or purpose of the Pocky products as snack products and do not affect the cost or quality of the Pocky products.  The fundamental use and purpose of a snack product such as a chocolate confectionary or cookie is to be eaten.  Attributes such as pleasing taste and texture and ease of consumption are important for that purpose.  According to Dr. Levine, the Pocky product configuration is not essential for taste, texture, or consumption.  Levine Decl. ¶ 18.

103.    The choice to use a sweetened, flour-based biscuit could be considered important for reasons of taste and texture.  However, the choice to produce that biscuit in an elongated, thin, straight, cylindrical rod shape is an ornamental flourish, which is not essential to the taste or texture of such a sweetened, flour-based biscuit.  Nor is an elongated, thin, straight, cylindrical rod shape essential for easy consumption.  Many other shapes are equally suited for easy consumption.  For example, circular, rectangular, or square cookies or biscuits are just as easy to eat as a long cylinder.  The choice to use an elongated, thin, straight, cylindrical rod shape does not necessarily result in a higher quality product than any of the many other potential shapes available and does not necessarily affect the cost to manufacture such a product.  In fact, the flavor and texture of a snack product like a chocolate confectionary are functions of its formulation and processing conditions, such as baking time and temperature or mixing conditions—not its shape.  Levine Decl. ¶ 19.

*PUBLIC VERSION*

104.    The choice to combine chocolate (or other cream or cream-like coating) with a sweetened, flour-based biscuit could be considered important for reasons of taste and texture. However, the choice to use that chocolate (or other coating) as a partial covering is an ornamental flourish, which does not necessarily result in a higher quality product and may actually increase the cost to manufacture such a product.  Levine Decl. ¶ 20.

105.    The choice to use high quality ingredients for a chocolate confectionary can have a large effect on the quality of the finished product because quality is largely controlled by product formulation and processing, such as mixing and baking.  The quality attained by ingredient choice and appropriate baking is not generally affected by the shape of the resulting product or the choice to wholly or partially cover the product in chocolate.  Levine Decl. ¶ 21.

106.    Dr. Levine opined that the Pocky product configuration does not result from a simple or inexpensive method of manufacture and does not affect the cost of the resulting snack product as compared to alternative snack product configurations.  Levine Decl. ¶ 22.

107.    For example, based on Dr. Levine's experience in manufacturing, he believes it is cheaper to produce a fully-coated biscuit than a partially-covered biscuit.  Biscuits can be fully coated with an enrobing machine, which are standard and well-known pieces of equipment and operate on a simpler principle than machines that can be used to partially cover products.  Levine Decl. ¶ 23.  Enrobing machines do not require the products to be held.  Levine Decl. ¶ 25, 57.

108.    Even considering partially-coated chocolate confectionaries, the Pocky product configuration is not the simplest, easiest, or least expensive option.  For example, the following figure shows a number of examples of other chocolate confectionary products that do not bear the Pocky product configuration.  Levine Decl. ¶ 24 (citing Oakley Decl., Ex. 46 (EZAKI0197226–28)) & Figs. 4–7.

*PUBLIC VERSION*



109.    Confectionaries such as those shown in Paragraph 108, all of which serve the purpose of

snack products, can be made by alternative methods such as rotary moulding or extrusion and

wire cutting.  A rotary moulding machine forms pieces of dough by the action of shaped voids on

a rotating wheel.  These pieces are deposited directly onto a conveyer for transport for further

processing.  An extruder and wire cutter machine shapes dough by forcing it through an opening

and cutting it with a wire at the appropriate depth.  Levine Decl. ¶ 25 & Figs. 8 & 9.

*PUBLIC VERSION*

110.    Rotary moulding and wire cutting methods are just as suitable for creating chocolate confectionaries as the methods that can be used to manufacture a product bearing the Pocky product configuration.  And the method used to manufacture a product bearing the Pocky product configuration is not necessarily easier, simpler, or less expensive than either of these alternatives.  Levine Decl. ¶ 26.

111.    When comparing the costs to manufacture Pocky to ███████████████████ ███████ the costs are very similar when adjusted for the relative capacities of the two production lines and the difference in cost per product for these two chocolate biscuits is quite small despite their vastly different shapes and appearances.



Levine Decl. ¶ 27 (citing Oakley Decl., Ex. 47 (EZAKI0182473 (English translation by Divergent Language Solutions dated Mar. 6, 2018)) & Fig. 10

***2.    Dr. Levine opined that exclusive use of the Pocky product configuration would not put competitors at a significant non-reputation-related disadvantage.***

112.    In Dr. Levine's opinion, exclusive use of the Pocky product configuration would not put competitors at a non-reputation-related disadvantage (let alone a significant one) because there

*PUBLIC VERSION*

are a multitude of alternative designs for snack products that serve the same purposes.  Levine Decl. ¶ 28.

113.    There are other ways to deliver a coated cookie stick that do not copy the essential nature of the design and appearance of the Pocky products.  For example, chocolate-coated products such as Twix bars and the sticks extracted from Kit Kat bars are very successful implementations of stick-like products that are completely coated.  The uncoated end of the Pocky sticks is one of the visual characteristics of the Pocky product, but given these two examples, this feature is not an essential factor in the performance of the product.  Levine Decl. ¶ 29.

114.    Many snack product configuration trademarks are registered with the PTO, including on the Principal Register.  For example:

| Mark / Description | Reg. No. / Owner / Register (Status) |
| --- | --- |
|  The mark consists of the three dimensional distinctive configuration of the goods themselves. The stippling in the drawing is intended to show the three dimensional nature of the trademark and does not indicate color nor does it form a part of the trademark. | 1,929,420<br>General Mills Marketing, Inc.<br>Principal (Live) |
|  The mark consists of the shape of the chocolate and candies. The lining is for shading purposes only and does not indicate color. | 2,078,468<br>Mondelez Europe GmbH<br>Principal (Live) |

*PUBLIC VERSION*

| Mark / Description | Reg. No. / Owner / Register (Status) |
|---|---|
|  Color is not claimed as a feature of the mark. The mark consists of the configuration of a crisp snack. The stippling is a feature of the mark and does not indicate color. | 3,293,236<br><br>Frito-Lay North America, Inc.<br><br>Principal (Live) |
|  Color is not claimed as a feature of the mark. The mark consists of the configuration of a spiral-shaped chip. | 3,839,907<br><br>Frito-Lay North America, Inc.<br><br>Principal (Live) |
|  Color is not claimed as a feature of the mark. The mark is a configuration of a candy bar that consists of twelve (12) equally-sized recessed rectangular panels arranged in a four panel by three panel format with each panel having its own raised border within a large rectangle. | 4,322,502<br><br>Hershey Chocolate & Confectionery Corporation<br><br>Principal (Live) |

*PUBLIC VERSION*

| Mark / Description | Reg. No. / Owner / Register (Status) |
|---|---|
| <br><br>Color is not claimed as a feature of the mark. The mark consists of a three-dimensional configuration of a chocolate candy piece in the nature of a trapezoidal prism-like shape featuring three spaced molded diagonal ridges at the top surface. The upper left ridge is small, while the other two ridges are equal in length and longer. The matter shown in broken lines, namely, the trapezoidal prism-like shape of the candy piece, is not a portion of the mark, but is only included to show the position of the mark. | 5,164,066<br><br>Cerreta Candy Company, Inc.<br><br>Principal (Live) |
| <br><br>The stippling on the drawing is for shading purposes only. | 1,074,161<br><br>Ward-Johnston, Inc.<br><br>Principal (Dead – Expired) |
| <br><br>The mark consists of an oval potato chip containing divots and ridges depicted by squares and lines. | 2,940,951<br><br>Leng-D'Or, S.A.<br><br>Supplemental (Live) |

*PUBLIC VERSION*

| Mark / Description | Reg. No. / Owner / Register (Status) |
|---|---|
|  Color is not claimed as a feature of the mark. The mark consists of the configuration of a snack food product which consists of an elongated tube, with ridges on the outside, that is folded on itself by twisting two portions together, leaving a connected end and a second, twisted end. The linings are a feature of the mark and are not intended to indicate any particular color. | 3,346,481 J&J Snack Foods Corp. Supplemental (Live) |
|  Color is not claimed as a feature of the mark. The mark consists of a three-dimensional configuration of a chocolate bar comprising a rectangular base with raised contiguous triangular segments, each segment facing in a direction opposite from its adjacent segments. The lining in the drawing is for shading purposes only. | 4,177,308 Migros-Genossenschafts-Bund |
|  Color is not claimed as a feature of the mark. The mark consists of a three-dimensional configuration of a chocolate-covered marshmallow bar in the shape of a rectangle with rounded corners and three curved indentations on the two long sides. The lining in the drawing is for shading purposes only. | 4,420,089 Grupo Bimbo, S.A. B. de C.V. |

31

*PUBLIC VERSION*

| Mark / Description | Reg. No. / Owner / Register (Status) |
|---|---|
| <br><br>Color is not claimed as a feature of the mark. The mark consists of a three-dimensional configuration of a chocolate confection in the shape of a truncated four-sided pyramid with a star design embossed on the top. | 4,626,539<br><br>Ludwig Schokolade GmbH & Co. |

Levine Decl. Ex. A.

115.    The figures in Paragraph 108 and the trademarks in Paragraph 114 show many other potential shapes that are just as suited for manufacturing and consumption as the Pocky products. Many of the products in Paragraphs 108 and 114 are just as easy to make and eat as the Pocky product configuration.  They may, in fact, be easier or less expensive to make.  None of these shapes appear more difficult or expensive to make than the Pocky product configuration.  In Dr. Levine's experience, biscuits and cookies are not commonly made in long, thin rod shapes in dimensions that resemble the Pocky product configuration.  On the contrary, that shape is uncommon for cookies and biscuits.  Levine Decl. ¶¶ 30–31.

### 3.    *Mr. Latella concluded that there are numerous alternative snack product shapes and configurations.*

116.    There are numerous commercially available snack products that are fully coated in chocolate or cream and/or embodying different shapes and proportions than Pocky, which are successfully selling on the U.S. market.  For example, items such as Kit Kat have larger market shares than the Pocky product.  Latella Decl. ¶ 31.

117.    Mr. Latella does not believe that consumers need to use the uncoated portion of the Pocky product to eat the product without getting chocolate on their hands.  Consumers purchase

*PUBLIC VERSION*

and eat all different kinds of fully chocolate or cream-coated biscuit or cookie stick products without getting chocolate on their hands, including those products referenced and depicted in Paragraph 97 above.  Further, the risk of getting chocolate and/or cream on one's hands while consuming these fully-coated products appears only to be an issue if the products are exposed to high temperatures and are melting.  There are numerous ways that consumers can pick up and handle Pocky and there is no right way to do so.  Latella Decl. ¶¶ 32–33 (citing Oakley Decl., Ex. 48 (Oku Dep.) at 101:5-15, 81:17-25, 95: 1-15; 96:6-11); Tsuji Decl. ¶ 15.

118.     Moreover, there is no reason that a product must have the exact product configuration as Pocky in order for a consumer to eat the product without getting chocolate or cream on his or her hands.  For example, a product could be mostly uncoated, half-coated, or coated on one side, and a consumer would be able to pick it up without touching the chocolate or cream.  Further, consumers eat chocolate bars and other confectionary items all the time without getting chocolate all over their hands.  The exact amount of coating (or lack of coating), as embodied in the Pocky product configuration, is therefore not required for a consumer to eat a partially chocolate or cream coated product without getting chocolate or cream on their hands.  Latella Decl. ¶ 34.

119.     The uncoated portion of the biscuit stick is only one aspect of the product.  It would be quite possible for a snack product to replicate the proportion of product that is covered with chocolate and the proportion that is uncovered in an overall configuration that does not otherwise copy the overall product configuration of the Pocky product.  Latella Decl. ¶ 35.

120.     There are numerous alternative designs for partially chocolate or cream coated biscuits or cookies that do not embody the Pocky product configuration because they differ in size, shape, dimensions, proportions, and/or the nature and amount of chocolate or cream coating, which are

*PUBLIC VERSION*

mass-manufactured and commercially successful in the United States. ███████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

121.    In Mr. Latella's opinion, it is not necessary to have an uncovered portion of the Pocky product in order to consume the product without getting messy and there are numerous alternative product configurations for chocolate or cream-coated biscuits, cookies or confections. Latella Decl. ¶ 37.

122.    Many companies seek to protect the brand recognition and identity associated within their products' appearance by obtaining federal trademark registrations on the configurations of the products.  For example, Pepperidge Farm owns U.S. trademark registrations that protect the overall appearance of its Goldfish crackers (U.S. Trademark Registration Nos. 4726460; 3290648; 1640659), as well as its Milano cookie (U.S. Trademark Registration No. 3852499). Similarly, Hershey holds U.S. trademark registrations for the product configuration of its Hershey Kiss (U.S. Trademark Registration Nos. Reg. No. 3572216; Reg. No. 3059066; Reg. No. 3028381) and its 12-piece Hershey bar (U.S. Trademark Registration No. 4322502).

*PUBLIC VERSION*



| U.S. Trademark Registration Number | Product Configuration | Product Image | Product Name |
|---|---|---|---|
| No. 4726460; No. 3290648; No. 1640659 | | | Pepperidge Farm Goldfish |
| No. 3852499 | | | Pepperidge Farm Milano Cookies |
| No. 3572216; No. 3059066; No. 3028381 | | | Hershey's Chocolate Kiss |
| No. 4322502 | | | Hershey's Chocolate Bar |

EZAK00187818-EZAK00187809, EZAK00198721-EZAK00198767,  EZAK00198811-EZAK00198878,  EZAK00198191-EZAK00198314,  EZAK00187824-EZAK00187860, EZAK00187521-EZAK00187554; EZAK00187484-EZAK00187520; EZAK00188168-EZAK00188657

Latella Decl. ¶ 38.

123.    Mondelez Europe owns a product configuration trademark for the appearance of its Toblerone product (U.S. Trademark Registration No. 2078468) and Tootsie Roll Industries, LLC holds a product configuration trademark for the appearance of its Andes mints (U.S. Trademark Registration No. 2638806).



| U.S. Trademark Registration Number | Product Configuration | Product Image | Product Name |
|---|---|---|---|
| No. 2078468 | | | Toblerone Bar |
| No. 2638806 | | | Tootsie Roll Andes Mint |

EZAK00187403-EZAK00187483; EZAK00186521-EZAK00186608.

35

*PUBLIC VERSION*

Latella Decl. ¶ 39.

124.    Other companies have created brand recognition for the appearance of their products and also acquired trademark registrations for the unique product configurations for a wide range of snack items.  For example, Cerretta Candy Company, Inc. owns a trademark on the product configuration of its French Mints (U.S. Trademark Registration No. 5164066), McKee Foods Kingman, Inc. owns a product configuration trademark registration for the appearance of its Little Debbie Be My Valentine cakes (U.S. Trademark Registration No. 4997554), and J&J Snack Foods Corp. owns a product configuration trademark for the appearance of its Tio Pepe's Churros Pastry Stix (U.S. Trademark Registration No. 5015715).



| U.S. Trademark Registration Number | Product Configuration | Product Image | Product Name |
|---|---|---|---|
| No. 5164066 | | | Cerretta Candy Company, Inc. French Mint |
| No. 4997554 | | | Little Debbie Be My Valentine Cake |
| No. 5015715 | | | Tio Pepe's Churro Pastry Stix |

EZAKI0189070-EZAKI0189201; EZAKI0188658-EZAKI0188714; EZAKI0188715-EZAKI0189069

Latella Decl. ¶ 39.

125.    A number of companies, such as Frito-Lay North America, Inc., Rice Investment, LP, and Princeton Vanguard, LLC own product configuration trademarks for the unique shapes of their pretzel snacks (U.S. Trademark Registration Nos. 3754107 (Rold Gold Heartzels); 3646587 (Utz Pretzel Wheels); 4036701 (Pretzel Crisps)).

*PUBLIC VERSION*

| U.S. Trademark Registration Number | Product Configuration | Product Image | Product Name |
|---|---|---|---|
| No. 3754107 | | | Rold Gold Pretzel Pretzel Crisps |
| No. 3646587 | | | Utz Pretzel Wheel |
| No. 4036701 | | | The Snack Factory Pretzel Crisps |

EZAKI0187713-EZAKI0187755; EZAKI0187661-EZAKI0187712; EZAKI0187910-EZAKI0188167

Latella Decl. ¶ 40.

126.    Most, if not all, snack products, such as those depicted in Paragraphs 97 and 122–125, are designed to be convenient and easy for consumers to store, transport, and eat quickly.  Latella Decl. ¶ 42.

127.    Manufacturers of snack foods intentionally develop their products so as to taste good and appeal to one or more of four key consumer drivers: 1) to save the consumer time; 2) to save the consumer money; 3) to entertain the consumer; or 4) to make something that is good for the health of the consumer.  But manufacturers find many different ways to attain those qualities and it is not unusual for companies to emphasize these attributes in the advertising and promotion of these products.  Latella Decl. ¶ 42.  Mr. Latella opines that the Pocky product configuration is not necessary to achieve any of these attributes.  Nor is the Pocky product configuration any more suited to these attributes than any number of other snack product shapes and configurations.  Latella Decl. ¶ 42.

>    **D.     Dr. Levine and Mr. Latella concluded that the evidence Lotte cites does not
>            show that the Pocky product configuration is functional.**

> ***1.     Dr. Levine concluded that the uncoated portion of the biscuit stick does not render the
>           Pocky product configuration functional.***

128.    Dr. Levine opines that the uncoated portion of the Pocky product is not essential for the

purpose of a snack product.  For example, consumers have not rejected Kit Kat and Twix

chocolate products because they are completely coated.  Levine Decl. ¶ 33.

129.    Melting is generally not a problem for chocolate-covered snack products because

chocolate behaves as a solid over most of the temperatures that consumers regularly encounter

while eating snack products.  Levine Decl. ¶ 34–35.

130.    Americans purchase and consume many products that are fully coated in chocolate which

are more commercially successful than Pocky products.  Additionally, there are other ways to

design a coated stick product so that the chocolate portion would not be held by the consumer.

Levine Decl. ¶ 36.

131.    In addition, the uncoated portion of the biscuit stick is just one element of the Pocky

product configuration.  In Dr. Levine's opinion, even if the uncoated portion of the Pocky biscuit

sticks could play some utilitarian role in certain limited circumstances, that role does not detract

from the ornamental nature of the overall combination of features.  Levine Decl. ¶ 36.

> ***2.     Dr. Levine concluded that Lotte's other purported "utilitarian advantages" of the
>           Pocky product configuration do not render the Pocky product configuration
>           functional.***

132.    Dr. Levine opines that the Pocky product configuration is no more suited for holding,

consumption, or packaging that the vast majority of other snack products.  Levine Decl. ¶ 37.

*PUBLIC VERSION*

> a. <u>Convenience or ease of consumption is not evidence of functionality.</u>

133.   All of the snack products depicted in Paragraph 97 above are convenient, easy to hold, and easy to eat.  All snack products, virtually without exception, share these same qualities. Levine Decl. ¶ 38.

134.   Dr. Levine opines that qualities such as convenience, ease of holding, and ease of consumption cannot be evidence that the Pocky product configuration in particular is functional when virtually every possible product configuration has the same purported advantages.  Levine Decl. ¶ 38.

135.   Many products whose configurations are registered trademarks with the PTO (see Paragraph 114) are convenient, easy to hold and easy to eat.  Levine Decl. ¶ 38 & Ex. A.

> b. <u>Ease of sharing or suitability for packaging in sharable quantities are not evidence of functionality.</u>

136.   Dr. Levine opines that ease of sharing is not evidence of functionality for the Pocky product configuration.  Levine Decl. ¶ 39.

137.   A majority of snack products are sold in quantities suitable for sharing, which is two or greater.  Levine Decl. ¶ 39.

138.   Other snack products sold as a single piece are designed to facilitate breaking into multiple pieces which can be shared (for example, Reg. No. 4,322,502 on the Principal Register for a Hershey bar in Paragraph 114).  Levine Decl. ¶ 39.

139.   Dr. Levine opines that the Pocky product configuration is no better suited to sharing than the vast majority of other snack products such as those shown in Paragraphs 97 and 114.  Levine Decl. ¶ 39.

140.   Dr. Levine opines that ease of sharing cannot be evidence that the Pocky product configuration is functional.  Levine Decl. ¶ 39.

*PUBLIC VERSION*

      c.    <u>The Pocky product configuration does not reduce packaging costs.</u>

141.    Dr. Levine opines that the Pocky product configuration does not reduce packaging costs. Levine Decl. ¶ 40

142.    According to Dr. Levine, the Pocky product configuration is harder to package than many other snack products.  Packaging a long, thin product, such as Pocky requires alignment prior to packaging.  It is simpler and cheaper to package snack products whose shapes allow for pouring the product into a package (for example Reg. No. 1,929,420 and Reg. No. 3,293,236 in Paragraph 114).  Levine Decl. ¶ 40.

143.    In Dr. Levine's opinion, none of these characteristics—convenience, ease of consumption, suitability for sharing, packaging costs—are advantages of the Pocky product configuration over the vast majority of other snack products.  Levine Decl. ¶ 41.

      d.    <u>The Pocky product configuration does not create a "unique texture" or "snap."</u>

144.    Texture of a confectionary is a function of its formulation and processing conditions, not its shape.  The word "snap" is not a technical term of art that food process engineers would use to describe a confectionary.  "Snap" is an ambiguous term.  Certainly, breaking a confectionary could create a "snap" sound, but the sound would depend on the formulation and processing of the product, not its shape or appearance.  Levine Decl. ¶ 42.

**3.    *Dr. Levine concluded that the '428 patent is not evidence that the Pocky product configuration is functional.***

145.    U.S. Patent No. 8,778,428 (the "'428 patent") claims priority to an application filed in Japan on May 26, 2006.  Hallerman Decl., Ex. 34 at (30).

146.    The '428 patent states that "[s]tick-shaped snacks, such as stick-shaped pretzels, composite snacks prepared by coating such stick-shaped pretzels with chocolate or the like, etc.,

*PUBLIC VERSION*

are conventionally known." Hallerman Decl., Ex. 34, 1:20–23. This comment from 2006 refers to Pocky itself, which was known in Japan for decades prior to 2006. *See* Tsuji Decl. ¶ 15.

147.    The '428 patent is currently in force and will not expire until 2027. Hallerman Decl., Ex. 34 at (22); 35 U.S.C. § 154.

148.    Dr. Levine opines that the '428 patent is not evidence that the Pocky product configuration is functional. Levine Decl. ¶ 43.

149.    The '428 patent discloses and claims *particular methods of manufacturing* straight stick-shaped snacks. Levine Decl. ¶¶ 44–46; *see, e.g.*, Hallerman Decl., Ex. 34, Abstract & col. 6, lines 21–60 (claim 1).

150.    Dr. Levine opined that Glico did not seek or receive utility patent rights in the Pocky product configuration via the '428 patent—Glico instead received patent rights to particular manufacturing methods and products made by those particular methods. Levine Decl. ¶¶ 44–46; Hallerman Decl., Ex. 34, 6:21–8:59.

151.    Dr. Levine opines that the central advance of the '428 patent is a method of manufacturing very thin biscuit sticks—2.5 mm to 3.5 mm in cross-sectional width (which is thinner than the vast majority of standard Pocky products)—so that they remain straight while baking. Levine Decl. ¶ 45; *e.g.*, Hallerman Decl., Ex. 34, 2:13–22.

152.    Dr. Levine opines that the Pocky product configurations are not essential to, or dependent upon, that advance—they are, at most, an optional possibility which might or might not be obtained by use of the methods of only four dependent claims of the '428 patent (and, even then, only in a very thin embodiment, not reflective of most embodiments of the Pocky trade dress). Levine Decl. ¶ 45; *see, e.g.*, Hallerman Decl., Ex. 34, 6:21–60, 7:8–47, 8:8–40 (independent claims not claiming coating), 6:61–64 (claim 2), 7:48–58 (claims 6–7), 8:50–58 (claim 13).

*PUBLIC VERSION*

a.     The '428 patent does not claim the Pocky product configuration

153.    Dr. Levine opines that the '428 patent does not claim any Pocky product configurations. Levine Decl. ¶ 46.

154.    The '428 patent contains fourteen claims.  Hallerman Decl., Ex. 34, col. 6, line 21–col. 8, line 59; Levine Decl. ¶ 46.

155.    Claims 1–13 are directed to *methods of manufacture* for producing stick-shaped snacks and not the stick-shaped snacks themselves.  Hallerman Decl., Ex. 34, col. 6, line 21 (claim 1), col. 6, line 61 (claim 2), col. 6, line 65 (claim 3), col. 7, line 4 (claim 4), col. 7, line 8 (claim 5), col. 7, line 48 (claim 6), col. 7, line 52 (claim 7), col. 7, line 59 (claim 8), col. 8, line 4 (claim 9), col. 8, line 8 (claim 10), col. 8, line 40 (claim 11), col. 8, line 46 (claim 12), col. 8, line 50 (claim 13); Levine Decl. ¶ 46.

156.    Claim 14 is directed to a stick-shaped snack, but only a stick-shaped snack that is made by the particular method of claim 1.  Hallerman Decl., Ex. 34, col. 8, line 59; Levine Decl. ¶ 46. The method of claim 1 does not produce a product bearing the Pocky product configuration at least because it contains no coating step.  Hallerman Decl., Ex. 34, col. 6, lines 21–60; Levine Decl. ¶ 46.

b.     The manufacturing methods claimed in the '428 patent do not necessarily result in the Pocky product configuration

157.    Dr. Levine opines that the patented manufacturing methods of the '428 patent do not necessarily result in a product bearing the Pocky product configuration.  Levine Decl. ¶ 47.

158.    Dr. Levine opines that the methods disclosed and claimed in the '428 patent can be used to create products that do not bear the Pocky product configuration.  Levine Decl. ¶ 47.

*PUBLIC VERSION*

159.    Claims 1, 3–5, and 8–12 of the '428 patent clearly do *not* result in the Pocky product configurations because they do not recite any coating step.  Levine Decl. ¶ 48; Hallerman Decl., Ex. 34, col. 6, line 21–col. 8, line 50.

160.    Claim 14, which is directed to a stick-shaped snack made by the method of claim 1, does not cover the Pocky product configurations because performing claim 1 does not yield the Pocky product configurations.  Levine Decl. ¶ 48; Hallerman Decl., Ex. 34, col. 8, line 59, Col. 6, lines 21-60.

161.    Dr. Levine opines that claim 2 (which includes the steps of claim 1) does not necessarily yield the Pocky product configurations, or even those limited Pocky product configurations that are 2.5 mm to 3.5 mm in cross-sectional width.  Claim 2 recites that "*at least* part of the stick-shaped" pastry is coated.  Therefore, performing claim 2 could also produce a biscuit stick that is *entirely* coated, and not covered by the Pocky product configurations.  Claim 2 could also produce a biscuit stick that is half, or less than half, coated, which would also be different than the Pocky product configurations. Levine Decl. ¶ 49; Hallerman Decl., Ex. 34, col. 6, lines 61–64.

162.    Dr. Levine opines that claim 6 (which includes the steps of claim 5) does not necessarily yield the Pocky product configurations, or even those limited Pocky product configurations that are 2 mm to 3 mm in cross-sectional width before baking.  Claim 6, like claim 2, recites that "*at least* part of the stick-shaped" pastry is coated, and like claim 2, could produce biscuit sticks that are *entirely* coated or less than half coated, and therefore not the Pocky product configurations. Levine Decl. ¶ 50; Hallerman Decl., Ex. 34, col. 7, lines 47–50.

163.    Dr. Levine opines that claim 7 does not necessarily yield the Pocky product configurations, or even those limited Pocky product configurations that are 2 mm to 3 mm in

*PUBLIC VERSION*

cross-sectional width before baking.  Claim 7 recites coating a stick-shaped pastry by holding one end and immersing another end in coating material.  Therefore, claim 7 could just as easily result in a stick-shaped biscuit that is *less* than half coated, and not covered by the Pocky product configurations.  Also, nothing in claim 7 would prohibit *fully* immersing the biscuit stick in the coating material, which would also create a product that is not covered by the Pocky product configurations.  Levine Decl. ¶ 51; Hallerman Decl., Ex. 34, col. 7, lines 51–58.

164.    Dr. Levine opines that Claim 13, which includes the steps of claim 10, does not necessarily result in the Pocky product configurations, or even those limited Pocky product configurations that are 2 mm to 3 mm in cross-sectional width before baking and 2.5 mm to 3.5 mm in cross-sectional width after baking.  Claim 13 includes the steps of claim 10, and like claim 7, recites coating a stick-shaped pastry by holding one end and immersing another end in coating material.  Claim 13 could result in a (2.5 to 3.5 mm wide) stick-shaped biscuit that is *less* than half coated, and nothing in claim 13 prohibits *fully* immersing the biscuit stick in the coating material.  Neither of those alternatives, which are possible results of claim 13, would be covered by the Pocky product configurations. Levine Decl. ¶ 52; Hallerman Decl., Ex. 34, col. 8, lines 50–58.

c.    <u>The Pocky product configuration can be manufactured by other methods not disclosed or claimed in the patent</u>

165.    The patented manufacturing method of the '428 patent need not be used to create products bearing the Pocky product configuration.  Levine Decl. ¶ 53–58.

166.    The '428 patent admits that at least one other method of manufacture is used to create similar products.  Levine Decl. ¶ 53; Hallerman Decl., Ex. 34, col. 1, lines 20–35 (Background of the Invention).

167.     Although the '428 patent notes some drawbacks to the prior art method (of extrusion and fully cutting before baking), Dr. Levine opines that those drawbacks are not prohibitive.  Levine Decl. ¶ 53.

168.     One could manufacture acceptably straight biscuit sticks using such a method.  Pocky, and its product configuration, pre-dated the '428 patent by decades, and the prior art manufacturing methods that were used to make Pocky represent alternative methods used to manufacture commercially successful Pocky products bearing the Pocky product configuration.  Levine Decl. ¶ 53–58.

169.     Dr. Levine opines that there are other, simpler ways to manufacture coated cookie sticks, either partially or completely coated.  Levine Decl. ¶¶ 55–56.

170.     Dr. Levine opines that dipping sticks to partially coat them could be done in other simpler—and probably cheaper—ways such as "enrobing."  Levine Decl. ¶ 57.

        d.     <u>The purported utilitarian advantages Lotte claims as disclosed in the '428 patent are not evidence that the Pocky product configuration is functional.</u>

171.     Lotte argues in its Motion that the '428 patent discloses certain "utilitarian advantages" of the Pocky product configuration, including that (1) the shape of the biscuit makes the product easy to eat, (2) the straightness of the product results in manufacturing efficiencies, and (3) partially coating a biscuit stick increases the strength of the resulting product.  Dr. Levine disagrees that these purported "utilitarian advantages" are a result of the Pocky product configuration.  Levine Decl. ¶ 59.

172.     Dr. Levine opines that ease of consumption is not a quality that renders a design functional for the reasons discussed in Paragraph 133–135, above.  Levine Decl. ¶ 60.

173.     The '428 patent only describes ease of consumption as an advantage with respect to biscuit sticks having a maximum cross-sectional width of 2.5 mm to 3.5 mm, and it distinguishes

*PUBLIC VERSION*

biscuit sticks with the dimensions of most varieties of Pocky as less easy to eat.  Hallerman Decl., Ex. 34, col. 4, lines 39-43; Levine Decl. ¶ 60.

174.    Dr. Levine opines that the straightness of the biscuit stick is not an advantage that renders the Pocky product configuration functional.  Levine Decl. ¶ 61.

175.    The '428 patent and its prosecution history compare two relatively identical stick-shaped products, one very straight, Hallerman Decl., Ex. 34, col. 1, 60–62 (describing the invention), and the other also straight but with some warping at the ends.  Hallerman Decl., Ex. 34, col. 1, lines 48–51 (describing prior art products); Levine Decl. ¶ 61.

176.    The '428 patent states that a biscuit stick that is very straight shape with no warping at the ends has advantages over a shape with warping, Hallerman Decl., Ex. 34, col. 5, line 64– col. 6, line 7, and thus it claims a method to prevent warping at the ends.  E.g. Hallerman Decl., Ex. 34, col. 6, lines 21–60 (claim 1); Levine Decl. ¶ 61.

177.    The Pocky product configuration, which includes other features besides the straightness of the stick, covers both very straight and relatively straight products (with some end-warping). Levine Decl. ¶ 61.

178.    In the real world, there is no such thing as a perfectly straight product—from an engineering perspective, all real world objects are straight to within some tolerance.  This is particularly true for food products.  Levine Decl. ¶ 61.

179.    Dr. Levine has opined that absolute straightness is not essential to the Pocky product configuration.  Levine Decl. ¶ 61.

180.    The '428 patent does not address shapes other than biscuit sticks (and only very thin ones at that) and therefore does not disclose any utilitarian advantage of the Pocky product

*PUBLIC VERSION*

configuration as compared to products with other shapes, such as circular, square, or rectangular. Levine Decl. ¶ 62; *see, e.g.*, Hallerman Decl., Ex. 34, col. 47–62.

181.     Dr. Levine has opined that a biscuit stick need not be perfectly straight to facilitate manufacturing.  Levine Decl. ¶ 63.

182.     The '428 patent itself notes two alternative methods of coating that do not require picking up the sticks (e.g., passing the sticks on a conveyor under a curtain of coating material).  Levine Decl. ¶ 63; Hallerman Decl., Ex. 34, col. 6, lines 13–19.

183.     In addition, the '428 patent does not suggest that its approach is necessary for creating relatively straight biscuit sticks that are wider than 3.5 mm.  Levine Decl. ¶ 63.

184.     Coating a biscuit stick will make it stronger, but so will increasing the thickness of the stick, which would not necessarily yield the Pocky product configuration.  Levine Decl. ¶ 64.

185.     Any increase in thickness—whether by coating or simply increasing the diameter of the uncoated stick—will increase the stick strength.  Levine Decl. ¶ 64.

186.     Coating the entirety of a biscuit stick, rather than just part, would also make the product stronger without yielding the Pocky product configuration.  Levine Decl. ¶ 65.

187.     Dr. Levine opines that the choice to coat only part of a biscuit stick—instead of increasing the width of the product or coating the whole length of the product—is not an advantage over the alternatives, but a choice to yield a particular ornamental appearance.  Levine Decl. ¶ 65.

188.     A fully coated stick will be stronger than a partially coated stick—if the purpose was to strengthen the product, it would be more effective to coat the whole thing from one end to the other.  Levine Decl. ¶ 65.

*PUBLIC VERSION*

189.    Dr. Levine opines that the Pocky product configurations are not necessary for a stronger product.  Lots of snack products have chocolate or cream coatings, but such a coating does not make them functional. Levine Decl. ¶ 66.

190.    The '428 patent only describes added strength of the coating as a purported advantage as applicable to biscuit sticks having a maximum cross-sectional width of 2.5 mm to 3.5 mm, thereby distinguishing biscuit sticks with the dimensions of most varieties of Pocky.  Levine Decl. ¶ 67; Hallerman Decl., Ex. 34, col. 6, lines 8-12.

191.    The '428 patent says nothing about "snap"—in fact, the word "snap" does not appear in the '428 patent at all.  Levine Decl. ¶ 68.

> e.    <u>At most the '428 patent discusses and claims methods that result in a biscuit stick that is 2.5 mm to 3.5 mm in cross-sectional width, which does not match the vast majority of embodiments of the Pocky product configuration.</u>

192.    Dr. Levine opines that the '428 patent discusses only a subset of the possible embodiments of the Pocky product configuration and distinguishes others, including embodiments that encompass the vast majority of Pocky products.  Levine Decl. ¶ 69.

193.    The '428 patent describes purported attributes of a biscuit stick as they relate to stick-shaped pastries with a "maximal cross-sectional width of . . . 2.5 mm to 3.5 mm."  Hallerman Decl., Ex. 34, col. 2, lines 20–21, col. 4, lines 34–44; Levine Decl. 69–70.

194.    The normal Pocky product configuration does not fall within the scope of the '428 patent's disclosure or claims because its cross-sectional width is about 4.0 mm.  Levine Decl. ¶ 71, Ex. B.

195.    The normal Pocky products do not conform to the maximum dimensions disclosed and claimed in the '428 patent, but are as much as 50% larger.  Levine Decl. ¶ 71, Ex. B.

*PUBLIC VERSION*

196.     The difference in cross-sectional width that Dr. Levine measured between Ultra Slim

Pocky and regular Chocolate Pocky was about 33%, which is a significant difference.  Levine

Decl. ¶ 72.

197.     Dr. Levine opines that a patent related to one embodiment of a product configuration, but

that distinguishes all other embodiments of the same product configuration, cannot show

functionality of the product configuration as a whole.  Levine Decl. ¶ 73.

**4.     *Dr. Levine concluded that the Japanese utility model is not evidence that the Pocky
         product configuration is functional***

198.     Ezaki Glico's Japanese Utility Model No. 903255 was part of the record considered by

the USPTO before it issued Glico's trademark Reg. No. 1,527,208.  Oakley Decl., Ex. 2 at

EZAKI0000054–57.

199.     The PTO was aware of the Japanese utility model, and nonetheless issued the '208

trademark registration to the Pocky product configuration.  Oakley Decl., Ex. 2 at

EZAKI0000151.

200.     The detailed description in the utility model presents a chocolate coated biscuit, but

focuses specifically on "depression B," into which the chocolate is inlaid.  Levine Decl. ¶ 75;

Hallerman Decl., Ex. 28 ("chocolate C that covers biscuit part A partly sets into grooves B and

more fully combines biscuit part A with chocolate part C, so that even when biscuit part A is

covered with chocolate C in a manner that leaves part D thereof exposed, not only is chocolate

part C is less prone to becoming separated from biscuit part A, but causing grooves B to be set

parallel to the 2 generating lines symmetrical to the center line of the cylindrical biscuit part A

also prevents virtually any loss of biscuit part A's strength against lateral pressure by virtue of

having formed grooves B, making [the invention] sensible and practical").

*PUBLIC VERSION*

201.    Dr. Levine opines that the "improvement" of Glico's utility model is the depression B rather than the overall shape and appearance. Including this depression or groove serves to increase the thickness of the coating and may change the moment of inertia (and therefore strength) of the resulting product slightly. Levine Decl. ¶ 75.

202.    Depression B is not relevant to this case because it is not part of the Pocky product configuration. Levine Decl. ¶ 75.

203.    There is no intellectual property right corresponding to a utility model in the United States, and a Japanese utility model is not the same as a U.S. utility patent. Oakley Decl., Ex. 49 (World Intellectual Property Organization ("WIPO") summary of types of nation protection available) at 2 (showing utility model instead of patent in available in Japan), 3 (showing utility model not available in the U.S.); Oakley Decl., Ex. 50 (WIPO summary of where Utility models can be acquired).

204.    Statements in the utility model about the product being "devised so that it can be easily eaten" and that "the 'elongated shape' of the partially coated biscuit stick makes it easy to eat and 'very convenient'" are not related to the improvement for which Glico applied in the utility model. Levine Decl. ¶ 75. The fact that the Pocky product configuration is easy to eat or convenient does not distinguish it from any other snack food product configuration. There are any number of snack foods that are easy to eat and convenient, yet do not bear the Pocky product configuration. Levine Decl. ¶ 76.

205.    The uncoated portion of the biscuit stick is an unnecessary ornamental flourish because chocolate and other coatings do not adhere to the hand under normal conditions. Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 46–49.

*PUBLIC VERSION*

**5.      Dr. Levine concluded that the other two U.S. utility patents Lotte cites are not evidence that the Pocky product configuration is functional.**

206.    Dr. Levine opines that U.S. Patent No. 6,242,021 ("**Rooney**") and U.S. Patent No.

4,889,729 ("**Aujourd'hui**") are not evidence that the Pocky product configuration is functional.

Levine Decl. ¶¶ 77, 82.

207.    Neither of the Rooney nor Aujourd'hui patents disclose a product that looks anything like

the Pocky product configurations.  Levine Decl. ¶ 78.  Dr. Levine, therefore, opines that Rooney

and Aujourd'hui cannot have any bearing on the functionality of the Pocky product

configurations, which must be considered as a whole.  Levine Decl. ¶ 78.

208.    Rooney discloses a "stick," but one that is surrounded by shapes that look like Cheerios.

The only commonality between the product disclosed in Rooney and the Pocky product

configuration is that there is an underlying stick.  The products otherwise look very different.

The product of Rooney is specifically described as an edible "toy," and the neatness of the

product doesn't come into the discussion.  Hallerman Decl., Ex. 36, Abstract & col. 1, lines 55–

58.



Figure 19.  Figure 1 of Rooney.

Levine Decl. ¶ 79.

*PUBLIC VERSION*

209.    The product disclosed in Aujourd'hui looks vastly different than the Pocky product

configurations.  Levine Decl. ¶ 80; Hallerman Decl., Ex 37, Fig. 1.

210.    Aujourd'hui discloses a product that looks more like Keebler Fudge Sticks, or Kit Kats—

a multilayered product of wafers separated by cream layers—which doesn't even vaguely look

like the Pocky product configurations.  Levine Decl. ¶ 80; Hallerman Decl., Ex 37, Fig. 1.

211.    Aujourd'hui claims an entirely different kind of "holding member" than the uncoated

portion of the Pocky product configuration.  Aujourd'hui specifically states that the non-sticky

finger piece is a wafer.  Levine Decl. ¶ 80; Hallerman Decl., Ex 37, col. 2, lines 40–45.



Figure 20.  Figure 1 of Aujourd'hui.

Levine Decl. ¶ 80.

212.    Aujourd'hui demonstrates that there are different ways to design a confectionary to be

held.  Levine Decl. ¶ 80.

213.    Dr. Levine opines that Aujourd'hui does not demonstrate that the wafer holding members

are essential to the use or purpose of a confectionary.  Levine Decl. ¶ 81.

214.    Dr. Levine disagrees with Aujourd'hui's implication that "wafer sheet pieces" need to be

applied to "chocolate products in order to avoid melting the chocolate by holding it in the hand"

because under most normal conditions chocolate does not immediately melt and soil a consumer's fingers.  Many chocolate products are entirely coated, and consumers use their fingers to eat snack products that are completely coated in chocolate or other material all the time.  Levine Decl. ¶ 81.

215.    Because of their major differences, Dr. Levine does not believe that either of the Rooney or Aujourd'hui patents are evidence that the Pocky product configuration is functional.  Levine Decl. ¶ 82.

216.    Lotte argues in its motion that the Rooney and Aujourd'hui patents bear specifically on the uncoated portion of the Pocky product configuration.  However, the uncoated portion is just one aspect of the overall appearance of the Pocky product configuration.  Levine Decl. ¶ 82.

### 6.    *Mr. Latella concluded that none of Glico's advertising or Lotte's other purported evidence shows that the Pocky product configuration is functional.*

217.    Mr. Latella opines that when the functionality inquiry is properly confined to the correct question—whether the product configuration is essential to the use or purpose or affects the cost or quality—and applied with an eye toward the snack market in general, Glico's advertising for Pocky products does not demonstrate that the Pocky product configuration is functional, either in whole or in part.  Latella Decl. ¶ 43.

218.    The uncoated portion of the Pocky product is not a functional feature of the Pocky product configuration at least because consumers purchase and eat all different kinds of fully chocolate or cream-coated biscuit, cookie or wafer products without getting chocolate or cream on their hands, including the products referenced in Paragraphs 97 and 122–125.  Latella Decl. ¶ 44.  The fact that the uncoated portion of the Pocky product allows users to see the biscuit stick does not make it a functional feature.  Latella Decl. ¶¶ 57–58.  Mr. Latella's deposition testimony was directed at artisanal products, not mass-produced products like Pocky.  Latella

*PUBLIC VERSION*

Decl. ¶ 58.  There are other ways to identify the nature of the product under a coating, such as describing the product or depicting a cutaway on the packaging.  Latella Decl. ¶ 58.  Indeed, Pocky's packaging states that the product is "chocolate cream covered biscuit sticks."  Latella Decl. ¶ 58.

219.   The risk of getting melted chocolate or cream on one's hands appears only to be an issue if coated products are exposed to high temperatures or held for a lengthy period.  Latella Decl. ¶ 45.

220.   Consumers eating a snack product normally would not hold onto the product for extended amounts of time, just for the length of time it takes consumers to consume the product.  Latella Decl. ¶ 45.

221.   Mr. Latella opines that the uncoated portion is not essential to the use or purpose of the Pocky product configuration because there are numerous ways that consumers can pick up and handle Pocky and that there is no right way to do so.  Latella Decl. ¶ 46.

222.   Glico provides demonstrations of the Pocky product in which the product is displayed and demonstrated in different ways, and consumers are not instructed or encouraged to pick up the Pocky product in any particular way.  Oakley Decl., Ex. 51 (Merren Dep.) at 154:5-155:13; Latella Decl. ¶ 47.

223.   Mr. Latella opines that there is no reason that a product must have the exact product configuration as Pocky in order to allow a consumer to eat a product without getting chocolate or cream on his or her hands and that the uncoated portion is not "essential to the use or purpose" of the product.  Latella Decl. ¶ 48.

224.   Mr. Latella opines that the uncoated portion of the Pocky product is simply one aspect of the Pocky product configuration and that even if the uncoated portion of the Pocky product had

some utility, that would not render the overall Pocky product configuration functional.  Latella Decl. ¶ 49.

225.    Lotte argues in its motion that the shape of the Pocky product configuration is functional because it renders products bearing this configuration convenient for transporting and sharing, because it allows for compact packaging, or because Glico has advertised these features to consumers in promoting the Pocky product.  Mr. Latella disagrees with each and every one of Lotte's arguments.  Latella Decl. ¶ 50–56.

226.    Snack products are intentionally designed to be easy and convenient for purchasers to transport and consume.  To that end, manufacturers generally configure their snack products so as make them portable, shareable, compact, and easy to eat on the go.  These attributes do not render the products "functional" and many companies have trademark registrations for the product configurations of products that have these qualities.  Moreover, it is not unusual for companies to emphasize these attributes in the advertising and promotion of these products.  Latella Decl. ¶ 51.

227.    Many of the registered trademark snack product configurations Paragraphs 122–125— which bear totally different and distinct shapes and appearances from the Pocky product configuration—are just as, or even more, portable, compact, and easier to share than products bearing the Pocky product configuration.  Latella Decl. ¶ 52.

228.    The shapes of the Pepperidge Farm Goldfish crackers, Pepperidge Farm Milano cookies, Hershey Kisses, Rold Gold Pretzel Heartzels, Utz Pretzel Wheels, and Snack Factory Pretzel Crips all lend themselves to sales in soft packages that are easy to fit in a pocket, purse, backpack, or lunch bag.  Typical packages for these items are shown below:



Latella Decl. ¶ 52.

229.    The products shown in Paragraph 227 are at least as portable as the Pocky product (or more so) because the shapes of these products are less fragile than the elongated, thin shape of the Pocky product, which requires a cardboard box to protect it.  Latella Decl. ¶ 53.

230.    The shapes of all of these products shown in Paragraph 227 are just as compact and just as easy to package and share as the Pocky product configuration (or more so), as demonstrated by the simple fact that more of them come in a single package.  Latella Decl. ¶ 54.

231.    Packaging efficiencies can also be achieved with almost any small or thin shape, and, if anything, the Pocky product configuration is less utilitarian than other snack products in this regard.  For example, while the Pocky products need to be aligned within their packaging to prevent breakage, other configurations are not aligned or arranged in any particular order within the packaging, making them easier to package.  Latella Decl. ¶ 56.

232.    Mr. Latella opines that convenience, portability, compactness, and shareability are commonly shared benefits of most snack products and the particular shape and appearance of the

*PUBLIC VERSION*

Pocky product configuration cannot be said to be essential to its use or purpose as a snack product on this basis.  Latella Decl. ¶ 56.

**E.      At deposition, Lotte's expert Mr. Townley agreed with many of Glico's experts' conclusions.**



*PUBLIC VERSION*

**F.     Lotte attempted to register the Pocky product configuration as a trademark in the United States.**

240.   ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



Oakley Decl., Ex. 52 at PWSP0007.

241.   The product configuration that Lotte was attempting to register is indistinguishable from

Glico's '119 and '404 Registrations in material respects:



Glico's Pocky Almond Crush product configuration reflected in the '119 and '404 Registrations.

242.   ███████████████████████████████████████████████████

███████████████████████████████████████████████████

*PUBLIC VERSION*



243. ████████████████████████████████████████████

████████████████████████████████████████

████████████████████

244. ████████████████████████████████████████

█████████████████████████████████████████████

245. ███████████████████████████████████████

██████████████████████████

246. ████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

247.     The '773 application became abandoned when Lotte failed to respond to the office action

by September 28, 1996.  Oakley Decl., Ex. 53 (Status of App. No. 74/712,773).

        **G.     Lotte has attempted to register the Pocky product configuration as a
                 trademark in other jurisdictions that prohibit trade dress rights covering
                 functional product configurations.**

248. ████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

*PUBLIC VERSION*

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

249.  ██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

250.  ██████████████████████████████████████

███████████████████████

| **Jurisdiction** **Statutory Authority** **(Citation)** | **Pertinent Bars to Registration** |
|---|---|
| ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ | |

*PUBLIC VERSION*



*PUBLIC VERSION*



251. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

252. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

253. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

254. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

*PUBLIC VERSION*



255. ████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

**VII.** ████████████████████████████████

    **A.**     **Glico's trademarks**

256.    Glico began marketing and selling Pocky products in the United States at least as early as August of 1978. *See* Oakley Decl., Ex. 10 at Revised Exhibit A; *id.*, Ex. 14.

257.    Glico has been continuously selling POCKY products bearing the Pocky product configuration in the United States from 1978 through the present, ████████████████████ ███████████████████████████ *See* Oakley Decl., Ex. 10 at Revised Exhibit A; *id.*, Ex. 14.

258. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

259.    Glico is the owner of, *inter alia*, the following U.S. Trademark Registrations for the Pocky product configuration and the Pocky Almond Crush product configuration: U.S. Glico's U.S. Trademark Registration No. 1,527,208 (the "'**208 Registration**") for the Pocky product configuration, registered on the Principal Register on February 28, 1989; U.S. Trademark Registration No. 1,986,404, (the "'**404 Registration**") for the Pocky Almond Crush product configuration, registered on the Supplemental Register on July 9, 1996, and U.S. Trademark Registration No. 2,615,119 (the "'**119 Registration**") for the Pocky Almond Crush product configuration, registered on the Principal Register on September 3, 2002. *See* Oakley Decl., Exs. 2, 11, 14.

*PUBLIC VERSION*



**B.**

260.

261.

262.

263.

264.

265.

266.

*PUBLIC VERSION*



267.

268.

269.

270.

271.

272.

*PUBLIC VERSION*

273.  ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

274.  █████████████████████████████████████

███████████████████████████████████████████

275.  █████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

276.  ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

277.    As Glico's trademark rights to the Pocky product configuration, as identified in the '208

Registration, are still valid and subsisting, ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

278.  █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*PUBLIC VERSION*



**C.**

279.

280.

281.

282.

283.


284.

285.

286.

287.

288.

289.



68

*PUBLIC VERSION*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ *Id.*

290. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

      **D.** ████████████████████████

291. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█

292. ████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

293. ████████████████████████████████████████████

████████████████████████████████████████████████████

*PUBLIC VERSION*



294.

295.

296.

297.

298.

*PUBLIC VERSION*

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

299.   ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

300.   ████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

**VIII.   Glico did not unreasonably delay legal proceedings, nor did Lotte suffer any prejudice from the timing of this suit.**

   **A.      Glico diligently put Lotte on notice that Glico objected to the sale of Pepero ████████████████████████████████████████████████████**

301.   In 1993 and 1994, Glico's outside counsel sent Lotte letters objecting to the sale of Lotte's infringing products in the U.S., asserting that those sales were likely to cause confusion, and "demand[ing] that [Lotte] immediately cease all manufacturing and sales of the Pepero and Choco Pretch snack foods in their current configuration and use of their existing packaging." Oakley Decl., Ex. 65 (letter from R. Grossman dated Dec. 13, 1993).

302.   ████████████████████████████████████████████

███████████████████████████████████████████████

*PUBLIC VERSION*



303.    After a further letter from Glico's counsel in March 1994, ▮▮▮▮▮▮▮▮▮▮▮

304.    ▮▮▮▮▮▮▮▮▮▮▮

305.    ▮▮▮▮▮▮▮▮▮▮▮

**B.    Lotte claims that it was anticipating litigation regarding its sales of Pepero in the U.S. throughout the 2000s until this suit was brought.**

306.    According to its privilege logs, Lotte asserted the work product doctrine (and therefore anticipated litigation) "regarding distribution of Pepero products in the United States" in 2003, 2012, and 2014.  Oakley Decl., Ex. 66 (Lotte America's Second Amended Privilege Log) at 1, 4, 5.

307.    Lotte America asserted attorney work product to shield documents from 2003 from disclosure, claiming that Lotte anticipated litigation regarding distribution of Pepero in the United States.  Dkt. 170 at 9–10.

308.    After examining some of those documents *in camera*, Magistrate Judge Wettre concluded that Lotte was, in fact, anticipating litigation in 2003.  *See* Dkt. 191.

*PUBLIC VERSION*

C.    **The alleged economic injury upon which Lotte relies supports the notion that Lotte carried on its business as usual without any significant or excessive change in promotion or advertising, which is not sufficient for a finding of laches.**

309.  ████████████████████████████████████████████████████

████████████████████████████████████████████████

310.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████



_____

[11] Hallerman Decl., Ex. 77 (LOTTE00004945).
[12] Hansen Decl., Ex. 1.

*PUBLIC VERSION*



311.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

### D.     New evidence and arguments

312.  Glico propounded an interrogatory seeking "all the factual bases for [Lotte's] Fourth

Affirmative Defense (Dkt. 117) that 'Plaintiffs' claims are barred by laches, as Plaintiffs

unreasonably delayed in bringing this action and thus prejudiced Defendants.'"  Oakley Decl.,

Ex. 67 (Glico's Second Set of Interrogatories to Lotte Korea) at 10.

313.  In response, Lotte answered:

> Lotte's PEPERO cookie sticks have been continuously and openly and
> notoriously sold in the United States since at least 1987 in the same stores as
> Ezaki Glico's POCKY cookie sticks and in competition with POCKY cookie
> sticks. Since at least March 1990, Ezaki Glico had actual knowledge that Lotte
> Confectionary was selling PEPERO cookie sticks throughout the United States,
> including in the same stores on the same shelves as Ezaki Glico's POCKY cookie
> sticks and in direct competition with Ezaki Glico's POCKY cookie sticks. In
> December 1993, Ezaki Glico's outside litigation counsel sent Lotte Confectionary
> a letter alleging that Ezaki Glico owned a trademark for the POCKY cookie stick,
> that Lotte's sale of PEPERO cookie sticks in the United States was causing a
> likelihood of confusion with the POCKY cookie stick, and demanding that Lotte
> stop selling PEPERO cookie sticks in the United States. Ezaki Glico's outside
> litigation counsel in the United States stated in subsequent letters to Lotte
> Confectionary in 1994 that Ezaki Glico owned a federal registration for its
> POCKY cookie stick configuration, that Lotte was liable for trademark
> infringement and unfair competition based on its sales of PEPERO cookie sticks

*PUBLIC VERSION*

in the United States, and that if Lotte did not stop selling PEPERO cookie sticks in the United States, Ezaki Glico would file a lawsuit against Lotte and seek monetary damages. Lotte continued to sell PEPERO cookie sticks throughout the United States, including in the same stores on the same shelves as Ezaki Glico's POCKY cookie sticks and in direct competition with Ezaki Glico's POCKY cookie sticks.

Ezaki Glico had actual knowledge that Lotte Confectionary was continuing to sell PEPERO cookie sticks in the United States, including in the same stores and on the same shelves as POCKY cookie sticks and in direct competition with POCKY cookie sticks in every year from 1994 through the filing of this action in 2015. Despite Lotte's refusal to stop selling PEPERO cookie sticks in response to Ezaki Glico's December 1993 letter and Ezaki Glico's actual and continuous knowledge from 1994 up until this action was commenced in 2015 that Lotte was continuing to sell PEPERO cookie sticks throughout the United States, including in the same stores and on the same shelves that Ezaki Glico was selling POCKY cookie sticks and in competition with POCKY cookie sticks, Ezaki Glico never objected at any time to those sales after 1994 until the filing of this lawsuit more than twenty years later in 2015.

Ezaki Glico's decades-long, inexcusable delay in filing suit has caused substantial, material prejudice to Lotte. In reliance on Ezaki Glico's decades-long delay in filing this action and Ezaki Glico's implied consent to the sale of PEPERO cookie sticks in the United States, Lotte has built up an enormously valuable business around the PEPERO cookie stick. During Ezaki Glico's delay, Lotte invested substantial resources in the advertising, marketing and promotion of the PEPERO cookie stick throughout the United States, earned millions of dollars from the sales of the products and built, at great effort, time and expense, significant distribution and retail channels for PEPERO cookie sticks, as well as a continuously growing and loyal client following of end users of PEPERO cookie sticks throughout the United States.

If Ezaki Glico had sued in the 1980s or 1990s and won, Lotte would not have dedicated the massive amount of time, effort and resources that over the course of 30 years of sales in the United States has created enormous goodwill and recognition in the PEPERO mark and made PEPERO cookie sticks into Lotte's second best-selling product in the United States and created a large, vibrant and growing customer base. Lotte America's business is largely built around the sale of PEPERO cookie sticks. If Ezaki Glico had sued and won back in the 1980s or 1990s, Lotte would have invested in establishing products other than PEPERO in the United States, and if it is enjoined now, it will lose all of this investment. Ezaki Glico's deliberate and bad faith decision to sit back and watch while Lotte developed an enormously successful product, business, and brand recognition around PEPERO before suing has increased Lotte's potential liability given the millions in sales that were made over three decades.

*PUBLIC VERSION*

In addition, Ezaki Glico has caused massive and material evidentiary prejudice to Lotte because of Ezaki Glico's nearly thirty-year delay in filing suit. Lotte created PEPERO in the early 1980s. Much of Lotte's documents relating to the creation and design of the PEPERO cookie stick were discarded long ago in the ordinary course of business, as were detailed sales records of exports of PEPERO cookie sticks to the United States, to whom those products were sold and the costs of those products. Plaintiffs have lost or discarded critically relevant documents such as (without limitation) documents relating to when Ezaki Glico first learned of PEPERO and the circumstances surrounding how it first learned of PEPERO sales in the United States and what it knew about PEPERO being sold in the United States in the 1980s and 1990s, as well as its sales documents showing exports of POCKY into the United States, and the identity of its customers, all of which allegedly dates back to the late 1970s. The third parties that may have had such documents or records also discarded them in the ordinary course of business.

Witnesses (for both Plaintiffs and Defendants) with information about the creation and design of the parties' respective POCKY and PEPERO cookie stick products, the sales and promotion of those products in the 1980s and 1990s in the United States, and Ezaki Glico's knowledge of PEPERO cookie sticks sales in the United States beginning in the 1980s have passed away or are no longer employed by the parties, and are unavailable. Some witnesses who once may have had knowledge, have dull and faded memories of the events that transpired in the 1980s and 1990s with respect to PEPERO and POCKY in the United States. If Ezaki Glico had timely brought this suit in the 1980s or early 1990s instead of sitting back and watching as Lotte built up a valuable business around PEPERO cookie sticks over a thirty-year period, Lotte would have suffered none of this evidentiary prejudice. Ezaki Glico has benefited from the loss of evidence that was occasioned by its bad faith and considered decision to wait thirty-years to file this case.

Lotte Confectionary reserves the right to supplement this response based on discovery produced later in this case.

Oakley Decl., Ex. 5 at 3–7.

314.    Lotte did not disclose in its contention interrogatory responses any theory of economic

prejudice related to Paragraph 19 of the Declaration of Sung Sik Eum in Support of Lotte's

Motion for Summary Judgment, Dkt. 239 ("**Eum Decl.**"):

The demand and popularity of Pepero allows Lotte America to persuade retailers to stock Lotte America's less well-known snack products. If Lotte America could no longer sell Pepero, the demand for many of its less well-known snacks would evaporate and it would lose many customers altogether.

*See* Oakley Decl., Ex. 5 at 3–7.

*PUBLIC VERSION*

315.    Lotte did not disclose in its contention interrogatory responses any theory of economic

prejudice related to Paragraph 20 of the Eum Decl.:

> Lotte America orders large quantities of Pepero from Lotte Confectionery every
> month both for its retail business and for its wholesale customers. The Pepero is
> shipped to the United States from Korea in large shipping containers that also
> hold the other snack products that Lotte America plans to sell. Due to the
> significant costs involved in shipment and importation of a container, the
> containers are shipped full to justify the cost. If Lotte America is prohibited from
> importing Pepero, it not be able to place orders of its less well-known snack
> products that are large enough to fill a container. Lotte America would have to
> either take a loss on each partially-filled container or stop importing Lotte
> Confectionery snack products altogether.

*See* Oakley Decl., Ex. 5 at 3–7.

316.    Lotte did not disclose in its contention interrogatory responses any theory of economic

prejudice related to Paragraph 20 of the Eum Decl.:

> The prohibitive cost of importation, combined with the loss of customers who are
> primarily interested in Pepero rather than Lotte America's other snacks, would
> likely make it impossible for Lotte America to sustain its snack importation
> business. Lotte America would likely need to lay off employees and relinquish its
> warehouse and trucking services.

*See* Oakley Decl., Ex. 5 at 3–7.

317.    The first time Lotte disclosed any theory related to Paragraphs 18–20 of the Eum Decl.

was when Lotte actually served the Eum Decl. on September 27, 2018, six days after its motion

for summary judgment was due.  Dkt. 239.

## IX.    Lotte is a willful infringer of Glico's Pocky product configuration trademarks.

      **A.**    ███████████████████████████████████████████

318.    ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

*PUBLIC VERSION*

319. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

320. ███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

321. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████

322. ███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

323. ███████████████████████████████████████████████

███████████████████████████████████████████████████

*PUBLIC VERSION*



324. ████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

325. ████████████████████████████████

████████████████████████

326.    In 2015, a court in Korea found Lotte guilty of copying the package design for Glico's

Baton d'Or products, a premier version of Pocky.  Oakley Decl., Exs. 79 (news article) & 80

(court decision).

**B.** ████████████████████████████████

327.    After Glico sent cease and desist letters in 1993 and 1994, ██████████████

█████████████████████████████████████████████

█████████████████████████

328. ████████████████████████████████████

████████████████

**C.** ████████████████████████████

329. ██████████████████████████████████████

███████████████

330. █████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

79

*PUBLIC VERSION*

███████████████████████████████████████████████████

███████████████████████████

331.   ███████████████████████████████████████████████████

███████████████████

332.   Glico seeks the profits Lotte made from Pepero, starting six years prior to this suit.

Dkt. 102 at 10; Oakley Decl., Ex. 10 at 7–8.

*PUBLIC VERSION*

In accordance with Local Rule 56.1(a), Glico hereby sets forth this response in opposition to Lotte's Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, Dkt. 235.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     The Pocky product configuration is <u>not</u> functional.

### A.     The Pocky Product Configuration Trade Dress

1.     Glico claims trade dress in a biscuit stick partially coated with chocolate or cream, and in some cases, crushed almonds (the "Pocky product configuration").  Glico owns two relevant trademark registrations for its configuration:

| Reg. No. | Registered Configuration | Glico's Description of the Configuration | Goods |
|---|---|---|---|
| 1,527,208 | | "The mark comprises an elongated rod comprising biscuit or the like, partially covered with chocolate." | "Chocolate covered candy stick" |
| 2,615,119 | | "The mark consists of the configuration of the applicant's goods, which are biscuit sticks, covered with chocolate or cream and almonds." | "Biscuit stick partially covered with chocolate or cream in which are mixed crushed pieces of almond." |

Dkt. 102 at Exs. 1, 3.  Glico filed the application for the configuration shown in Registration No. 1,527,208 on December 16, 1987, which was later registered on February 28, 1989.  *Id.* Ex. 1.  Glico filed the application for Registration No. 2,615,119 on October 10, 2001, and it registered on September 3, 2002.  *Id.* at Ex. 3.

**Response:**  Disputed.  Glico owns three relevant trademark registrations for the Pocky product configuration.  Dkt. 102 at Ex 2; *see* PSF ¶¶ 18–44.

2.     Glico has defined its Pocky product configuration trade dress as:

*PUBLIC VERSION*

> (1) An elongated, thin, straight, cylindrical rod-shaped biscuit;
> (2) With more than half, but not all, of the biscuit coated with chocolate and/or a cream or cream-like coating that fully covers from and extends from one end of the biscuit over halfway to the other end but terminates short of the other end;
> (3) With the coated portion of the biscuit having a rounded end;
> (4) And the uncoated portion having a generally flat end.

Exhibit 1 (Glico Response to Lotte America Revised Rog. No. 6).  With respect to its Pocky Almond Crush product, Glico defines the Pocky product configuration the same way, except with the addition of "almond pieces" to the coated portion of the biscuit stick.  *Id.*

> **Response:**  Disputed.  Glico defines its Pocky product configuration for products other than Almond Crush as

> an elongated, thin, straight, cylindrical rod-shaped biscuit with more than half, but not all, of the biscuit coated with chocolate and/or a cream or cream-like coating that fully covers and extends from one end of the biscuit over halfway to the other end, but terminates short of the other end, and with the coated portion of the biscuit having a rounded end and the uncoated portion of the biscuit having a generally flat end.

Hallerman Decl., Ex. 1 at 4).  Lotte's parsing of the language into discrete and numbered subparts is not part of Glico's description.  Undisputed to the extent that Glico defines its product configuration for Pocky Almond Crush similarly with the addition of almond pieces to the cream or cream-like coating.  *Id.*

3.     The Pocky product configuration trade dress as defined by Glico in this case encompasses a variety of Pocky products, including Pocky Chocolate and Pocky Ultra Slim.  *See, e.g.*, Exhibit 2 at EZAKI0004790:

*PUBLIC VERSION*



**Response:**  Undisputed to the extent that the Pocky product configuration trade dress as defined by Glico in this case encompasses a variety of Pocky products, including Pocky Chocolate and Pocky Ultra Slim.  Undisputed to the extent that the picture depicts packaging of several varieties of Pocky.  Disputed to the extent that the paragraph implies that the text of the picture above or the product packages define the Pocky product configuration trade dress.  See Glico's Response to Lotte America's Revised Interrogatory No. 6 (Hallerman Decl., Ex. 1 at 4); Dkt. 102, Exs. 1–3.

4.      All of the Pocky products depicted here, including the Pocky Chocolate product (the first product shown in the picture) and Pocky Ultra Slim (the second product shown below) are encompassed by the Pocky product configuration trade dress as defined by Glico in this case. Here is a photograph depicting a Pocky Chocolate stick and a Ultra Slim Pocky Chocolate stick:

*PUBLIC VERSION*



Exhibit 3.

**Response**:  Undisputed to the extent that the Pocky product configuration trade dress as defined by Glico in this case encompasses a variety of Pocky products, including Pocky Chocolate and Pocky Ultra Slim.  See Glico's Evidentiary Objections, Exhibit 3.

Disputed as ambiguous to the extent that Lotte intends "[a]ll of the Pocky products depicted *here*" to encompass products other than Pocky Chocolate and Pocky Ultra Slim.  See Glico's Response to Lotte America's Revised Interrogatory No. 6 (Hallerman Decl., Ex. 1 at 4); Dkt. 102, Exs. 1–3.

5.   

**Response**:  Glico objects to the foregoing paragraph as based on inadmissible evidence. Expert reports are inadmissible hearsay.  *See* Glico's Evidentiary Objections, Exhibit 4.  Glico objects to the foregoing paragraph as mischaracterizing the documents by reproducing only a portion of the relevant passage.

*PUBLIC VERSION*

Undisputed that the quoted language appears in the context of larger sections of the cited document, but not material because these characteristics do not make a product functional. See PSF ¶¶ 116–127, 132–44, 225–32.

6. ████████████████████████████████████████████
████████████████████████████████████████

**<u>Response</u>:** Glico objects to the foregoing paragraph as based on inadmissible evidence. Expert reports are inadmissible hearsay. *See* Glico's Evidentiary Objections, Exhibit 5. Glico objects to the foregoing paragraph as mischaracterizing the document by reproducing only a portion of the relevant passage.

Undisputed that the quoted language appears in the context of larger sections of the cited document, but not material because these characteristics do not make a product functional. See PSF ¶¶ 102–11, 133–35, 226.

7. In fact, Glico's functionality expert, Dr. Leon Levine, does not dispute ████████
████████████████████████████████████████████ Exhibit 6 (Levine Deposition)
160:15–161:2. The Pocky product configuration is ████████████████████████████
██████ Exhibit 7 (Latella Deposition) 276:14-277:4.

**<u>Response</u>:** Glico objects to the foregoing paragraph as mischaracterizing the testimony of Dr. Levine and Mr. Latella by reproducing only portions of the relevant passages. Glico objects to the questioning of Dr. Levine as inquiring as to the contents of a document without presenting that document to the witness. Disputed because Dr. Levine and Mr. Latella do not believe and did not state that the Pocky product configuration is necessary to the stated purposes or is any more suited to the stated purposes than any other snack product. See PSF ¶¶ 117–19, 128–131, 132–40, 218–24; see also Oakley Decl., Ex. 45 at 31:13–19, 45:22–46:5, 70:10–13, 227:20–228:20 (getting hands messy is not perceived as a problem by consumers), 99:24–100:8,

*PUBLIC VERSION*

101:1–2, 254:14–22 (most snacks are easy to eat), 101:8–13, 254:14–22 (most snacks are easy to

transport.), 101:24–102:1, 254:14–22 (most snacks are easy to share).

8.   ██████████████████████████████████████████████
██████████████████████████

**Response:**  Glico objects to the foregoing paragraph as mischaracterizing the quoted

document by reproducing only a portion of the text.  See Hallerman Decl., Ex. 8 at

EZAKI0094537.  Glico objects to the characterization of Dr. Levine's testimony as only

addressing a portion of his statement.  Glico objects to the questioning of Dr. Levine as inquiring

as to the contents of a document without presenting that document to the witness.

Undisputed that the document mentions the quoted text as only one of several core

values, but immaterial because the uncoated portion is only one element of the Pocky product

configuration and does not render the design functional.  See PSF ¶¶ 128–31, 218–24.

*1.      The uncoated portion of the biscuit stick is not essential, does not affect the cost or
         quality, and forms just a single part of the overall Pocky product configuration.*

9.   ██████████████████████████████████████████████
████████████████████████████. Exhibit 6 (Levine Dep.) 100:10–101:13.

**Response:**  Glico objects to this statement as beyond the scope of Dr. Levine's expertise,

and therefore expert testimony from a lay witness.

Undisputed that Dr. Levine made the quoted statement but disputed as without

foundation or evidentiary support and immaterial because the uncoated portion is only one

element of the Pocky product configuration and does not render the design functional.  See PSF

¶¶ 128–31.  Disputed.  Tsuji Decl. ¶ 15 Latella Decl. ¶¶ 33, 47.

10.   ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

*PUBLIC VERSION*

**Response:**  Disputed.  Consumers do not get coating on their hands under most normal conditions regardless of where they hold the sticks.  Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 45, 47.  Also not material because the uncoated portion is only one element of the Pocky product configuration and does not render the design functional.  Levine Decl. ¶¶ 36; Latella Decl. ¶¶ 44–49.

11.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Response:**  Glico objects to the foregoing paragraph as reproducing only a part of Mr. Latella's testimony out of context.

Disputed.  Mr. Latella was testifying about artisanal products, not mass produced products such as Pocky.  Oakley Decl., Ex. 82 (Latella Dep.) at 57:22–59:2.  Also not material because the uncoated portion is only one element of the Pocky product configuration and does not render the design functional.  Latella Dec. ¶¶ 57–58.

12.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Response:**  Disputed.  There is no formal term for the uncoated portion of the biscuit stick.  Hallerman Decl., Ex. 11 81:3–9.  ████████████████████████████

████████████████████████████████████████████████████

████  Not material because there are ways to make products bearing the Pocky product configuration, which do not require ████████████████████████████████

████████████  Levine Decl. ¶¶ 22–26, 52–58, 63; Hallerman Decl., Ex. 34, col. 6, lines 13–16 (alternative method of coating by placing biscuit sticks on a conveyor).



*PUBLIC VERSION*

13. ███████████████████████████████████████ ████
██████████████████████████████████████

**Response:**  Undisputed as to those methods described in the specific cited testimony, but

not material because there are ways to make products bearing the Pocky product configuration,

which do not require ███████████████████████████████████

████ Levine Decl. ¶¶ 22–26, 52–58, 63; Hallerman Decl., Ex. 34, col. 6, lines 13–16

(alternative method of coating by placing biscuit sticks on a conveyor).

14. ███████████████████████████████████████
█████████████████████████

**Response:**  Undisputed that the original prototypes were created by ███████████, but

disputed that ███████████████████████ and immaterial because there are ways to

make products bearing the Pocky product configuration, which do not require that the

manufacturing machinery hold the uncoated portion of the biscuit stick.  Levine Decl. ¶¶ 22–26,

52–58, 63; Hallerman Decl., Ex. 34, col. 6, lines 13–16 (alternative method of coating by placing

biscuit sticks on a conveyor).

15. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

**Response:**  Undisputed that Glico in some instances uses such a method, but immaterial

because there are ways to make products bearing the Pocky product configuration, which do not

require ████████████████████████████████████ Levine

Decl. ¶¶ 22–26, 52–58, 63; Hallerman Decl., Ex. 34, col. 6, lines 13–16 (alternative method of

coating by placing biscuit sticks on a conveyor).

*PUBLIC VERSION*

16. ████████████████████████████████████████████
████████████████████████████████████

**Response:**  Undisputed that Glico in some instances uses such a method, but immaterial because there are ways to make products bearing the Pocky product configuration, which do not require t████████████████████████████████████████.  Levine Decl. ¶¶ 22–26, 52–58, 63; Hallerman Decl., Ex. 34, col. 6, lines 13–16 (alternative method of coating by placing biscuit sticks on a conveyor).

17. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

**Response:**  Disputed that Glico employs the method described in this paragraph because the almonds do not stick as well when they are applied while the stick is oriented vertically.  ████
████████████████████████████████████████████
████████████████████████  Hallerman Decl., Ex. 11 67:9–15.
Undisputed to the extent that Glico in some instances uses ████████████████████
████████████ but immaterial because there are ways to make products bearing the Pocky product configuration, which do not require t████████████████████████████████
████████████  Levine Decl. ¶¶ 22–26, 52–58, 63; Hallerman Decl., Ex. 34, col. 6, lines 13–16 (alternative method of coating by placing biscuit sticks on a conveyor).

*2.*   ***Partial coating is not essential and does not affect cost or quality.***

18. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████



*PUBLIC VERSION*

**Response:**  Glico objects to the foregoing paragraph as based on inadmissible evidence. Expert reports are inadmissible hearsay.  *See* Glico's Evidentiary Objections, Exhibits 5 & 12. Disputed that partial coating makes the biscuit stick stronger and thus more resistance to breakage.  Levine Decl. ¶¶ 64–67.  Disputed that the purpose of partial coating is to strengthen the stick.   Levine Decl. ¶¶ 64–67.  Also not material.  Levine Decl. ¶¶ 64–67.  Undisputed to the extent that Glico does not claim color as a feature of its Pocky product configuration trade dress.

19. ███████████████████████████████
████████████████████████████████████████
████████

**Response:**  Undisputed to the extent that Glico uses such a method to make its Almond Crush Pocky product.  Not material because the method described is only one possible way to manufacture products bearing the Pocky product configurations and because the method described makes only a single embodiment of the Pocky product configurations.  Levine Decl. ¶¶ 22–26, 52–58, 63, 64–67.

### 3.      *The shape of the biscuit stick is not essential and does not affect cost or quality.*

20. ████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████

**Response:**  Glico objects to the foregoing paragraph as based on inadmissible evidence. Expert reports are inadmissible hearsay.  *See* Glico's Evidentiary Objections, Exhibit 5. Disputed because the Pocky product configuration is unique.  Latella Decl. ¶¶ 22–30; Oakley Decl., Ex. 82 at 33:8–16; Levine Decl. ¶ 17; PSF ¶ 293.  Undisputed that elongated, cylindrical rod-shaped cookies or biscuits are easy to eat, but not material because all snack products are easy to eat and the Pocky product configuration is no easier to eat than most other snack

*PUBLIC VERSION*

products.  Levine Decl. ¶¶ 28–31, 38; Latella Decl. ¶¶ 42, 51.  Disputed because product

formulation and processing also determine a product's strength and resistance to breakage.

Levine Decl. ¶¶ 19, 42.  Not material because the length, width or diameter, and geometry of any

snack product affects that product's strength and resistance to breakage.  Levine Decl. ¶¶ 64–67.

     21.　　███████████████████████████████████████
████████████████████████████████████████

     **Response:**  Glico objects to this questioning and testimony at deposition as vague.

Disputed because the opening width required to eat a product bearing the Pocky product

configuration is not quantified in any way.  Oakley Decl., Ex. 82 at 277:5–278:9.  Not material

because many snack products may be eaten "without opening one's mouth wide."  Oakley Decl.,

Ex. 82 at 277:5–278:4; Latella Decl. ¶¶ 42, 51; Levine Decl. ¶¶ 28–31, 38.

     22.　　███████████████████████████████████████
█████████████████

     **Response:**  Glico objects to the foregoing paragraph as based on inadmissible evidence.

Expert reports are inadmissible hearsay.  *See* Glico's Evidentiary Objections, Exhibit 4.

Disputed.  The Pocky product configuration does not yield packaging efficiencies.  Latella Decl.

¶¶ 52–56; Levine Decl. ¶¶ 39–41.

### 4.　　*Rounded Coated End*

     23.　　The Pocky product configuration's rounded , coated end which Glico claims as a
feature of its trade dress ███████████████████████████████████████
████████████████████████████████████████
███

     **Response:**  Not material because ████████████████████████████

██████████████████████ end does not show functionality, and is only one

element of the Pocky product configuration and does not render the design functional.  Levine

Decl. ¶¶ 22–26, 28–31, Ex. A; Latella Decl. ¶¶ 31, 38–42.

*PUBLIC VERSION*

*5.* **Flat Uncoated End**

24. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

**Response:** Not material because ████████████████████████████

████████████████████████████████ does not show functionality, and is only one

element of the Pocky product configuration and does not render the design functional.  Levine

Decl. ¶¶ 22–26, 28–31, Ex. A; Latella Decl. ¶¶ 31, 38–42.

**B.**   **Glico has not admitted that the Pocky Configuration is functional.**

25. ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

**Response:**   Undisputed that Glico introduced Pretz in the early 1960s.  Undisputed that

Glico stated ████████████████████████████ Hallerman Decl., Ex. 15

at EZAKI0161026.  Undisputed that Glico stated ████████████████████████

████████████████████████████ Hallerman Decl., Ex. 15 at EZAKI0161026.

But immaterial because those attributes do not show functionality.  Latella Decl. ¶¶ 43–56;

Levine Decl. ¶¶ 37–39.  Disputed that Pretz was a precursor to Pocky.  Pocky is a different

product entirely.  Latella Decl. ¶ 22.

26. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

**Response:**  Undisputed that Glico stated ████████████████████████

████████████████████████████████████████████ Hallerman

Decl., Ex. 15 at EZAKI0161026.  Undisputed that Glico stated ████████████████

*PUBLIC VERSION*

 Hallerman Decl., Ex. 8 at EZAKI0094533.  Disputed because someone who eats a snack product fully coated with chocolate does not get chocolate on his hands from holding the product.  Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 33; Tsuji Decl. ¶ 15.

27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Response:**  Disputed because someone who eats a snack product fully coated with chocolate does not get chocolate on his hands from holding the product.  Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 33; Tsuji Decl. ¶ 15.  Disputed that getting a mess on one's hands while eating a fully coated snack product is a "problem."  Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 33–37; Tsuji Decl. ¶ 15.  Undisputed to the extent that Exhibits 8, 14 and 15 to the Hallerman Decl. contain the quotations attributed to them.

28. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*PUBLIC VERSION*



**Response:**  Undisputed that the Pocky's Navigation document contains a page entitled

"Physical Definition" that states ███████████████████████████████████████████

██████████████████████████   Hallerman Decl., Ex. 8 at EZAKI0094538.

Undisputed that the Pocky's Navigation document contains a page entitled ████████████

████████████████████████████████████████████████████████████████████

████████████   Hallerman Decl., Ex. 8 at EZAKI0094538.  Disputed because ██████████

██████████████████████████████████████████████████████████████████████

and disputed that Pocky need be held by the uncoated portion.  Not material because ██████

████████████████████████████████████████   is not a characteristic that is caused by the

*PUBLIC VERSION*

Pocky product configuration.  Levine Decl. ¶¶ 28–31, 38; Latella Decl. ¶¶ 31, 38–42.  Not

material because the ██████████ is not necessary.  Levine Decl. ¶¶ 33–36; Latella Decl. ¶ 37.

### C.    Glico's advertising does not show that the Pocky product configuration is functional.

29.    Glico touts the Pocky product configuration as ██████████████████ Glico advertises
its Pocky product configuration as an "innovation." Exhibit 17 (website capture of Glico website
in 2016); *see also, e.g.*, Exhibit 18 (Glico website).

**Response:**  Undisputed that the █████████████████████████████

███████████████████████████████████████████████

Hallerman Decl., Ex. 16.  Undisputed that Glico's website stated "the 'handle' innovation

'innovation of having it by hand.'"  Hallerman Decl., Ex. 17.  Disputed that Glico advertises its

Pocky product configuration as an "innovation", because the exhibit does not refer to the entire

Pocky product configuration.  Immaterial because these qualities do not show functionality.

Levine Decl. ¶¶ 33–36, 38, 39; Latella Decl. ¶¶ 38–56.

30.    █████████████████████████████
███████████████████████████████████████
███████████████████████████████████
██████████████████████████████



**Response:**  Undisputed that Glico stated that ███████████████████████ ████████████████  Hallerman Decl., Ex. 19.  Undisputed that Exhibit 19 to the Hallerman Decl. contains the picture and text shown.  Disputed that the characteristics are identified as ████████████████ -- they are not.  Immaterial because these characteristics do not show functionality.  Levine Decl. ¶¶ 33–36, 38, 39; Latella Decl. ¶¶ 38–56.

31.    Glico promotes the "convenient design" and "tiny" size of the Pocky product configuration in its advertising of Pocky, including to retailers. *See, e.g.*, Exhibit 20 (Pocky advertising).

**Response:**  Undisputed that Exhibit 20 to the Hallerman Decl. states "[t]hanks to this unique and convenient design, in combination with successful promotions, Pocky has been rapidly growing in popularity."  Hallerman Decl., Ex. 20 at EZAKI0151872.  Disputed that the cited advertising promotes the "tiny" size of the Pocky product configuration.  Hallerman Decl., Ex. 20.  Immaterial because these characteristics do not show functionality.  Levine Decl. ¶¶ 38–41; Latella Decl. ¶¶ 38–56.

32.    ███████████████████████████████████████████ ██████████████████████████████████████████████

**Response:**  Undisputed that Mr. Tsuji testified that ████████████████████ █████████████████████████████████████████████████████ ██████  Hallerman Decl., Ex. 10 at 193:12–14; Oakley Decl., Ex. 83 (Tsuji Dep. Ex. 30). Disputed that this is the only way to hold Pocky.  Tsuji Decl. ¶ 15.  Immaterial because this characteristic does not show functionality.  Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 38–56.

33.    Glico touts the "convenient design" and "tiny" size of the Pocky product configuration in its promotion of Pocky, including to retailers. *See, e.g.*, Exhibit 20.  The design is well-suited to easy-to-carry packaging, which Glico also promotes in its Pocky advertisements. *See, e.g.*, Exhibit 21.

**Response:**  Undisputed that Exhibit 20 to the Hallerman Decl. states "[t]hanks to this unique and convenient design, in combination with successful promotions, Pocky has been

rapidly growing in popularity." Hallerman Decl., Ex. 20 at EZAKI0151872. Disputed that the cited advertising promotes the "tiny" size of the Pocky product configuration. Hallerman Decl., Ex. 20. Disputed that the Pocky product configuration is well-suited to easy-to-carry packaging compared to any other snack product. Levine Decl. ¶¶ 39–41; Latella Decl. ¶¶ 52–56. Undisputed that Exhibit 21 to the Hallerman Decl. states "Portable Pocky  Whether satisfying your craving by yourself or sharing the good times with friends, one compact, easy-to-carry package holds plentiful amounts of Pocky." Hallerman Decl., Ex. 20 at EZXAKI0026943. Immaterial because these characteristics do not show functionality. Levine Decl. ¶¶ 38–41; Latella Decl. ¶¶ 38–42.

34.    Glico has promoted that the Pocky configuration allows many Pocky sticks to be "packed close together" in a "compact box" meaning the quantity in the box is suitable for sharing. See, e.g., Exhibit 19 at EZAKI0151761-62.

**Response:**  Undisputed that Glico stated "many sticks are packed closely together in a compact box." Hallerman Decl. Ex. 20 at EZAKI0151762. Undisputed that Glico stated "quantity in a box is both suitable for oneself and good for sharing it." Hallerman Decl. Ex. 20 at EZAKI0151761. Disputed that the Pocky product configuration is any more well-suited to packaging or sharing than most other snack products. Levine Decl. ¶¶ 38–41; Latella Decl. ¶¶ 38–42, 52–56. Immaterial because these characteristics do not show functionality. Levine Decl. ¶¶ 38–41; Latella Decl. ¶¶ 38–42, 52–56.

35.    Glico advertises Pocky on its web sites as:

- Having a "no-mess handle"
- An "easy-to-handle stick that keeps chocolate off your hands"
- "The snack with a 'handle'"
- "A simple, yet innovative idea of leaving a portion uncoated"
- "Easy to 'handle'"
- "[I]n the beginning[,] . . . hand-dipped in chocolate, leaving one end of the stick (the 'handle') bare

*PUBLIC VERSION*

Exhibit 9 (Glico's Resp. to Lotte America's RFA 11, 14, 17, 20, 23, 26, 29, 32, and 35).

**Response:**  Undisputed that each of the quotations appeared in the context of larger sections on Glico's website.  Disputed that the uncoated portion is needed to keep chocolate off of hands or for no-mess.  Consumers do not get coating on their hands under most normal conditions regardless of where they hold the sticks.  Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 45, 47.  Also not material because the uncoated portion is only one element of the Pocky product configuration and does not render the design functional.  Levine Decl. ¶ 36; Latella Decl. ¶ 35.

36.   In addition to expressly referring to the uncoated portion of the Pocky product configuration as the "handle," Glico shows the Pocky products being held by the uncoated portion in its advertising. *See, e.g.*, Exhibit 21:



*See also* Exhibit 22 [sic].

**Response:**  Undisputed that Exhibit 21 to the Hallerman Decl. shows a product bearing the Pocky product configuration being held by the uncoated portion of the biscuit stick. Undisputed that Exhibit 21 to the Hallerman Decl. states that Pocky is "generously coated with high-quality chocolate except for a small portion at one end, creating a handle."  Disputed that

*PUBLIC VERSION*

this is the only way to hold Pocky.  Tsuji Decl. ¶ 15.  Also not material because the uncoated

portion is only one element of the Pocky product configuration and does not render the design

functional.  Levine Decl. ¶¶ 36; Latella Decl. ¶ 35.

     37.    Glico also promotes the thin width of its Pocky product configuration, touting the "snap" produced when broken or eaten. Exhibit 21:



     **<u>Response</u>:**  Disputed that Exhibit 21 to the Hallerman Decl. promotes the width of the

Pocky product configuration.  Disputed that the "light snapping sound and texture" are due to the

Pocky product configuration.  Levine Decl. ¶ 42, 68.

     38.    To this day, Glico promotes useful benefits of the Pocky product configuration on its website, such as:

99

*PUBLIC VERSION*



> Great to have around the house. With the no mess handle of the Pocky stick, your kids won't have chocolate all over their hands.

> With plenty of sticks in each box, Pocky is the perfect snack for bringing people closer together and livening the mood. Or simply relax on the couch and share Pocky with that special someone.

Exhibit 23 (Glico website – "About Pocky").

**Response:**  Disputed that the characteristics quoted are "useful benefits" of the Pocky product configuration.  Levine Decl. ¶¶ 34–36, 39; Latella Decl. ¶¶ 45, 47, 52–56.  Disputed that the uncoated portion is needed to keep chocolate off of hands or for no-mess.  Consumers do not get coating on their hands under most normal conditions regardless of where they hold the sticks.  Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 45, 47.  Disputed that the Pocky product configuration is any more well-suited to packaging or sharing than most other snack products.  Levine Decl. ¶¶ 38–41; Latella Decl. ¶¶ 38–42, 52–56.  Immaterial because the characteristics quoted do not show functionality.  Levine Decl. ¶¶ 39; Latella Decl. ¶¶ 38–42.

39. [redacted]

[redacted]

*PUBLIC VERSION*

**Response:**  Undisputed that Exhibits 24 and 25 to the Hallerman Decl. contain the figure above.  Disputed that Glico always makes this recommendation.  Oakley Decl., Ex. 51 at 154:2–23 (Pocky sometimes offered at demonstrations with coated portion sticking up).

40.    Glico packages Pocky so that the uncoated portion is at the top of the package when opened, as shown below (Exhibit 26 (Glico website – "Pocky share happiness" page):



*See also* Exhibit 27.

**Response:**  Undisputed that Glico packages Pocky such that the uncoated portion is all toward one end of the package.  Disputed that Glico instructs consumers as to which end of the package to open.  Hallerman Decl. Ex. 26.

### D.    Glico's U.S. utility patent and Japanese utility model do not show that the Pocky Product Configuration is functional.

*1.    Utility Model*

41.    In 1966, the same year Pocky made its debut in Japan, Glico applied to register a Japanese Utility Model for a "Biscuit Coated With Chocolate."  Exhibit 28.  Glico's applied-for invention, depicted below, was eventually registered (Reg. No. 903255). *See id.*; Exhibit 9 (Glico Resp. to Lotte America RFA No. 76). The registration has since expired. Exhibit 9 (Glico Resp. to Lotte America RFA No. 77).

*PUBLIC VERSION*



**Response:**  Disputed.  The invention **relates to** a chocolate coated biscuit, but the invention **consists of** groove B, which is not part of the Pocky product configuration.  Hallerman Decl., Ex. 28; Levine Decl. ¶ 75; Oakley Decl., Ex. 45 at 221:1–6 (Pocky products do not have the grooves B.).

42.    Glico described the invention as a "chocolate covered biscuit, concerned with an invention relating to an improvement of a so-called finger biscuit, where in the surface of the biscuit is coated with chocolate so that it is difficult be separates, and moreover, **is devised so that it can be easily eaten**." Exhibit 28 at EZAKI0182365.

**Response:**  Disputed.  The invention consists of groove B, which is not part of the Pocky product configuration.  Hallerman Decl., Ex. 28; Levine Decl. ¶ 75.  Disputed that the product configuration is any more easily eaten than other snack products.  Levine Decl. ¶¶ 28–31, 38 ; Latella Decl. ¶¶ 38–42.  Not material because ease of consumption does not show functionality.  Levine Decl. ¶ 76; Latella Decl. ¶¶ 38–42.

*PUBLIC VERSION*

43.    Glico's claimed invention included "a construction of a chocolate coated biscuit, wherein biscuit part A forms an extreme **elongated column shape** . . . and is further **coated** with chocolate C so that **one part** D thereof exposes this biscuit part A." *Id.*

**Response:**  Disputed.  The invention consists of groove B, which is not part of the Pocky product configuration.  Hallerman Decl., Ex. 28; Levine Decl. ¶ 75.

44.    As described in Glico's Japanese Utility Model, the exposed biscuit part "serve its so-called purpose as a handle, and chocolate does not adhere to the hands." *Id.*

**Response:**  Undisputed that the Utility Model stated (in part) "exposed part D serves its so-called purpose as a handle, and chocolate does not adhere to the hand."  Hallerman Decl., Ex. 28.  Disputed that chocolate would adhere to the hand if the biscuit were entirely coated. Levine Decl. ¶¶ 34–36; Latella Decl. ¶¶ 45, 47.

45.    Glico represented that the "**entire shape**" of the chocolate covered biscuit enabled it to be "**easily eaten**," and it was "**very convenient**." *Id.*; *see* Exhibit 6 (Levine Dep.) 172:18-21; 173:5-15).

**Response:**  Disputed.  Exhibit 28 to the Hallerman Decl. does not use the phrases "entire shape," "easily eaten," or "very convenient."  Hallerman Decl., Ex. 28.  Not material because those characteristics do not show functionality.  Levine Decl. ¶¶ 28–31, 38 ; Latella Decl. ¶¶ 38–42.

46.    Glico's functionality expert, Dr. Leon Levine, admitted that Glico's Japanese Utility Model ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Exhibit 6 (Levine Dep.) 187:8-24).

**Response:**  Undisputed that Dr. Levine admitted that the utility model includes, among other things, certain statements that the product is easily eaten, convenient, and had a so-called handle.  Levine Dep. 187:8–24.  Disputed because Dr. Levine does not believe and did not state that the Pocky product configuration is necessary to the stated purposes or is any more suited to the stated purposes than any other snack product.  Levine Decl. ¶ 76.  Not material because those characteristics do not show functionality.  Levine Decl. ¶¶ 33–36, 38; Latella Decl. ¶¶ 38–56.

103

*PUBLIC VERSION*

**2.    *Utility Patent***

a.    Prosecution of Glico's Patent Application

47.    ████████████████████████████████████████████████
████████████████████████████████████████████████

**Response:**  Undisputed that the application for the '428 patent was filed with the PTO in

2008.  Undisputed that the application was entitled "Stick-shaped snack and method for

producing same."

48.    In its application, Glico conceded that "stick-shaped snacks, such as stick-shaped pretzels, composite snacks prepared by coating such stick-shaped snacks with chocolate or the like, etc., are **conventionally known**."  Exhibit 29 at LCON00009967.  Glico further noted that these "conventionally known" snacks are generally "produced by holding one end of baked stick-like shaped dough with a clip or like holder, and immersing the other end of the baked stick-like shaped dough into a container of liquid chocolate, etc."  *Id.*

**Response:**  Undisputed that the application stated "Stick-shaped snacks, such as stick-

shaped pretzels, composite snacks prepared by coating such stick-shaped pretzels with chocolate

or the like, etc., are conventionally known."  Hallerman Decl., Ex. 29 at LCON00009967.

Undisputed that the application stated "In general, stick-shaped snacks coated with chocolate and

the like are produced by holding one end of a baked stick-like shaped dough with a clip or like

holder, and immersing the other end of the baked stick-like shaped dough into a container of

liquid chocolate, etc."  Hallerman Decl., Ex. 29 at LCON00009967.  See PSF ¶ 164.

49.    Glico recognized that problems can occur in the production of stick-shaped snacks—namely, that the ends of the baked stick-shaped snacks become "warped and deformed, making it difficult to produce straight stick-shaped snacks."  *Id.* at LCON00009967-LCON00009968.  As stated in Glico's utility patent application, these warped and deformed ends leads the holder of baked-stick shaped snack when coating the product to not be able to "firmly hold the baked shaped dough, resulting in production problems such as the baked shaped dough rotating or dropping during the coating operation."  *Id.* at LCON00009968.  Glico's sought patent protection for its solution to these problems: a "**straight**" stick-shaped snack and a method for producing same."  *Id.*

*PUBLIC VERSION*

**Response:**  Undisputed that the application stated "However, in the production of stick-shaped snacks by the above method, when baking the stick-like shaped dough, both ends thereof are warped and deformed, making it difficult to produce straight stick-shaped snacks." Hallerman Decl., Ex. 29 at LCON00009967–68.  Undisputed that the application stated that "when producing stick-shaped snacks having a coating of chocolate or the like on the surface of a narrow baked stick-like shaped dough, because the baked shaped dough to be held by a holder has one end warped and bent, it is difficult to firmly hold the baked shaped dough by the holder, resulting in production problems such as the baked shaped dough rotating or dropping during the coating operation."  Hallerman Decl., Ex. 29 at LCON00009968.  Disputed that these issues prevented manufacture of stick-shaped snacks or straight stick-shaped snacks.  Levine Decl. ¶¶ 52–58, 63.  Disputed that Glico sought patent protection for a stick-shaped snack or a straight stick-shaped snack, because the patent makes clear that Glico only sought patent protection for particular manufacturing methods.  Levine Decl. ¶¶ 43–52; Oakley Decl., Ex. 45 at 144:18–23.

50.     The Pocky product configuration created by methods claimed in Glico's utility patent results in a biscuit stick with a "maximum cross-sectional width of 2.5 to 3.5 mm [that] are thinner than conventional stick-shaped snacks, and thus are **very easy to eat** and have an enjoyable new texture, encouraging consumers to buy them."  *Id.* at LCON00009973.

**Response:**  Undisputed that the application stated "Stick-shaped snacks having a maximum cross-sectional width of 2.5 mm to 3.5 mm are thinner than conventional stick-shaped snacks, and thus are very easy to eat and have an enjoyable new texture, encouraging consumers to buy them."  Hallerman Decl., Ex. 29 at LCON00009973.  Undisputed that the manufacturing method claims of the '428 patent result in biscuit sticks of that cross-sectional width.  Disputed that the Pocky product configuration is created by the methods claimed in Glico's utility patent. Levine Decl. ¶¶ 64–67.  Disputed that the width of a snack product determines its texture. Levine Decl. ¶¶ 42.  Not material because the vast majority of Pocky products are wider than

105

3.5 mm, and thus distinguished in the cited quotation.  Levine Decl. ¶¶ 64–67.  Not material because these characteristics do not show functionality.  Levine Decl. ¶¶ 38, 60; Latella Decl. ¶¶ 38–42.

51.  ████████████████████████████████████████████
████████████████████████████████████████████
████████████

**Response:**  Disputed.  The application specifically distinguishes products with a cross-sectional width of 2.5–3.5 mm from those with wider cross-sectional widths.  Hallerman Decl., Ex. 29 at LCON00009973; Hallerman Decl., Ex. 34 at 4:39–43.  Not material because this characteristic does not show functionality.  Levine Decl. ¶¶ 28–31, 38, 60; Latella Decl. ¶¶ 38–42; Levine Dep. 214:7–14, 226:3–11.

52.  As explained in Glico's utility patent application, the straight stick-shaped snacks enable efficient alignment of the straight stick-shaped snacks for coating.  "[I]f the stick-shaped pastries are warped, the stick-shaped pastries are difficult to roll, thus making it difficult efficiently receive the stick-shaped pastries in the slots and thereby align the same."  <u>Exhibit</u> 29 at LCON00009975.  If the stick-shaped snacks are **straight**, however, "the above problem can thus be reliably avoided," and a conveyer can align the stick-shaped snacks at regular intervals in preparation for coating  (*Id.* at LCON00009975, LCON00009982):



**Response:**  Disputed.  The application describes only one particular method of manufacture.  Levine Decl. ¶¶ 52–58, 63.  Relative straightness is not important for other manufacturing methods.  Levine Decl. ¶¶ 61–36.  There is no such thing as absolutely straight.

53.     After aligning the straight stick-shaped snacks, the patent application discloses and claims a coating step, whereby the aligned straight stick-shaped snacks are coated in chocolate or other coating. *Id.* at LCON00009974-LCON00009975. The straightness of stick-shaped snack allows the holder of the straight stick-shaped snacks to "firmly hold one end of each of the stick-shaped pastries" so that they do not "rotat[e] or drop[] from the holder, thus enabling the efficient production of stick-shaped snacks coated with a coating material." *Id.*

**Response:** Disputed. The application describes only one particular method of manufacture. Levine Decl. ¶¶ 52–58, 63. Relative straightness is not important for other manufacturing methods and there is no such thing as absolutely straight. Levine Decl. ¶¶ 61–36.

54.     As explained in Glico's patent application, the straightness of the stick-shaped snacks also reliably avoids the inconvenience of the alignment of the stick-shaped pastries failing during the coating step, thereby causing the sticks to become "joined via the coating material." *Id.* at LCON00009975. The straightness of the stick-shaped snack "make[s] it possible to efficiently produce stick-shaped snacks coated with a coating material." *Id.*

**Response:** Disputed. The application describes only one particular method of manufacture. Levine Decl. ¶¶ 52–58, 63. Relative straightness is not important for other manufacturing methods. Levine Decl. ¶¶ 61–36. There is no such thing as absolutely straight. Levine Decl. ¶¶ 61–36.

55.     The coating of the stick-shaped snack with a coating material makes it possible to produce a thin stick-shaped—even as thin as 2.5 to 3.5 mm—that is strong and does not easily break. *Id.* at LCON00009976.

**Response:** Undisputed that the application stated "even if the stick-shaped pastries 40 are so thin that the maximum cross-sectional width is, for example, 2.5 mm to 3.5 mm, coating the surfaces of the stick-shaped pastries 40 with a coating material makes it possible to produce a stick-shaped snack that is strong and does not easily break." Hallerman Decl., Ex. 29 at LCON00009976. Disputed that the quotation refers to sticks that are any thicker than 2.5 to 3.5 mm, and thus disputed that the quotation has any relevance to most varieties of Pocky. Disputed that partial coating serves the purpose of making the product strong. Levine Decl. ¶¶ 64–67. .

56.     Glico's utility patent application contained three claims, only one of which expressly included a specification of a maximum cross-sectional width:

*PUBLIC VERSION*

Claim 1: "A method for producing a stick-shaped snack from a string-like dough . . . the method comprising, a cutting step of cutting the baked string-like dough at the cuts to thereby form stick-shaped pastries."

Claim 2: "A method for producing a stick-shaped snack according to claim 1, further comprising, after the cutting step, a coating step of coating at least part of the stick-shaped pastries with a coating material."

Claim 3: "A stick-shaped snack comprising a stick-shaped pastry and a coating material over the surface of the stick-shaped pastry . . . the maximum cross-sectional width of each stick-shaped pastry being 2.5 mm to 3.5 mm."

*Id.* at LCON00009977.

**Response:**   Undisputed that the application contained three claims.  Undisputed that

claim 3 in the application specified a maximum cross-sectional width and that claims 1 and 2 did

not.  Immaterial because the initial application does not reflect the issued claims.

57.    In response to office actions from the PTO rejecting Claim 1 as obvious, Glico later amended Claim 1 to refer to "forming stick-shaped pastries having a maximum cross-sectional width of 2.5 mm to 3.5 mm." Exhibit 30; Exhibit 31.

**Response:**   Undisputed that the PTO rejected the claim 1 as obvious in an office action

dated July 20, 2010.  Hallerman Decl., Ex. 30 at LCON00009826, LCON00009828.  Undisputed

that Glico amended claim 1 to include a step of "forming the solid string-shaped dough by

cutting a dough sheet having a predetermined thickness into string shapes" and amending the

cutting step to recite "having a maximum cross-sectional width of 2.5 mm to 3.5 mm" in a

response dated October 20, 2010.  Hallerman Decl., Ex 31 at LCON00009810, LCON00009811.

58.    At a later point in prosecuting its patent application, Glico responded to an office action rejecting Claim 2, the coating step, by amending its application to include new dependent claims which specifically included "aligning" and "coating" steps that would result in coating a portion of the straight stick-shaped snack by holding one end of the stick-shaped snack. Exhibit 32 at LCON00009650:

*PUBLIC VERSION*

> New dependent claims 9, 10, 13, 14, 18 and 19 further define <u>the rolling step includes rolling the solid dough between rollers while gradually reducing the distance between the rollers, an aligning step and that the coating step includes holding one end of the stick-shaped pastry while immersing the other end of each stick-shaped pastry in the coating material</u>. These aspects of applicants claimed invention are described in applicants' specification at page 4, line 27 to page 5, line 2; page 8, line 24 to page 9, line 4; and elsewhere.

**Response:**  Undisputed that Glico added new dependent claims 9, 10, 13, 14, 18, and 19 and made the statement quoted above in a response dated May 13, 2013.  Hallerman Decl., Ex. 32, LCON00009639, LCON00009650.  Disputed that the coating steps would necessarily result in coating "a portion" of the stick-shaped snack, because there is no such limitation in the claims.

59.    The patent examiner, too, rejected these claims as obvious, in light of prior art, and Glico appealed the rejection to the Board of Patent Appeals and Interferences. Exhibit 33. Glico argued that its invention was not obvious by linking the need for **straight** sticks—specifically, straight ends—to the coating step. *Id.* at LCON00009686. In the prior art, "warped and bent ends cannot be held by a holder for further processing such as applying an additional chocolate coating . . . The Appellants discovered a method of making stick-shape snacks that are straight and not bent or warped at the ends thereof, thereby avoiding the problems of the conventionally made stick-shaped snacks." *Id.*

**Response:**  Disputed.  Glico filed its appeal brief on September 30, 2012, Hallerman Decl., Ex. 33 at LCON00009682, which was before its response adding new claims 9, 10, 13, 14, 18 and 19.  Hallerman Decl., Ex. 32, LCON00009639, LCON00009650.  Therefore, Glico was not appealing claims 9, 10, 13, 14, 18, and 19.  Glico did not argue that its invention was not obvious by linking the need for straight sticks to the coating step.  Hallerman Decl., Ex. 33, at LCON00009686 (cited passage appears in a summary, not in the argument, which starts at LCON00009690).  At this point in prosecution only claims 2 and 6 recited a coating step.

*PUBLIC VERSION*

Hallerman Decl., Ex. 33, at LCON00009687.  Glico did not separately argue for the patentability of either claim 2 or claim 6 in its appeal brief.  Hallerman Decl., Ex. 33 at LCON00009683–84 (Table of Contents).

60.     Glico further argued that there was a "long felt but unresolved need" for "forming straight (i.e., warped and deformed) baked dough products."  *Id.* at LCON00009702.  Glico advocated that its invention was an improvement and worthy of patent protection:

> In the Specification, Appellants explain the difficulties in the prior art of forming straight (i.e., not warped and deformed) baked dough products having the thickness and width dimensions required in the claims on appeal (Spec. p. 1, l. 35 to p. 2, l. 3). In addition, the prior art stick-shaped snacks having warped and bent ends are difficult to further process, resulting in production problems such as the baked sticks rotating and dropping during a coating operation (Spec. p. 2, ll. 4-10).  The invention claimed on appeal solves this long felt but unresolved need and failures of others in the past and therefore is patentable.

**Response:**  Disputed.  Glico stated that "Willard teaches that forming products from solid string-shaped dough having the dimensions in the claims on appeal is impossible."  Hallerman Decl., Ex. 33 at LCON00009702.  The dimensions in the claims on appeal, which were 2.5 – 3.5 mm baked (claim 1) and 2–3 mm unbaked (claim 5), were thinner than conventional stick-shaped snacks.  Hallerman Decl., Ex. 33 at LCON00009687 & Ex. 29 at LCON00009973 (those dimensions are "thinner than conventional stick-shaped snacks").  In its brief, Glico was addressing difficulties that apply to "baked dough products having the thickness and width dimensions required in the claims on appeal," Hallerman Decl. Ex. 33 at LCON00009702, which by its literal terms did not apply to the vast majority of embodiments of the Pocky product configuration.  Levine Decl. ¶¶ 69–73.

61.     Eventually, after additional office actions from the examiner and responses by Glico advocating that its applied-for claims were worthy of patent protection, the PTO issued

*PUBLIC VERSION*

Glico a registration, U.S. Patent No. 8,778,428, for "Stick-Shaped Snack and Method for Producing the Same." Exhibit 34.

**Response:** Undisputed that the PTO issued the '428 patent with fourteen claims on July 15, 2014.

<div align="center">

b.   Patent Claims

</div>

62.   In addition to all of the statements by Glico above in the patent application, *see supra* SUMF ¶¶ 49-61, the utility patent issued to Glico encompassed fourteen claims, including the following:

Claim 1: "A method for producing a stick-shaped snack," using string-shaped dough of an unspecified width, "forming stick-shaped pastries having a maximum cross-sectional width of 2.5 mm to 3.5 mm," as further detailed in the patent;

\*\*\*

Claim 5: "A method for producing a stick-shaped snack," using string-shaped dough having a width of 2mm to 3 mm and resulting in stick-shaped pastries of an unspecified width, as further detailed in the patent.

Claim 6: The method for producing a stick-shaped snack according to claim 5, further comprising, after the third cutting step, a coating step of coating at least part of the stick-shaped pastries with coating material.

Claim 7: "The method for producing a stick-shaped snack according to claim 6, further comprising: prior to the third cutting step, an aligning step of aligning the stick-shaped pastries parallel to each other, wherein the coating step includes holding one end of each stick-shaped pastry while immersing another end of each stick-shaped pastry in the coating material."

\*\*\*

Claim 10: "A method for producing a stick-shaped snack," using string-shaped dough having a width of 2 mm to 3 mm and resulting in "stick-shaped pastries having a maximum cross-sectional width of 2.5 mm to 3.5 mm

\*\*\*

Claim 13: "The method for producing a stick-shaped snack according to claim 10, if further comprising: prior to the third cutting step, an aligning step of aligning the stick-shaped pastries parallel to each other, and after the third cutting step, a coating step of coating at least part of the stick-shaped pastries with a coating material, wherein the coating step includes holding one end of each stick-shaped pastry in the coating material."

<div align="center">

111

</div>

*PUBLIC VERSION*

Claim 14: "A stick-shaped snack made by the method of claim 1."

Exhibit 34.

**Response:** Undisputed that the '428 patent issued with fourteen claims. Hallerman

Decl., Ex. 34 6:21–8:59. Disputed that the claims are accurately set forth in the foregoing

paragraph. Patent claims are defined by each and every single limitation, and are not properly

characterized by excerpts.

63.     According to Glico's own functionality expert, Dr. Leon Levine, ███████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

**Response:** Glico objects to this paragraph to the extent it is based on inadmissible

evidence. Expert reports are inadmissible hearsay. See Glico's Evidentiary Objections, Exhibits

5 & 12. Disputed. Dr. Levine only testified that "[u]nder some conditions, the '428 patent can

describe the making of a Pocky or Pocky-like product." Levine Dep. 102:6–13; Oakley Decl.,

Ex. 45 at 166:16–20 (The '428 patent describes a 2.5–3.5mm cross sectional width of a stick

shaped snack that is thinner than most varieties of Pocky.). See PSF ¶¶ 157–64, 192–97.

64.     Indeed, by following Claims 5, 6, and 7 of Glico's utility patent, the Pocky
product configuration will result. Claim 5 covers a method for producing a stick-shaped snack
using dough with a thickness of 2 to 3mm. *See* Exhibit 34. Claim 6 includes the stick-shaped
snack produced by the method of Claim 5 and the addition of "a coating step of coating at least
part of the stick-shaped pastries with a coating material." *Id.* Claim 7 further specifies a method
of coating the stick-shaped snack as stated in Claim 6: "**holding one end** of each stick-shaped
pastry **while immersing another end** of each stick-shaped pastry **in the coating material**." *Id.*

**Response:** Disputed. Following claims 5, 6, and 7 of the '428 patent does <u>not</u>

necessarily result in the Pocky product configuration, Levine Decl. ¶¶ 47–51, as Lotte's own

expert admitted. Oakley Decl., Ex. 45 at 188:11–22 (The method of claim 5 does not result in

the Pocky product configuration.), 191:8–11 (claim 6), 191:12–15 (claim 7).

*PUBLIC VERSION*

65.     The same is true if one practices the steps of Claims 10 and 13. Claim 10 of the Glico Utility Patent covers a method for producing a stick-shaped snack which results in a baked stick-shaped snack having a cross-sectional width of 2.5 mm to 3.5 mm. *Id*. Claim 13 further claims a coating step where at least part of the baked stick-shaped snack is coated by "**holding one** end of each stick-shaped pastry **while immersing another end** of each stick-shaped pastry **in the coating material.**" *Id*.

**Response:**  Disputed.  Following claims 10 and 13 of the '428 patent does <u>not</u> necessarily result in the Pocky product configuration, Levine Decl. ¶¶ 47–48, 52, ███████████ ██████.  Oakley Decl., Ex. 45 at 191:24–192:5 (The method of claim 10 does not result in the Pocky product configuration), 192:20–23 (claim 13).

66.      ████████████████. Exhibit 6 (Levine Dep.) 232:18–233:24; *see id.* 254:23-255:13 ██████████████████

**Response:**  Glico objects to the paragraph to the extent it is based on inadmissible evidence.  Expert reports are inadmissible hearsay.  See Glico Evidentiary Objections, Exhibit 12.  Disputed.  None of the methods claimed in the '428 patent would be used to make straight stick-shaped snacks with the diameter of Pocky Chocolate.  Levine Decl. at 25 n.13.  Claim 5 would not result in a product like Pocky Chocolate.  Levine Decl. at 25 n.13.  Dr. Levine testified that the '428 patent covered "a way of making a straight, coated stick," did not describe or even mention Pocky, and specified dimensions that only matched a single variety of Pocky. Levine Dep. 198:25–199:13.  Dr. Levine does not believe, and did not testify, that Glico received any patent rights to Pocky products.  Levine Dep. 101:19–102:20; Levine Decl. ¶¶ 43–58.

67.     ████████████████

*PUBLIC VERSION*

**Response:**  Glico objects to the paragraph to the extent it is based on inadmissible evidence.  Expert reports are inadmissible hearsay.  See Glico Evidentiary Objections, Exhibit 12.  Glico objects to the paragraph as reproducing a short quotation out of context.  The full quotation is:

> Mr. Townley opines that  Mr. Townley omits a major qualification.  As explained more fully below, ***the '428 Patent discusses only a subset of the possible embodiments of the POCKY product configurations and distinguishes others***, including embodiments that encompass the vast majority of POCKY products.  As shown in Exhibit B, the normal POCKY product configuration does not fall within the scope of the '428 Patent's disclosure or claims.  ***Based on my measurements, Ultra Slim Pocky fits the dimensions disclosed and claimed in the patent***,

Hallerman Decl., Ex. 12, ¶ 37.

Disputed.  None of the claims of the '428 patent necessarily results in the Ultra Slim Pocky product or any embodiment of the Pocky product configuration.  Ultra Slim Pocky is neither disclosed nor claimed in the '428 patent.  Levine Decl. ¶¶ 46–52.

68.  Exhibit 12 (Levine Rebuttal) ¶¶ 47-48; Exhibit 6 (Levine Dep.) 213:14-214:14; 218:2-12; 225:6-16; 226:3-13; 235:25-236:5.

**Response:**  Glico objects to this paragraph to the extent it is based on inadmissible evidence.  Expert reports are inadmissible hearsay.  See Glico's Evidentiary Objections, Exhibit 12.  Disputed.  Glico did not describe "snap" during prosecution of the '428 patent.  See DSF ¶¶ 47–61.  "Snap" is not a utilitarian advantage.  Levine Decl. ¶ 42, 68.  Ease of consumption was only described in the '428 patent in connection with products having a cross-sectional width

*PUBLIC VERSION*

of 2.5 mm to 3.5 mm, and thicker products were expressly distinguished.  Hallerman Decl.,

Ex. 34 at 4:39–43.  Further the Pocky product configuration is no easier to consume than the vast

majority of other snack products.  Ease of consumption also is not material because it does not

show functionality.  Levine Decl. ¶¶ 28–31, 38; Latella Decl. ¶¶ 38–42.  Partial coating is not a

utilitarian advantage.  Levine Decl. ¶¶ 64–67.  The manufacturing steps described by the '428

patent do not apply to the Pocky product configuration, but only one to method of making very

thin biscuit sticks.  Levine Decl. ¶¶ 22–26, 52–58, 63.  Disputed also that the patent and/or its

claims can be construed to apply to products thicker than 2.5 to 3.5 mm.



**Response**:  Undisputed.  The difference is 33%, which is significant.  Levine Decl. ¶ 72.

> **E.**     **Third-party utility patents are not evidence that the Pocky Product Configuration is functional.**

*1.*     *The "Pretzel Stick Snack Item" Patent*

70.     The PTO previously issued a utility patent (U.S. Patent No. 6,242,021) entitled "Pretzel Stick Snack Item." Exhibit 36.

**Response**:  Undisputed that the PTO issued U.S. Patent No. 6,242,012 to Rooney et al.

("**Rooney**") entitled "Pretzel stick snack item."  Not material because Rooney is not evidence

that the Pocky product configuration is functional.  Levine Decl. ¶¶ 77–79, 82.

*PUBLIC VERSION*

71.    The Abstract of the Pretzel Stick Snack Item Patent discloses a bite-sized snack food item that "can be held by the fingers of one hand, and bitten off . . . the stick may also be coated with candy or another contrasting food substance." *Id.* at LOTTE00005687.

**Response:**  Undisputed that, Rooney discloses:

A small, bite-sized snack food item is disclosed which combines a pretzel stick and a group of cereal rings annularly disposed on the stick, thereby combining the flavor of the pretzel with the flavor of the cereal in a bite-sized unit. The unit can be held by the fingers of one hand, and bitten off, and it also may be attractive to a child in the manner of a toy. The stick may also be coated with candy or another contrasting food substance.

Hallerman Decl., Ex. 36 at LCON00005687.  Not material because Rooney is not evidence that the Pocky product configuration is functional.  Levine Decl. ¶¶ 77–79, 82.

72.    The Pretzel Stick Snack Item Patent describes the invention in part as a pretzel stick "that may be held **by one end** and the other end bitten off by a consumer." *Id.* at LOTTE00005690 (emphasis added). An object of the invention was "to provide a snack item which **can be conveniently held at one end by a consumer**, and the other free end either bitten off or licked by the consumer." *Id.*

**Response:**  Undisputed that Rooney states "the present invention combines a pretzel stick and a group of cereal rings annularly disposed upon the pretzel stick so that the stick may be held by one end and the other free end bitten off by a consumer."  Hallerman Decl., Ex. 36 at LCON00005690.  Undisputed that Rooney states "it is a further object of the present invention to provide a snack item which can be conveniently held at one end by a consumer and the other, free end either bitten off or licked by the consumer."  Hallerman Decl., Ex. 36 at LCON00005690. Not material because Rooney is not evidence that the Pocky product configuration is functional.  Levine Decl. ¶¶ 77–79, 82.

73.    The end of the snack item described in the Pretzel Stick Snack Item Patent is claimed in Claim 7 as "one end portion extending outwardly from the adjoining cereal rings," which partially coat the pretzel stick. *Id.* at LOTTE00005691.

**Response:**  Undisputed that claim 7 of Rooney recites "The food item of claim 6, in which the pretzel stick includes at least one end portion extending outwardly from the adjoining

*PUBLIC VERSION*

cereal rings." Hallerman Decl., Ex. 36 at LCON00005691.  Not material because Rooney is not evidence that the Pocky product configuration is functional.  Levine Decl. ¶¶ 77–79, 82.

74.  ████████████████████████████████████████████
████████████████████████████████████████████████

**Response:**  Glico objects to this paragraph as based on inadmissible evidence.  Expert reports are inadmissible hearsay.  See Glico's Evidentiary Objections, Exhibit 12.  Undisputed that claim 7 reads as set forth in response to DSF ¶ 74.  Not material because Rooney is not evidence that the Pocky product configuration is functional.  Levine Decl. ¶¶ 77–79, 82.

75.  This handle also enables the coating of the Pretzel Snack Item by "**dipp[ing] [the pretzel stick with cereal rings] into a container of melted chocolate or similar candy jacketing composition by holding end in a holder** . . . and lifting the combination up and down until thoroughly coated," as shown in the figure below. Exhibit 36 at LOTTE00005691.



FIG. 5

**Response:**  Undisputed that Rooney states "As shown in the latter figure, the combination 10 of the pretzel stick 14 with cereal rings 12 assembled thereon may be dipped into a container 24 of melted chocolate or similar candy jacketing composition one or more times by holding end 14B in a holder, such as waxed paper 28, and lifting the combination 10 up and down until it is thoroughly coated."  Hallerman Decl., Ex. 36 at LOTTE00005691.  Not material

*PUBLIC VERSION*

because Rooney is not evidence that the Pocky product configuration is functional.  Levine Decl.

¶¶ 77–79, 82.

## 2.    *The "Clean Finger" Patent*

76.    The PTO also previously issued a utility patent (U.S. Patent No. 4,889,729) entitled "Coated Edible Article with Holding to Prevent Finger Soiling. Exhibit 37 (the "Clean Finger Patent").

**Response:**  Undisputed that the PTO issued U.S. Patent No. 4,889,729 to Aujourd'hui

entitled "Coated edible article with holding member to prevent finger soiling."  Hallerman Decl.,

Ex. 37 at LCON00005704.

77.    The Clean Finger Patent "relates to a coated edible article which includes means by which the article **can be held while being consumed without soiling the fingers**. The invention has application in a wide range of edible articles . . . which are comprised of or are covered with a coating which melts when held in the hand and is subjected to body heat."  *Id.* at LOTTE00005707.

**Response:**  Undisputed that Aujourd'hui states "This invention relates to a coated edible

article which includes means by which the article can be held while being consumed without

soiling the fingers. The invention has application in a wide range of edible articles, such as

candies, coated wafers and biscuits and other edible articles which are comprised of or are

covered with a coating which melts when held in the hand and is subjected to body heat."

Hallerman Decl., Ex. 37 at LCON00005707.  Not material because melting is not a problem for

the Pocky product configuration.  Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 45, 47.  Not material

because the product disclosed by Aujourd'hui looks nothing like Pocky.  Levine Decl. ¶¶ 77, 80–

82.

78.    The problem to be solved by the Clean Finger Patent is that when someone grabs a snack item such as a wafer bar "coated with a fat glaze, or other melting coatings," "the finger which is in contact with the glaze becomes soiled because the melting temperature of the coating is below normal body temperature." *Id.*

*PUBLIC VERSION*

**Response:**  Undisputed that Aujourd'hui states "Wafer bars of the type described above are usually wrapped in a paper or cellophane sheet, or similar material. The wafer bar is removed by tearing open the packaging and pulling the wafer out of the packaging by grasping the wafer bar at the top and bottom between the thumb and index or middle finger. However, because the underside of the wafer bar is coated with the fat glaze, or other melting coatings, the finger which is in contact with the glaze becomes soiled because the melting temperature of the coating is below normal body temperature."  Hallerman Decl., Ex. 37 at LCON00005707.  Not material because melting is not a problem for the Pocky product configuration.  Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 45, 47.  Not material because the product disclosed by Aujourd'hui looks nothing like Pocky.  Levine Decl. ¶¶ 77, 80–82.

79.    The Clean Finger Patent states that an object of the invention is to "provide a holding member for a coated edible article, which holding means provides a decorative and attractive appearance to the article." *Id.*

**Response:**  Undisputed that Aujourd'hui states "It is yet another object of the present invention to provide a holding member for a coated edible article, which holding means provides a decorative and attractive appearance to the article."  Hallerman Decl., Ex. 37 at LCON00005707.  Not material because melting is not a problem for the Pocky product configuration.  Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 45, 47.  Not material because the product disclosed by Aujourd'hui looks nothing like Pocky.  Levine Decl. ¶¶ 77, 80–82.

80.    The holding member disclosed in the Clean Finger Patent is a "disc" on the outside of the coated snack product "to avoid melting the chocolate by holding it in the hand." *Id.*

**Response:**  Undisputed that Aujourd'hui states "Preferably, the applied layer is foodstuff and may be in the shape of an oblate, a circular or oval disc, a polygonal disc or a representational shape, for example, such as an animal."  Hallerman Decl., Ex. 37 at LCON00005707.  Undisputed that Aujourd'hui states "In addition to the particular embodiments

*PUBLIC VERSION*

disclosed above, candies, biscuits and cookies of any type and form with a coating on one or more sides can naturally be provided with raised holding members whereby the product can be handled without soiling the fingers. Likewise, the wafer sheet pieces can be applied to chocolate products in order to avoid melting the chocolate by holding it in the hand." Hallerman Decl., Ex. 37 at LCON00005708. Not material because melting is not a problem for the Pocky product configuration. Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 45, 47. Not material because the product disclosed by Aujourd'hui looks nothing like Pocky. Levine Decl. ¶¶ 77, 80–82.

81.     The holding member further is "the approximate size of a finger-end whereby it can be easily grasped and held by the thumb, index finger, or middle finger." *Id*. The Clean Finger Patent requires that the holding member must be:

> at least of a size large enough to be held by a fingertip but having a relatively small surface area in relation to the surface area of said coating so as not to affect the taste of the wafer sheet and coating assembly, said holding member being comprised of a substance which does not melt at or below body temperature, whereby the article can be handled without soiling the fingers.

*Id.* at LOTTE00005708 at 4:3-11.

**Response:**  Undisputed that Aujourd'hui contains the quoted text. Not material because melting is not a problem for the Pocky product configuration. Levine Decl. ¶¶ 33–36; Latella Decl. ¶¶ 45, 47. Not material because the product disclosed by Aujourd'hui looks nothing like Pocky. Levine Decl. ¶¶ 77, 80–82.

**II.** ████████████████████████████████████████████████████.

    **A.** ███████████████████████

    82. ████████████████████████████████████████████
████████████████████████████████████████████
████████

    **Response:** ████████████████████████████████████

████████████████████████████████████████████

*PUBLIC VERSION*

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

83.   ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████ *Id.*

**<u>Response</u>:**   ████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

84.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████

**<u>Response</u>:**   ████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

*PUBLIC VERSION*

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

85.   ███████████████████████████████████████████

███████████████████████████████████████████

██████████

**Response:**   ██████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

86.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

**Response:**   ██████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

*PUBLIC VERSION*

87. ██████████████████████████████████████

**Response:** ████████████████████████████████

*PUBLIC VERSION*

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████   ████████████████████████

████████████████████████

88.   ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

**<u>Response</u>:**   ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

*PUBLIC VERSION*

89.

*PUBLIC VERSION*

**Response:**

*PUBLIC VERSION*

██████████████████████████████████████████████████

██████████████████████████████████████████████

■     ████████████████████████████████████

■     ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**Response:**  ████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*PUBLIC VERSION*

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

91.   ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

    **<u>Response:</u>**  █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

92.   ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

    **<u>Response:</u>**  █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

*PUBLIC VERSION*

93.

**Response:**

*PUBLIC VERSION*

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████

**C.**   ████████████████████████████████████████

95.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

**Response:**   ██████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ instead requests "[t]he prosecution file history for U.S. Patent No. 8,778,428 ("Stick-Shaped Snack and Method for Producing Same" (No. 16) and "[a]ll documents and things you sent to or received from any person concerning U.S. Patent No. 8,778,428 ("Stick-shaped Snack and Method for Producing Same.")" (No. 17).

96.   ████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████ *Id.*

**Response:**   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*PUBLIC VERSION*

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

97.   ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█

**Response:**   ██████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

*PUBLIC VERSION*

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

98.   ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████

**<u>Response</u>:** ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

*PUBLIC VERSION*

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████

99.   ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

**<u>Response</u>:**   ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

*PUBLIC VERSION*



100.

**<u>Response</u>:**

PUBLIC VERSION

████████████████████████████████████████████████

████████████████████████████████████████████

**III.**   **Glico brought suit upon discovering that** ████████████████████████
████████████████████████████████.

**A.**   **Lotte Confectionery and its Pepero Products**

101.   Lotte Confectionery, a Korean corporation, created Pepero biscuit sticks in the early 1980s. Exhibit 50 (Deposition of Jina Choi) 104:8-12.  Due to the passage of time, no one at Lotte Confectionery has personal knowledge about how Pepero was created, and many documents relating to the creation were destroyed in the ordinary course of business long before Glico filed this lawsuit in 2015.  Exhibit 51 (Deposition of Ja Young Hwang) 159:17-161:3.

**Response:**  Undisputed that Lotte Korea began selling Pepero biscuit sticks in Korea in

or about 1983.  Hallerman Decl., Ex. 50 104:8–12.  ██████████████████████████

████████████████   Personal knowledge of Lotte Korea employees regarding how Pepero was

created is not material because the documents are of such volume and clarity that they speak for

themselves.  See PSF ¶¶ 318–26.

102.   Lotte Confectionery sells Pepero in Korea, Japan, Europe and elsewhere. *See*, *e.g.*, Exhibit 52 at 1-22 (Lotte Confectionery's export records showing sales of Pepero to different countries between 1988 and 2001).

**Response:**  Disputed.  Lotte Korea has exported Pepero to various jurisdictions, but the

only document in Exhibit 52 to the Hallerman Decl. with ████████████████████

████████████████████████████████████  Hallerman Decl., Ex. 52

at 25.  Lotte cites no evidence to show that Lotte Korea sold Pepero in any jurisdiction prior to

2000.  Hallerman Decl., Ex. 52.

103.   Lotte Confectionery first sold Pepero in the United States in 1987. Exhibit 50 (Choi Dep.) 76:5-9; Exhibit 53 (██████████████████████████████
████████)). Images of Lotte's most popular Pepero products, Pepero Chocolate and Pepero Almond, are below. Exhibit 54:



**Response:**  Glico Objects to this paragraph to the extent it is based in inadmissible evidence.  See Glico's Evidentiary Objections, Exhibit 53.  Glico objects to Exhibit 54 to the Hallerman Decl. as unauthenticated photographs.  Disputed.  Lotte's purported evidence that Pepero was sold in the United States in 1987 does not show or establish that fact.  Oakley Decl., Ex. 22 at 208:15–209:25, Ex. 22 (Choi Dep. Ex. 85).  The earliest evidence that Lotte sold Pepero in the United States is from ███  Hansen Decl. ¶ 10 (citing Oakley Decl., Ex. 19).

104.    Lotte Confectionery's Pepero biscuit sticks have not materially changed in appearance since those products were first sold in the United States in 1987. *See, e.g.*, Exhibit 55 (chart depicting Pepero packages from 1983 through 2012, showing image of materially similar Pepero biscuit sticks on front of packaging)).

**Response:**  Glico objects to the use of Exhibit 55 of the Hallerman Decl. for the stated proposition because the appearance of the packages is not discernable from the exhibit.  Disputed that Pepero was first sold in the United States in 1987, because there is no evidence that shows or establishes that.  The earliest evidence that Lotte sold Pepero in the United States is from ███ Hansen Decl. ¶ 10 (citing Oakley Decl., Ex. 19).  See Response to DSF ¶ 103.  Undisputed to the extent that the overall appearances of the Pepero biscuit sticks have not materially changed.

105.    Since 1987, the packaging of Lotte Confectionery's Pepero chocolate biscuit sticks has been a red, rectangular box featuring the Pepero brand and images of the chocolate cookie stick. *Id.*; Exhibit 56 (image of Pepero boxes on shelf in 2013)); Exhibit 57 (images of Pepero boxes on shelves between 2002 and 2009). *see also* Exhibit 58 (Lotte Confectionery's Response to Glico's Rog No. 2).

**Response:**  Disputed that Pepero was sold in the United States in 1987 or between 1987 and ███ See Response to DSF ¶ 103.  Undisputed that the packaging of Lotte Korea's Pepero

chocolate biscuit sticks has been a red, rectangular box featuring images of a chocolate cookie stick.

106.    Since the 1980s and continuing to date, Pepero and Pocky have been sold primarily in retail stores that cater to persons of Asian heritage. ███████████████



**Response:**  Disputed.  Glico disputes that Pepero was sold in the United States prior to ██████  See Response to DSF ¶ 103.  ████████████████████████

████████████████████████  Fukumoto Decl. ¶ 16 & Exs. B–D;

Hallerman Decl., Ex. 63 127:24-134:5.  Pocky has been sold in mainstream American retailers

since at least ███████████████.  See PSF ¶¶ 56–57.

107.    In the 1980s and 1990s, Pepero was sold to distributors and in retail stores by way of those distributors, in California, Illinois, New York, and Maryland and many other states. *See, e.g.,* ████████████████████

**Response:**  Disputed.  Glico disputes that Pepero was sold in the United States prior to ██████  See Response to DSF ¶ 103.  ████████████████████████

████████████████████████  Hallerman Decl., Exs. 59 & 60.  Undisputed

that Glico sent a cease and desist letter to a distributor of Pepero in Illinois in 1993.  Disputed

that Exhibit 64 to the Hallerman Decl. is evidence of retail sales in Illinois as of 1993.  The

location of retail sales is not tied to the location of the distributor and the letter does not mention

the location of sales.  Undisputed that Glico sent a cease and desist letter to a distributor of

Pepero in New York in 1995.  Disputed that Exhibit 65 to the Hallerman Decl. is evidence of

*PUBLIC VERSION*

retail sales in New York as of 1995.  The location of retail sales is not tied to the location of the distributor and the letter does not mention the location of sales.  Undisputed that Glico listed a number of Pepero importers in Exhibit 61 to the Hallerman Decl.  Disputed that Exhibit 61 to the Hallerman Decl. is evidence of retail sales in any of the states listed on that document.  The locations of importers are not tied to the locations of sales and the document does not mention the location of sales.

     108.    Since the 1980s, retailers in the United States have sold Pepero and Pocky side-by-side, on the same shelf, or in the same aisle and continue to do so today. *See, e.g.*, Exhibits 56-57, 66-72. *See also* ███████████████████████ ███████████████████████ Some annotated examples are below.



2002, Hannam Chain Supermarket, Los Angeles

Pocky

Pepero

*PUBLIC VERSION*



2008, H Mart, Naperville, IL

Pepero

Pocky

**Exhibit 57**

**Response:** Disputed. Glico disputes that Pepero was sold in the United States prior to ███ See Response to DSF ¶ 103. Glico objects to Exhibit 56 to the Hallerman Decl. because there is no indication of the location or time of the depicted scene. Undisputed that Pocky and Pepero have been sold in some of the same ████████████████████████. ████████████

███████████████████████████████████████████████

███████ Fukumoto Decl. ¶ 16 & Exs. B–D. ████████████████████

████████████████████████████████████ Fukumoto Decl. ¶ 18.

109.    Lotte Confectionery's business records concerning the advertising and sale of Pepero in the United States in the 1980s and 1990s were destroyed in the ordinary course of business long before Glico's filed this lawsuit in 2015. *See* Exhibit 58 (Lotte Confectionery's Supplemental Response to Rog No. 10). Lotte Confectionery subpoenaed the business records of its importers of Pepero into the United States during the 1980s and 1990s, including Rhee Bros, Hanmi, Inc., Seoul Shik Poom Inc., and Jin Han International Inc., but none of these importers provided any documents from that time period. Hallerman Decl. ¶ 94.

**Response:**   Disputed.  Glico disputes that Pepero was sold in the United States prior to ▇▇▇  See Response to DSF ¶ 103.  Disputed, because unknown, as to what documents Lotte required from the recipients of its third party subpoenas, and how thorough a search they each conducted.  Not material because Lotte has produced documents reflecting its sales records for Pepero dating back to ▇▇▇ and further documents from the ▇▇▇ are not relevant to the merits of the substantive issues in the case.

110.    Lotte Confectionery has no personnel with knowledge of the sale or advertising of Pepero in the United States in the 1980s and 1990s, let alone personnel who could quantify such sales and advertising or identify all of the various states in which Pepero was being sold. Exhibit 50 (Choi Dep.) 209:15209:25); Exhibit 51 (Hwang Dep.) 107:7-107:22. Despite Lotte Confectionery's efforts to identify and locate the prior employees, they are not available. *See, e.g.*, Exhibit 51 (Hwang Dep.) 111:21-112:10; 159:17-161:3; 178:21-179:7; 180:21181:20; 182:18-183:9.

**Response:**   Disputed.  Glico disputes that Pepero was sold in the United States prior to ▇▇▇  See Response to DSF ¶ 103.  Not material because Lotte has produced documents reflecting its sales records for Pepero dating back to ▇▇▇ and further documents from the ▇▇▇ are not relevant to the merits of the substantive issues in the case.

111.    Due to the passage of time, Lotte Confectionery cannot prove the full extent and geographic scope of Pepero sales in the United States in the 1980s and 1990s. *See, e.g.*, SUMF ¶¶ 109-110, *supra*. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Exhibit 52 (compilation exhibit of Lotte's Confectionery's summary import records showing sales of Pepero for the years 1989-1991, 1990-1992, 1993-1995, 1996, 1997, 1998, and 2000-2015). From the 1980s through 2000, Lotte Confectionery's total revenues from Pepero sales in the United States were approximately ▇▇▇. *See id.*



**Response:**   Disputed.  Glico disputes that Pepero was sold in the United States prior to ▇▇▇  See Response to DSF ¶ 103. See also Hansen Decl., Ex. 1, which shows the exact revenue figures for Pepero ▇▇▇▇▇▇▇.

*PUBLIC VERSION*

**B.**   ███████████████████████████████████████████

112.    Lotte America is Lotte Confectionery's sister company.  Eum Decl. ¶ 2.  Prior to 2000, Lotte America served as an import/export company for the Lotte conglomerate of companies, but it did not import food for Lotte Confectionery. *Id.*

**Response:**  Undisputed.

113.    In 2000, Lotte America began to market, distribute, and sell Pepero in the United States.  Eum Decl. ¶ 4; Exhibit 58 (Lotte Confectionery's Response to Glico's Rog No. 10).  Since 2000, with very limited exception, Lotte Confectionery's sales of Pepero in the United States have been made through Lotte America.  Exhibit 58 (Lotte Confectionery's Response to Glico's Rog No. 10).

**Response:**  Undisputed.

114.    Since 2000, Lotte America has sold primarily four flavors of Pepero: chocolate, almond, white cookie, and nude. Eum Decl. ¶ 5. Below are examples of these products and their packages (*id.*; *see also* Exhibit 73):



**Response:**  Undisputed.

115.    Lotte America also sells a variety of special Pepero flavors during a seasonal marketing event called "Pepero Day."  Eum Decl. ¶ 6.

**Response:**  Undisputed.

116.    Pepero has always been one of Lotte America's top-selling Confectionery items. Eum Decl. ¶ 7.

**Response:**  Disputed.  Lotte America did not sell Pepero prior to ████  See DSF ¶ 113.

Additionally, the evidence shows that ██████████████████████████████████

██████████████.  See PSF ¶¶ 85–87; Oakley Decl., Ex. 35 at 43:1–45:10, 15:22–16:17.

*PUBLIC VERSION*

117.    Since 2000, Lotte America has marketed Pepero to distributors who sold to retail stores throughout the United States, including stores that cater to Asian communities and Hispanic communities, as well as mainstream retail stores like Walmart and 7-Eleven. Eum Decl. ¶ 8; *see also* Exhibit 75 (Lotte America's customer list); Exhibit 76 (Lotte America's distributor customers in 2002-2005). The vast majority of the Pepero is sold to retail stores that cater to the Asian community. Eum Decl. ¶ 11. Many of these stores also sell Pocky in the same aisle or on the same shelf as Pepero. *Id.*



**Response:**  Disputed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fukumoto Decl. ¶ 16 & Exs. B–D; Hallerman

Decl., Ex. 63 127:24-134:5. ▮▮▮▮▮▮▮▮▮▮▮▮▮ Oakley Decl., Ex. 81.

Undisputed that Pocky and Pepero have been sold in some of the same ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮ Fukumoto Decl. ¶ 16 & Exs. B–D. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Fukumoto Decl. ¶ 18.  Glico objects to paragraph 8 of the Eum Decl.

See Glico's Evidentiary Objections, Eum Decl. ¶ 8.

118.    Initially, Lotte America was located on the East Coast and sold Pepero only to wholesalers and distributors who, in turn, would sell the product to retailers throughout the United States. Eum Decl. ¶ 8. In 2006, due to the success of Pepero, Lotte America began to sell Pepero directly to retailers. *Id.* In 2006, Lotte America moved from New Jersey to California to be close to key retailers and expand distribution. *Id.* ¶ 9. Lotte leased a warehouse to store Pepero and other products so that it could deliver the products directly to retailers. *Id.* Since 2006, Lotte America has sold Pepero directly to hundreds of retailers located throughout California and up and down the entire West Coast as well as retailers located in many southern and western states such as Georgia, Texas, Arkansas, Arizona, and Nevada, and online retailers who ship their products nationwide. *Id.*

**Response:**  Disputed that Lotte America moved from New Jersey to California to be

close to key retailers and expand distribution for Pepero. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See PSF ¶¶ 85–87;

Oakley Decl., Ex. 35 at 43:1–45:10, 15:22–16:17.  Disputed that the warehouse Lotte rented was

*PUBLIC VERSION*

tied to Pepero as opposed to its other products.  See PSF ¶¶ 85–87; Oakley Decl., Ex. 35 at 43:1–45:10, 15:22–16:17, 34:12–16 (█████████████████████████).

119.    Over the years, Lotte America has spent hundreds of thousands of dollars advertising and promoting Pepero in the United States. Eum Decl. ¶ 12; *see also* Exhibit 77 (Lotte America's estimated marketing expenditures for Pepero on an annual basis). In addition, Lotte America's employees invest thousands of hours each year to make trips throughout the United States to meet with existing distributors and retailers and to solicit new business. Eum Decl. ¶ 12.

**Response:**  Disputed. ████████████████████████████



████████████████████████████████████████████

Hallerman Decl., Ex. 77 (LOTTE00004945); Hansen Decl., Ex. 1; see PSF ¶¶ 309–11. ████

████████████████████████████████████ Oakley

Decl., Ex. 35 at 18:14–20:1.

120.    Since 2000, Lotte America also has continuously sold Pepero at wholesale to dozens of distributors located throughout the United States. Eum Decl. ¶¶ 8 10; Exhibit 75 (Lotte America's customer list including wholesale customers)); Exhibit 76 (Lotte's wholesale customer sales in 2002-2005)). Those distributors, in turn, sell Pepero directly to retailers and smaller distributors across the country. Eum Decl. ¶¶ 8 10.

**Response:**  Disputed. ████████████████████████████

Fukumoto ¶ 16; Hallerman Decl., Ex. 63 128:22–129:7.

121.    Despite moving its main office to California, Lotte America retained a remote employee on the East Coast whose responsibility was to service Lotte America's distributor and wholesaler customers on the East Coast. Eum Decl. ¶ 10. Those distributors continued to sell Pepero to thousands of retailers up and down the East Coast as well as throughout the country. *Id*; Exhibit 75 at 7 (showing distribution area of Lotte America's major wholesale customers)).

**Response:**  Disputed. ████████████████████████████

Fukumoto ¶ 16; Hallerman Decl., Ex. 63 128:22–129:7.

122.    For more than a decade, Lotte America has invested in an annual promotional event for Pepero, "Pepero Day," which takes place every November 11. Eum Decl. ¶ 13. To promote this popular event, Lotte America takes out advertisements in newspapers, puts out marketing materials, and partners with universities to conduct social events on Pepero Day. *Id.*; *see also* Exhibit 78 (Images of Lotte's promotion events in connection with the 2007 Pepero Day, 2008 Pepero Day, and 2012 Pepero Day).

*PUBLIC VERSION*

**Response:**  Undisputed, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████   Hallerman Decl., Ex. 77 (LOTTE00004945); Hansen Decl., Ex. 1; see PSF

¶¶ 309–11.

123.    Lotte America advertises its Pepero on social media, including Facebook and Instagram, where it has thousands of followers. Eum Decl. ¶ 14.

**Response:**  Undisputed, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████   Hallerman Decl., Ex. 77 (LOTTE00004945); Hansen Decl., Ex. 1; see PSF

¶¶ 309–11.

124.    Lotte America annually participates in snack food trade shows in the United States, where it meets retailers and distributors who are potential customers.  Eum Decl. ¶ 15; *see also e.g.* Exhibit 57 at 12 (images of Lotte's trade show booths).

**Response:**  Undisputed that Lotte participated in one annual snack food trade show in the

United States from 2005–08.  Hallerman Decl., Ex. 57 at 12   Disputed that Lotte's presence at

those is tied to Pepero.  Hallerman Decl., Ex. 57 at 12 (depicting Lotte booths in 2005–08

featuring product other than Pepero).

125.    Lotte America has for decades conducted frequent in-store sampling events in retail stores throughout the country.  Eum Decl. ¶ 16.  Lotte America hires demonstration companies to provide samples of Pepero and Lotte's other snacks to consumers shopping in these stores.  *Id.*; *e.g.* Exhibit 79 (photograph from in-store sampling event in 2013).

**Response:**  Undisputed that Lotte conducts in-store sampling events in the United States,

except that "for decades" is unsubstantiated.  ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████.  Hallerman Decl., Ex. 77 (LOTTE00004945); Hansen Decl., Ex. 1; see PSF

¶¶ 309–11.

*PUBLIC VERSION*

126.   Lotte America established relationships with ███████████ ██████████████████ who cater to the growing market of mainstream American consumers seeking snacks from foreign countries. Eum Decl. ¶ 17; Exhibit 75 (Lotte America's Customer List).

**Response:**   Glico objects to paragraph 17 of the Eum Decl.  See Glico's Evidentiary

Objections, Eum Decl. ¶ 17.  Disputed.  ████████████████████████████

████████████████████████████ Fukumoto Decl. ¶ 16 & Exs. B–D;

Hallerman Decl., Ex. 63 127:24-134:5.

127.   Since 2000, Lotte America has introduced Pepero to hundreds of thousands of new customers and consumers throughout the country. Eum Decl. ¶ 18.

**Response:**   Disputed because there is no supporting evidence, and thus it is mere

speculation, and not material because ███████████████████. ███████████

████████████████████████████████████

████████████████████ Hallerman Decl., Ex. 77 (LOTTE00004945);

Hansen Decl., Ex. 1; see PSF ¶¶ 309–11.

128.   Lotte America's revenues from the sale of Pepero have grown steadily from approximately ██████████████████████████████ *See* Exhibit 76 (showing Lotte America's approximate revenues for Pepero on an annual basis from 2000-2016); Exhibit 80 (Lotte America's Response to Glico's Rog. 33, Appendix A – revenues 2007-2017). From 2000 through 2017, Lotte America earned over ████ ████████████ from the sale of Pepero in the United States. *See id.*

**Response:**   Undisputed.  But not material because █████████████████

████████████████████, see PSF ¶¶ 85–87, and ██████████████████

████████████. See PSF ¶¶ 309–11.

129.   Over the last 30 years Lotte Confectionery ████████████████ ██████ from sales of Pepero in the United States, exclusive of sales made to Lotte America. Exhibit 52 (combined exhibit of early Lotte Confectionery export records); Exhibit 74 (Lotte Confectionery's Response to Glico Rog. No. 24 and Appendix A thereto – revenues 2005-2017).

**Response:**   Disputed.  Glico disputes that Pepero was sold in the United States prior to

████  See Response to DSF ¶ 103.

**C.**  ████████████████████████████████████████

130.    The demand and popularity of Pepero allows Lotte America to persuade retailers to stock Lotte America's less well-known snack products. Eum Decl. ¶ 19.  If Lotte America could no longer sell Pepero, the demand for many of its less well-known snacks would evaporate and it would lose many customers altogether. *Id.*

**Response:**  Glico objects to paragraph 19 of the Eum Decl. (including because this statement is speculative opinion from a lay witness).  See Glico's Evidentiary Objections, Eum Decl. ¶ 19.  Disputed.  █████████████████████████████████████████



███████████████████  See PSF ¶¶ 85–87; Oakley Decl., Ex. 35 at 43:1–45:10, 15:22– 16:17.  ████████████████████████████  Oakley Decl., Ex. 35 at 43:1– 44:10.  █████████████████████████████████████████████████ ███████████████  Oakley Decl., Ex. 35 at 44:19–45:10.  █████████████ ████████████████████████████████  Hallerman Decl., Ex. 58 at 25.

131.    Lotte America orders large quantities of Pepero from Lotte Confectionery both on behalf of its retail business and for its wholesale customers on a monthly basis. Eum Decl. ¶ 20. Lotte Confectionery ships the Pepero products along with other snacks in large containers to Lotte America or its wholesale customers. *Id.* Due to the significant costs involved in shipment and importation of a container, the containers are shipped full to justify the cost. *Id.* If Lotte America is prohibited from importing Pepero, it could no longer place orders of its less-popular snacks that are large enough to fill a container. *Id.* Lotte America would be required either to take a loss on each partially-filled container or stop importing Lotte Confectionery snack products altogether. *Id.*

**Response:**  Glico objects to paragraph 20 of the Eum Decl. (including because this statement is speculative opinion from a lay witness).  See Glico's Evidentiary Objections, Eum Decl. ¶ 20.  Disputed.  █████████████████████████████████████████

███████████████████  See PSF ¶¶ 85–87; Oakley Decl., Ex. 35 at 43:1–45:10, 15:22– 16:17.  ███████████████████████████████████████████████

████████████  Hallerman Decl., Ex. 58 at 25; Oakley Decl. ¶ 101.

*PUBLIC VERSION*

132.    The prohibitive cost of importation, combined with the likely loss of customers who are primarily interested in Pepero rather than Lotte America's other snacks, would likely make it impossible for Lotte America to sustain its snack importation business. Eum Decl. ¶ 21. The loss of this business would have devastating effects on Lotte America, as Lotte America would likely need to lay off employees and relinquish its warehouse and trucking services. *Id.*

**Response:**  Glico objects to paragraph 21 of the Eum Decl. (including because this statement is speculative opinion from a lay witness).  See Glico's Evidentiary Objections, Eum Decl. ¶ 21.  Disputed.  T█████████████████████████████████ ███████████████████  See PSF ¶¶ 85–87; Oakley Decl., Ex. 35 at 43:1–45:10, 15:22–16:17. █████████████████████████████████████████████ ████████████████████████████████████  Oakley Decl., Ex. 35 at 19:18–20:1. ██████████████████████████████████ ████████████████████████████████  Oakley Decl., Ex. 35 at 34:3–21, 29:11–31:13. ████████████████████ ████████████████████  Hallerman Decl., Ex. 58 at 25; Oakley Decl. ¶ 101.

**D.**    ████████████████████████████████████ ██████████████

133.    Glico has known that Lotte was selling Pepero in the United States in competition with Pocky since at least March 1989. Exhibit 53; Exhibit 13 (Glico's Response to Lotte Confectionery's RFA 4). ██████████████████████████████████ ████████████████████████████ ███████████  *Id.*

**Response:**  Glico objects to Lotte's use here of Exhibit 53.  There is no indication that the author had any personal knowledge of the document's contents, or that its contents were based on evidence of any sort.  See Glico's Evidentiary Objections, Exhibit 53.  Disputed.  Glico disputes that Pepero was sold in the United States prior to ████  See Response to DSF ¶ 103. Undisputed that Exhibit 53 to the Hallerman Decl. lists █████████████████████.

134.    ████████████████████████████████ ██████████████████████████████████████

*PUBLIC VERSION*

████████████████████████████████████ Exhibit 81 (Glico's Response to Lotte Confectionery's Rog No. 10 ); Exhibit 63 (Fukumoto Dep.) 27:4-27:19. ██████████ ████████████████████ *Id.* Because the document is nearly 30 years old, Glico has no recollection of the document, including who, if anyone, reviewed or received the document, the purpose of the document or how or when the information relating to Pepero contained in the document was gathered. *See id.* Other Glico employees who would have had knowledge about sales of Pepero in the 1980s and 1990s and had other relevant knowledge are similarly unavailable or do not recall details. Exhibit 63 (Fukumoto Dep.) 82:8-83:18; 85:3-11, 107:2-12. Glico cannot state for a fact that it did not know of the sale of Pepero in the United States beginning in the autumn of 1987, ████████████████████████████████████ ██████████████

**Response:**  Glico objects to Lotte's use here of Exhibit 53.  There is no indication that the author had any personal knowledge of the document's contents, or that its contents were based on evidence of any sort.  See Glico's Evidentiary Objections, Exhibit 53. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Undisputed that Mr. Takano is no longer a Glico employee, and not within Glico's control.  Disputed that Mr. Takano is unavailable.  There is no evidence that Lotte attempted to obtain third party discovery from Mr. Takano.  Oakley Decl. ¶ 100.  Glico disputes that Pepero was sold in the United States prior to ██████ See Response to DSF ¶ 103.  Lotte cannot state for a fact, and has produced no evidence, that any Pepero sales occurred before ██████

135.    There is no evidence that Glico sent a cease and desist letter to anyone—Lotte, distributors, or retailers—concerning Pepero until more than three years after the date of this ████████████████████████████████ document. *See* Exhibit 13 (Glico's Response to Lotte Confectionery's RFA 75).



*PUBLIC VERSION*



**Response:**  Undisputed that Glico's trademark counsel in the United States sent a letter to Lotte on December 13, 1993 stating that Glico owned trademark rights in the Pocky product configuration and that the sale of Lotte's confusingly similar products were likely to cause confusion of consumers and potential consumers of snack food products by leading them to believe that your products are manufactured by Glico or to believe that there is a connection between Glico and Lotte.  Hallerman Decl., Ex. 82 at TTKC00195.  Undisputed that Glico's trademark counsel in the United States demanded that Lotte immediately cease all manufacturing and sales of the Pepero snack foods in their current configuration and use of their existing packaging."  Hallerman Decl., Ex. 82 at TTKC00196.  Undisputed that Glico's trademark counsel in the United States sent a letter to Lotte on January 17, 1994 noting that Lotte had not responded to the December letter.  Hallerman Decl., Ex. 83 at TTKC00185.

136. 

**Response:**  Disputed.

Hallerman Decl., Ex. 84.

149

*PUBLIC VERSION*

█████████████████████████████████████ Hallerman Decl., Ex. 84.

███████████████████████████████████████████

████████████████ Hallerman Decl., Ex. 84. ██████████████████████████████

██████████████████████████████████████████ Hallerman

Decl., Ex. 84.

137. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████

**Response:**  Undisputed that Glico's trademark counsel in the United States sent a letter to Lotte on March 18, 1994 stating that "If we do not receive a prompt response from Lotte indicating that it will respect [Glico's] rights and comply with our demands, our client may be forced to resolve this matter by taking legal action without further notice to you."  Hallerman Decl., Ex. 85 at TTKC00178.

138. ███████████████████████████████████████████
███████████████████████████████

**Response:**  Undisputed that ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████ Hallerman Decl., Ex. 86.



139. ██████████████████████████████████████████████
████████████████████████████████████████████
███████████

**<u>Response</u>:** Undisputed that Glico's trademark counsel in the United States sent a further letter on May 12, 1994 stating that "It has now been approximately six weeks since your letter, and we still have received no further word from either your company or counsel representing Lotte. In addition, this matter has now dragged on since our initial correspondence with you in December 1993. [Glico] has been most indulgent in allowing Lotte ample time to look into its claims of infringement and to provide a good faith, substantive response. You are hereby notified that our patience has now been exhausted, and we expect your response without further delay." Hallerman Decl., Ex. 87 at TTKC00518.



140. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█

**<u>Response</u>:** Undisputed t ████████████████████████████
████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Hallerman Decl., Ex. 88. ██████████████████████████

████ Hallerman Decl., Ex. 89.

141. Mr. Park left Lotte Confectionery over 20 years ago and cannot be located. Exhibit 51 (Hwang Dep.) 56:12-57:24. Lotte Confectionery's personnel do not have knowledge about any communications between Glico and Lotte or about whether there were

*PUBLIC VERSION*

communications between the parties after the August 19, 1994 letter or what the substance of those communications were if they did occur. *Id.* 33:3-33:24; 55:2-56:5; 62:12-64:15; 68:22-69:11; 69:18-71:1; 72:21-75:9; 76:5-77:12; 95:4-96:3); Exhibit 50 (Choi Dep.) 136:4-137:18; Exhibit 58 (Lotte Confectionery Response to Glico's ROG No. 10). ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

**Response:**  Disputed. ████████████████████████████████████

████████████████████████  Hallerman Decl., Ex. 51, 56:12-57:24.  Not material

because the documents are unambiguous and speak for themselves.

142.    Lotte did not have the 1993-1994 correspondence between the parties in its possession, custody or control and obtained it when Glico produced it in discovery in this case. Exhibit 51 (Hwang Dep.) 65:2-21; Exhibit 58 (Lotte Confectionery's Response to Glico's ROG No. 10.) Lotte has no documents in its possession, custody or control about the 1993-1994 correspondence between the parties or actions that were or were not taken as a result of the parties' correspondence. *Id.* The same thing is true with respect to Glico – it is not aware of any documents dated after Mr. Park's August 19, 1994 letter relating to the matter. Exhibit 39 (Sato Dep.) 33:9-21, 34:4-35:6.

**Response:**  Disputed that Glico had no documents in its possession, custody or control

about the 1993–94 correspondence.  Glico's trademark counsel retained records that were under

Glico's control.  See Hallerman Decl., Exs. 82–89.  Undisputed that Glico is aware of no

communication with Lotte, until 2014, after ██████████████████████████████

████████████████████████████████████████████████████████

████████████████  Hallerman Decl., Ex. 89.  Disputed that Lotte has no documents about actions that

were or were not taken as a result of the parties correspondence, as there is ample evidence of

Lotte's willful infringement thereafter.  See PSF ¶¶ 306–08, 330.

143.    Glico knew that Lotte Confectionery continued to sell Pepero in the United States after Lotte's August 19, 1994 letter and Glico continued to maintain that the sale of that product was infringing. ████████████████████████████████████████

████████████████████. Exhibit 59; Exhibit 60. ████████████████

████████████████████████████████████████████████████████

PUBLIC VERSION



)); Exhibit 13 (Glico's Responses to Lotte Confectionery's RFA 11-12, 30-32, 46-47, 57-58, 73-74 (

)); Exhibit 90 (

.)); Exhibit 63 (Fukumoto Dep.) 127:24-134:5 (

)).

**Response:** Disputed.

Fukumoto Decl. ¶ 16; Tsuji Decl. ¶ 12; Hallerman Decl., Ex. 63 128:22–129:7; Hallerman Decl., Ex. 59 (

) & Ex. 60 (same);.

Fukumoto Decl. ¶ 16; Hallerman Decl., Ex. 63 128:22–129:7.

144.

**Response:** Disputed.

Exhibit 61 to the Hallerman Decl. lists                                          . Glico listed                                          . Hallerman Decl., Ex. 90 at EZAKI0122917, Ex. 44 at EZAKI0182309, Ex. 45 at EZAKI0106653.

See PSF ¶¶ 318–26.

145.    Despite having continuous actual knowledge that Lotte was selling Pepero in the United States in competition with Pocky following its 1994 cease and desist letters, Glico did not file this lawsuit until July 10, 2015 – more than 25 years after learning of its infringement claims in March 1989 and more than 21 years after Glico sent its last cease and desist letter to Lotte in May 1994.  Dkt. 1.

*PUBLIC VERSION*

**Response:**  Disputed. █████████████████████████

████████████████████████████████████████████

Fukumoto Decl. ¶ 16; Tsuji Decl. ¶ 12; Hallerman Decl., Ex. 63 128:22–129:7; Hallerman Decl.,

Ex. 59 (████████████████████████████████

██████████████████████) & Ex. 60 (same); ██████████████

██████████████████████ Fukumoto Decl. ¶ 16; Hallerman Decl.,

Ex. 63 128:22–129:7.  Glico attempted to bring suit in 2014.  See PSF ¶¶ 11–14.

*PUBLIC VERSION*

Dated: October 22, 2018               Respectfully submitted,

/s/ *Roy H. Wepner* _____

Roy H. Wepner
Charles P. Kennedy
Natalie S. Richer
LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel: 908.654.5000
Fax: 908.654.7866

/s/ *Steven M. Levitan* _____

Steven M. Levitan (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
Tel: 650.463.4000
Fax: 650.463.4199

Anna Kurian Shaw
(admitted *pro hac vice*)
Katherine Bastian
(admitted *pro hac vice*)
Lauren Cury
(admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel: 202.637.5600

Aaron S. Oakley
(admitted *pro hac vice*)
Katherine Armstrong Nelson
(admitted *pro hac vice*)
HOGAN LOVELLS US LLP
1601 Wewatta St #900
Denver, CO 80202
Tel: (303) 899-7300

*Attorneys for Plaintiffs Ezaki Glico*
*Kabushiki Kaisha, d/b/a Ezaki Glico Co., Ltd. and*
*Ezaki Glico USA Corporation*

155

*PUBLIC VERSION*

## <u>Certificate of Service</u>

I hereby certify that a true and correct copy of the foregoing was served upon the

following counsel of record via email on this 22nd day of October 2018:

Riley Thomas Orloff
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
212-547-5400
rorloff@mwe.com

John J. Dabney
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8343
jdabney@mwe.com

Mary Hallerman
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8738
mhallerman@mwe.com

Katie Bukrinsky
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8194
kbukrinsky@mwe.com

Rebecca Harker Duttry
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8248
rduttry@mwe.com

/s/  *Roy H. Wepner*