Riley T. Orloff (RO4865)
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY  10173-1922
Email:  rorloff@mwe.com
Tel:  212.547.5683
Fax: 212.547.5444

John J. Dabney (admitted *pro hac vice*)
Mary D. Hallerman (admitted *pro hac vice*)
Katie Bukrinsky (admitted *pro hac vice*)
Rebecca H. Duttry (*admitted pro hac vice*)
rduttry@mwe.com
Email:  jdabney@mwe.com, kbukrinsky@mwe.com,
mhallerman@mwe.com, rduttry@mwe.com
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
Tel:  202.756.8000
Fax:  202.756.8087
*Attorneys for Defendants/Counterclaimants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EZAKI GLICO KABUSHIKI KAISHA, d/b/a | : | |
| EZAKI GLICO CO., LTD., | : | |
| and EZAKI GLICO USA CORPORATION, | : | Civil Action No. 15-5477-MCA-LDW |
| | : | |
| Plaintiffs/Counterdefendants. | : | |
| | : | District Judge Madeline Cox Arleo |
| v. | : | |
| | : | Magistrate Judge Leda Dunn Wettre |
| LOTTE INTERNATIONAL AMERICA CORP. | : | |
| and LOTTE CONFECTIONERY CO. LTD. | : | |
| | : | |
| Defendants/Counterclaimants. | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF APPEAL OF MAGISTRATE JUDGE'S DENIAL OF MOTION TO COMPEL PRODUCTION OF NERA'S PILOT SURVEYS AND FOR SANCTIONS

**TABLE OF CONTENTS**

BACKGROUND ....................................................................1

    I.    DR. VAN LIERE, VAN LIERE CONSULTING LLC
         AND NERA CONSULTING ...............................................1

    II.    DR. VAN LIERE AND NERA WITHHELD
         DOCUMENTS ABOUT PILOT SURVEYS ...................................2

    III.    THE DEPOSITIONS OF DR. VAN LIERE AND
         NERA...............................................................3

         A.    NERA Refuses to Testify About Pilot Surveys.....................3

         B.    Dr. Van Liere Admits That NERA's Dr.
                Iyengar and Ms. Singer Assisted in Designing
                the Surveys That Form the Basis for His
                Opinions in this Case. ...........................................8

    IV.    LOTTE SEEKS TO COMPEL DISCLOSURE OF
         THE IMPROPERLY WITHHELD PILOT
         SURVEYS ...........................................................9

         A.    Lotte's Motion to Compel ........................................9

         B.    Dr. Van Liere Changes his Testimony About
                His Staff's Role ................................................10

          C.    The Alzheimer's Decision........................................12

    V.    THE MAGISTRATE JUDGE'S DECISION ...............................13

    VI.    LOTTE'S TIMELY APPEAL .........................................15

LEGAL STANDARD ...............................................................15

ARGUMENT ......................................................................16

    I.    THE MAGISTRATE JUDGE COMMITTED
         LEGAL ERROR BY REFUSING TO COMPEL
         PRODUCTION OF THE PILOT SURVEYS. ...............................17

    II.    THE MAGISTRATE JUDGE ERRED BY
         CREDITING DR ....................................................23

**CONCLUSION**.................................................................................................**27**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's*
*Found. Of Am., Inc.*,
307 F. Supp. 3d 260 (S.D.N.Y. Apr. 20, 2018) ............................................*passim*

*Apple Inc. v. Amazon.com, Inc.*,
No. 11-1327, 2013 WL 1320760 (N.D. Cal. Apr. 1, 2013) ...................14, 17, 26

*Bobian v. CSA Czech Airlines*,
222 F. Supp. 2d 598 (D.N.J. 2002) .....................................................................15

*Derrickson v. Cir. City Stores, Inc.*,
DKC 95-3296, 1999 WL 1456538 (D. Md. Mar. 19, 1999), *aff'd*
*sub nom. Johnson v. Cir. City Stores, Inc.*, 203 F.3d 821 (4th Cir.
2000) ...........................................................................................................*passim*

*Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co. of Wisconsin*,
131 F.R.D. 63 (D.N.J. 1990).................................................................................15

*Eisai Co., Ltd. v. Teva Pharm. USA, Inc.*,
629 F. Supp. 2d 416 (D.N.J. 2009) .....................................................................16

*Haines v. Liggett Group, Inc.*,
975 F.2d 81 (3d Cir. 1992) ..................................................................................16

*Herman v. Marine Midland Bank*,
207 F.R.D. 26 (W.D.N.Y. 2002) ....................................................................25, 26

*In re Benicar*,
319 F.R.D. 139 (D.N.J. 2017).............................................................................17

*Lee Valley Tools, Ltd. v. Indus. Blade Co.*,
288 F.R.D. 254 (W.D.N.Y. 2013) .................................................................17, 26

*Ansell Healthcare Products LLC v. Reckitt Benckiser LLC*,
15-CV-915-RGA, 2017 WL 6328149 (D. Del. Dec. 11, 2017).................*passim*

*Robocast v. Apple, Inc.*,
   No. 11-235 and 10-1055, 2013 WL 12155813 (D. Del. Sept. 18,
   2013 ................................................................................................*passim*

*Sher v. Raytheon Co.*,
   8:08-CV-889-T-33AEP, 2010 WL 11507787 (M.D. Fla. Aug. 13,
   2010) ..............................................................................................*passim*

*Synthes Spine Co. v. Walden*,
   232 F.R.D. 460 (E.D. Pa. 2005) ....................................................... 19

*U.S. v. Dish Network, L.L.C.*,
   297 F.R.D. 589 (C.D. Ill. 2013) ....................................................... 24

*United States v. U.S. Gypsum Co.*,
   333 U.S. 364 (1948) .......................................................................... 15

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(ii) ................................................................ 16

Fed. R. Civ. P. 26(b)(3)-(4) ...................................................................... 2

Fed. R. Civ. P. 30(b)(6) ............................................................................ 3

Fed. R. Civ. 72(a) ................................................................................... 15

L. Civ. R. 72.1 ....................................................................................... 15

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, Defendants
Lotte International America Corporation and Lotte Confectionery Co. Ltd.
(collectively, "Lotte") appeal Magistrate Judge Wettre's January 23, 2019 Letter
Order denying their motion to compel the production of documents concerning
pilot surveys (and testimony concerning those surveys) (collectively, "Pilot
Surveys") related to the expert report of Glico's expert Dr. Kent Van Liere.

## BACKGROUND

**I. DR. VAN LIERE, VAN LIERE CONSULTING LLC AND NERA CONSULTING**

In July 2017, Glico retained Dr. Van Liere to design and implement surveys
to assess whether consumers are likely to confuse Glico's POCKY products and
Lotte's PEPERO products. Ex. B (Van Liere Report ¶ 1); Ex. C (Van Liere Dep.
10:8-25).[1]  At the time, Dr. Van Liere was a Managing Director at NERA. Ex. B
(Van Liere Report ¶¶ 2, 4). In late 2017, Dr. Van Liere retired from NERA and
formed his own consulting company, Van Liere Consulting, LLC. Ex. B (Van
Liere Report ¶ 2); Ex. C (Van Liere Dep. 7:20-8:2). For the duration of the
assignment in this case and culminating in the production of his expert report in
April 2018, Dr. Van Liere was assisted by NERA Senior Consultant Dr. Samantha
Iyengar and NERA Economic Analyst Ms. Arie Singer. Ex. B (Van Liere Report

---

[1] Exhibits L-M are to the declaration of Katie Bukrinsky, submitted herewith.
Exhibits A-K were previously filed with the Magistrate Judge at Docket 202.

¶¶ 2, 7 ("Throughout this report, I have used the terms "I," and "my" to refer to work performed by me *and/or others under my direction*."); Ex. C (Van Liere Dep. 20:1-21:9) (emphasis added). Dr. Van Liere's expert report disclosed two surveys ("Van Liere Surveys")—one launched in November 2017 assessing likelihood of confusion with the POCKY chocolate product, and the other launched in February 2018 assessing likelihood of confusion with the POCKY almond product. Ex B.

## II.   DR. VAN LIERE AND NERA WITHHELD DOCUMENTS ABOUT PILOT SURVEYS

Lotte served a subpoena on NERA seeking documents related to Dr. Van Liere's assignment in this case, including documents concerning any pilot or test surveys that were performed. Ex. D (Subpoena to NERA Requests for Production Nos. 1-3). Both NERA and Glico objected, asserting that some of the requested documents were protected from disclosure by the attorney-client privilege, work product, and Fed. R. Civ. P. 26(b)(3)-(4). Ex. E (NERA Objections to Document Subpoena Requests for Production Nos. 1-3); Ex. F (Glico Objections to NERA Document Subpoena Requests for Production Nos. 1-3). Lotte also served a document subpoena on Dr. Van Liere, seeking documents related to his report, including any pilot or test surveys. Ex. G (Van Liere Document Subpoena Requests for Production No. 1, 4).

Neither NERA nor Dr. Van Liere produced any documents related to pilot surveys in response to Lotte's subpoenas. However, NERA produced seven

invoices, some of which showed work performed by "economic analysts" and

"economic research staff" in the months prior to mid-November 2017 when the

survey relating to POCKY Chocolate—which Dr. Van Liere relied upon as the

basis for the opinions in his expert report—was launched. Ex. B (Van Liere Report

¶ 12 n. 10); Ex. H (NERA invoices). From late July 2017 through October 2017,

NERA staff worked approximately 25 hours on this assignment. Ex. H (NERA

invoices, specifically NERA000918; NERA000920). During this same period, Dr.

Van Liere worked a grand total of **one hour** on the assignment. Ex. H (NERA

invoices, NERA000918; NERA000920). These invoices make clear that NERA

staff performed the lion's share of the work on the survey that formed the basis for

Dr. Van Liere's opinions in this case. *Id.* In January and February 2018, NERA

staff worked over 40 hours on the assignment. Ex. H (NERA invoices –

NERA000922; NERA000923). During this same period, Dr. Van Liere worked

**zero hours**, despite the fact that the POCKY Almond survey (the second survey

that forms the basis for his opinions) was launched on February 2, 2018 and

completed on February 21, 2018. *See id.;* Ex. B (Van Liere Report ¶ 12 n. 10).

## III.    THE DEPOSITIONS OF DR. VAN LIERE AND NERA

### A.    NERA Refuses to Testify About Pilot Surveys

To understand the nature and extent of NERA's involvement in Dr.Van

Liere's surveys, Lotte noticed the deposition of NERA under Federal Rule of Civil

Procedure 30(b)(6). <u>Ex. I (NERA Deposition Subpoena)</u>. Lotte sought testimony

on a variety of topics, including:

- <u>Topic No. 1</u>: "All internal communications concerning, referring, or relating to any survey, pilot survey, test survey, proposed survey, possible survey research, focus group, or analysis involving Ezaki Glico's POCKY products, Lotte's PEPERO products, Meiji's LUCKY products, or candy, cookie, or biscuit products (including packaging) made by any person."

- <u>Topic No. 2</u>: "All internal communications between NERA and any person, including Ezaki Glico's attorneys or attorney's staff (e.g., Hogan Lovells US LLP law firm, the Lerner David Littenberg Krumholz & Mentlik LLP law firm, and the Workman Nydegger law firm), Van Liere Consulting, and Critical Mix, concerning, referring, or relating to any survey, pilot survey, test survey, proposed survey, possible survey, research, focus group, or analysis involving Ezaki Glico's POCKY products, Lotte's PEPERO products, Meiji's LUCKY products, or candy, cookie, or biscuit products (including packaging) made by any person."

- <u>Topics No. 3 – 9</u>: The work performed by NERA as shown in the invoices produced by NERA, "including the identities of all employees who performed the work and the specific work performed by each employee."

- <u>Topic No. 10</u>: "All work performed by NERA concerning any survey, pilot survey, test survey, proposed survey, possible survey, research, or analysis concerning Ezaki Glico's POCKY products or Lotte's PEPERO products not reflected in the invoices referenced in Topics 3-9 above."

<u>Id</u>. (NERA Deposition Subpoena). Both Glico and NERA objected to these topics

based on, among other things, attorney-client privilege, work product, and Fed. R.

Civ. P. 26(b)(3)-(4). <u>Ex. J (NERA Objections to NERA Dep. Subpoena); Ex. K

(Glico Objections to Glico Dep. Subpoena)</u>. NERA nevertheless designated Dr.

Van Liere to testify on its behalf on all of the topics in the deposition subpoena,

including Topics 1-3 and 9-10. <u>Ex. C (Van Liere Dep. 16:6-17)</u>.

On July 12, 2018, Lotte deposed Dr. Van Liere (in his personal capacity as Glico's expert in this case) and NERA, who designated Dr. Van Liere to testify on its behalf on all topics. In his personal capacity, Dr. Van Liere testified that he was unaware of a survey about POCKY or PEPERO other than the two surveys described in his report. Ex. C (Van Liere Dep. 25:1-5; 25:21-25; 26:13-26:25; 27:24-28:3; 29:5-8; 30:11-14). But when Lotte's counsel asked Dr. Van Liere in his capacity as NERA's corporate designee whether NERA had designed, conducted, or was aware of any survey, including a pilot or test survey, about POCKY or PEPERO other than the two surveys described in Dr. Van Liere's report, Glico's counsel objected based on "privilege" and instructed Dr. Van Liere not to answer. Ex. C (Van Liere Dep. 25:6-20; 26:1-12; 28:4-16; 29:13-30:6; 31:3-15). Dr. Van Liere followed Glico's' counsel's instruction and refused to answer. *See id.* (Van Liere Dep. 25:6-20; 26:1-12; 28:4-16).

Thereafter and based on Glico's counsel's continued objections, Dr. Van Liere refused to answer any question in his capacity as NERA's corporate designee about pilot or test surveys, including whether Dr. Iyengar and Ms. Singer—the NERA employees identified by Dr. Van Liere as having assisted in the design and implementation of the surveys described in his report—were aware of any pilot surveys or test surveys:

> Q: Dr. Van Liere, in your capacity as a corporate representative today testifying on behalf of NERA, other than the surveys described in the

5

Van Liere report and the Isaacson report, **is NERA aware of any other survey concerning Pocky products or Pepero Products**?

Ms. Shaw: I'm going to object on the grounds of privileged work product doctrine, and instruct the witness not to answer.

Q: Dr. Van Liere, are you going to follow your counsel's objection?

A: Yes.

Q: In your capacity testifying today as a corporate representative on behalf of NERA, **is NERA aware of when any surveys concerning Pocky products or Pepero products, other than the surveys described in your expert report and the – Dr. Isaacson's survey, were conducted in this case**?

Ms. Shaw: Same objection. I'm going to object on the grounds of privileged work product doctrine and instruct the witness not to answer.

Q: Dr. Van Liere, will you be following your counsel's instruction not to answer?

A: Yes.

Q: In your capacity as a corporate representative today testifying on behalf of NERA, **does NERA know who instructed NERA to conduct any sort of pilot survey involving Pocky products or Pepero products in this case**?

Ms. Shaw: Objection, foundation. Objection on—I'm going to instruct the witness not to answer on the grounds that it calls for work product, privileged product.

Q: Dr. Van Liere, will you be following your counsel's instruction not to answer?

A: Yes.

***

6

Q: In your capacity as a corporate representative today testifying on behalf of NERA, **does NERA know whether NERA engaged anyone to conduct a pilot survey concerning Pocky products or Pepero products**?

Ms. Shaw:  Objection, foundation. I'm going to instruct the witness not to answer on the grounds of attorney-client privileged work product.

Q:  Dr. Van Liere, will you be following your counsel's instruction not to answer?

A:  Yes.

Q:   In your capacity as a corporate representative today testifying on behalf of NERA, **does NERA know the results of any pilot survey conducted concerning Pocky products or Pepero products**?

Ms. Shaw: . . . Objection, foundation. I'm going to instruct the witness not to answer on the grounds of privileged work product doctrine.

Q:  Dr. Van Liere, will you be following your counsel's instruction not answer?
A:  Yes.

***

Q: **In your capacity as a corporate representative today testifying on behalf of NERA, did Dr. Iyengar perform any work in relation to any pilot survey conducted by NERA concerning Pocky products or Pepero products**?

Ms. Shaw: Objection. I'm going to instruct the witness not to answer on the grounds of attorney work – attorney work product doctrine privilege.

Q: Dr. Van Liere, will you be following your counsel's instruction not to answer?

A: Yes.

Q: **In your capacity as a corporate representative today testifying on behalf of NERA, did Ms. Singer perform any work in relation to a pilot survey concerning Pocky products or Pepero products**?

Ms. Shaw: Objection. I'm going to instruct the witness not to answer on the grounds of attorney work product privilege.

Q: Dr. Van Liere, will you be following your counsel's instruction not to answer?

A: Yes.

Ex. C (Van Liere Dep. 218:24-220:12; 220:24-221:15; 221:20-222:14; 222:21-224:3; 225:2-226:1).

### B. Dr. Van Liere Admits That NERA's Dr. Iyengar and Ms. Singer Assisted in Designing the Surveys That Form the Basis for His Opinions in this Case.

Although Dr. Van Liere refused to answer any questions concerning the work of Dr. Iyengar and Ms. Singer when testifying on behalf of NERA, he testified in his personal capacity that Dr. Iyengar and Ms. Singer assisted him in designing the surveys that formed the basis of his expert opinions:

Q: And what was the role that Ms. Iyengar had in the surveys that you conducted or designed in this case?

A: She had involvement in both the kind of background reviewing materials, pleadings and so on assisting with the survey design, reviewing the surveys, and some work related to analyzing the data and then the report proofing and assisting with that.

8

Ex. C (Van Liere Dep. 20:1-8). Indeed, Dr. Van Liere repeatedly testified that the design of the survey was a collective effort involving himself and Dr. Iyengar, continuously responding to questions about various aspects of the creation and design with "**we**." Ex. C at 22:24 ("**we** use coders"), 23:22-23, 24:1-2 ("as **we're** finishing up, **we** proof the project"), 27:6, 26:17-18, 27:12, 27:14-15.

Dr. Iyengar has a PhD in sociology and is herself an expert in survey research. Ex. L (NERA profile page). Dr. Van Liere further testified that Ms. Singer—a "senior analyst"—had a similar role to Dr. Iyengar, and coordinated with an outside company to deploy the survey and obtain the survey results. Ex. C (Van Liere Dep. 21:1-9).

## IV.   LOTTE SEEKS TO COMPEL DISCLOSURE OF THE IMPROPERLY WITHHELD PILOT SURVEYS

### A.   Lotte's Motion to Compel

Following the depositions of Dr. Van Liere and NERA, Lotte moved to compel testimony and documents concerning the Pilot Surveys. *See generally* Dkt. 202. Lotte argued that Dr. Iyengar and Ms. Singer's knowledge of the Pilot Surveys would have informed their work in designing the surveys that Dr. Van Liere ultimately relied upon for his opinions in his expert report under Rule 26(a). *Id.* at 7-9. Glico opposed the motion. Dkt. 208.

### B.   Dr. Van Liere Changes his Testimony About His Staff's Role

In its opposition, Glico scrupulously avoided stating that the Pilot Surveys do not exist, *see generally* Dkt. 208, and instead relied on the evasive declaration of Dr. Van Liere. Even in that Declaration, however, Dr. Van Liere did not deny that: (1) NERA conducted or at least knew about Pilot Surveys concerning POCKY or PEPERO, and (2) Dr. Iyengar and/or Ms. Singer participated in designing the Pilot Surveys or were aware of their design and results. *See generally* Dkt. 208-2. Indeed, Dr. Van Liere acknowledges that he works "with [his] former associates at NERA, performing research, consulting, and providing testimony related to the use of surveys, sampling, and statistical analysis in litigation matters." Dkt. 208-2 ¶ 1.

Through his Declaration, Dr. Van Liere attempted to re-characterize the nature of the work performed by NERA's Dr. Iyengar and Ms. Singer in the case. *Id.* Whereas Dr. Van Liere had testified at his deposition that Dr. Iyengar and Ms. Singer participated in designing the surveys and in quality control, Ex. C (Van Liere Dep. 20:1-8, 21:1-9), Dr. Van Liere testified in his Declaration that the work of these highly educated and expensive experts consisted of performing ministerial quality control functions, e.g., "check[ing] for wording issues, review[ing] the accuracy of skip instructions (that is, instructions to skip or change the order of questions), and assist[ing] with other quality control issues." Dkt. 208-2 ¶ 6.

Critically, however, even these tasks are not necessarily ministerial. For example, Dr. Iyengar and Ms. Singer's assistance with "checking for wording issues" could relate to the manner in which material questions were framed in the Van Liere Surveys, which in turn would have been impacted by the knowledge that Dr. Iyengar and Ms. Singer had obtained from the Pilot Surveys. Dr. Van Liere's Declaration also states that Dr. Iyengar and Ms. Singer "assisted by reviewing the survey results and analyzing the survey data, which I also reviewed." Dkt. 208-2 ¶ 6. Dr. Iyengar and Ms. Singer's work in this regard could also have been influenced by their knowledge of the Pilot Surveys by informing the types of responses that were counted as evidence of confusion.

Dr. Van Liere's Declaration is strikingly evasive in critical respects. For example, he states that he "was responsible for creating the design of the surveys," but in the next sentence he states that he "was **<u>solely</u>** responsible for selecting the format of the survey, selecting the stimuli for the surveys and selecting the questions for the surveys." Dkt. 208-2 ¶ 5 (emphasis added). Dr. Van Liere's omission of the word "solely" with respect to his "responsibility" for "creating the design of the surveys" strongly suggests that others, most notably Dr. Iyengar and Ms. Singer, were also responsible for "creating the design of the surveys." Indeed, Dr. Van Liere is conspicuously silent on the question of who selected the controls for the surveys. Dr. Iyengar and Ms. Singer's knowledge of the Pilot Surveys

11

would have impacted their work with respect to "creating the design of the surveys" and selecting the controls for the surveys upon which Dr. Van Liere's expert opinions are based.

Even though Dr. Van Liere states that "he was solely responsible for selecting the format of the survey, selecting the stimuli for the surveys, and selecting the questions for the surveys," that does not negate the fact that his selections were made based on options that were provided by Dr. Iyengar and Ms. Singer. Dr. Iyengar and Ms. Singer's knowledge of the Pilot Surveys would have impacted what options they provided—or did not provide—to Dr. Van Liere.

### C.   The Alzheimer's Decision

Less than a year ago, a federal court found Dr. Van Liere's testimony to be "not . . . candid" with regard to whether surveys performed by him were influenced by pilot surveys performed by NERA's Dr. Iyengar and Ms. Singer. In particular, the Southern District of New York discredited Dr. Van Liere's survey because he had "improper[ly]" manipulated his survey design based on results obtained from pre-test surveys conducted by NERA. *Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. Of Am., Inc.*, 307 F. Supp. 3d 260, 277 (S.D.N.Y. 2018).

In *Alzheimer's*, Dr. Van Liere was also retained to conduct a likelihood of confusion survey. 307. F. Supp. 3d at 274. Prior to doing so, Ms. Singer conducted

pilot/pre-test likelihood of confusion surveys. [2] *Id.* at 277; Ex. M (Van Liere Dep. in *Alzheimer's* case, 38:20-42:6). As here, Dr. Van Liere testified that he was not aware of the pre-test results of these surveys. 307 F. Supp. 3d at 277 ("Dr. Van Liere testified that his staff never disclosed the results of these pre-test surveys to him... [and] also claimed to be entirely ignorant about the methodology employed by NERA staff in conducting the pre-test studies."). And as here, Dr. Van Liere testified that Dr. Iyengar and Ms. Singer assisted him in designing the survey that ultimately formed the basis for his expert opinions. Ex. M (Van Liere Dep. in *Alzheimer's* case 31:11-19).

The *Alzheimer's* court found Dr. Van Liere "not [] candid" in his testimony that the pre-test surveys did not affect the design of the survey that he ultimately conducted and relied upon for his expert opinions in that case. 307 F. Supp. 3d 260 at 277. It found that the design of the survey that was relied upon by Dr. Van Liere had been manipulated to obtain a more favorable result based on outcome of the pre-test surveys conducted by NERA's Dr. Iyengar and Ms. Singer. *Id.*

## V.    THE MAGISTRATE JUDGE'S DECISION

The Magistrate Judge denied Lotte's motion based on her finding that Dr. Van Liere himself did not have knowledge about the Pilot Surveys. Dkt. 293 at 2.

---

[2] Unlike Glico, the proponent of the survey in *Alzheimer's* had properly produced the pre-test surveys, recognizing that such documents were not immune from discovery based on a privilege. 307 F. Supp. 3d at 277.

The Magistrate Judge stated that "[t]he fact that two NERA employees provided limited assistance to Dr. Van Liere with the surveys on which his expert report is based does not overcome or rebut Dr. Van Liere's sworn statements that no one including those NERA employees - provided him any information about pilot surveys that may have been conducted by others at NERA." *Id.*

The Magistrate Judge found that if NERA's Dr. Iyengar and Ms. Singer conducted pilot surveys related to the same topic as Dr. Van Liere's expert report, then Lotte would be entitled to depose Dr. Iyengar and Ms. Singer regarding the nature of their work on the surveys that formed the basis for Van Liere's opinions based on the opinion in *Apple v. Amazon*. Dkt. 293 at 3.[3] But then the Magistrate Judge held that, "this Court is not willing to reopen expert discovery so Lotte can attempt to find some substantiation for its presently unsubstantiated challenge to Dr. Van Liere's sworn testimony that he was solely responsible for designing the substance of his surveys, was not aware of, and did not review, consider, or use any information beyond his own surveys." *Id.*

In so doing, the Magistrate Judge relied on Dr. Van Liere's declaration to find that the roles of Dr. Iyengar and Ms. Singer in the Van Liere surveys were

---

[3] In *Apple*, the court held that if the testimony elicited at the depositions of the survey expert's staff showed that their work on the expert's survey was sufficiently substantive that the survey could have been influenced by the pilot surveys, then the party could come back to court to seek discovery of the pilot surveys themselves and deposition testimony about those surveys. *Apple Inc. v. Amazon.com, Inc.,* 11-1327, 2013 WL 1320760, at *4 (N.D. Cal. Apr. 1, 2013).

"limited" and "ministerial" and did not credit Dr. Van Liere's conflicting deposition testimony that in fact Dr. Iyengar and Ms. Singer were involved in the "survey design" of the Van Liere Surveys. *See* Dkt. 293 at 4 (quoting Dr. Van Liere's Declaration that he was "solely responsible" for various aspects of his surveys).

## VI.    LOTTE'S TIMELY APPEAL

The Magistrate Judge issued her Letter Order denying Lotte's motion on January 23, 2019. *See* Dkt. 293. Lotte's summary judgment motion is pending before this Court which, if granted, would moot this motion. Thus, Lotte sought to alter the deadline to appeal the Magistrate Judge's Letter Order until after the Court rules on summary judgment. *See* Dkt. 294; L. Civ. R. 72.1 (stating that "[e]ach of the above periods may be altered by the Magistrate Judge or Judge."). The Magistrate Judge partially granted Lotte's request by permitting it until February 28, 2019 to file the appeal. Dkt. 298. Lotte timely file this appeal pursuant to the Magistrate Judge's Order.

## <u>LEGAL STANDARD</u>

This Court reviews the Magistrate Judge's denial of a motion to compel under a "clearly erroneous and contrary to law" standard. *See* Fed. R. Civ. 72(a) (setting forth non-dispositive pretrial motion standard of review); *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co. of Wisconsin*, 131 F.R.D. 63, 64 (D.N.J.

1990) (reversing magistrate judge's finding that attorney-client privilege shielded the witness from answering questions at his deposition). A finding is "clearly erroneous" when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A ruling is "contrary to law" when "the magistrate judge has misinterpreted or misapplied applicable law." *Bobian v. CSA Czech Airlines*, 222 F. Supp. 2d 598, 601 (D.N.J. 2002). This Court reviews the Magistrate Judge's legal conclusions *de novo*. *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) (district court conducts "plenary" review of magistrate judge's legal conclusions); *see, e.g. Eisai Co., Ltd. v. Teva Pharm. USA, Inc.*, 629 F. Supp. 2d 416, 433 (D.N.J. 2009), *as amended* (July 6, 2009) (applying *de novo* standard of review to magistrate judge's legal conclusions in ruling on discovery motions).

## **ARGUMENT**

This appeal asks the Court to determine whether documents and information considered by an expert's staff who also designed the survey that formed the basis of the expert's opinion are discoverable pursuant to Fed. R. Civ. P. 26(a)(2)(B)(ii). Numerous courts have answered in the affirmative, stating that where the expert's staff considered documents in preparing the expert's report—or indeed, even in preparing materials that the expert then relied upon in preparing his report—those

documents must be produced. The Magistrate Judge's failure to order the production of the pilot surveys here was legal error. *See Eisai*, 629 F. Supp. 2d at 424.

## I.     THE MAGISTRATE JUDGE COMMITTED LEGAL ERROR BY REFUSING TO COMPEL PRODUCTION OF THE PILOT SURVEYS.

As a testifying expert, Dr. Van Liere was required to produce all "the facts or data considered by the witness in forming his opinions." Fed. R. Civ. P. 26(a)(2)(B)(ii). *See Robocast v. Apple, Inc.*, No. 11-235 and 10-1055, 2013 WL 12155813, at *1 (D. Del. Sept. 18, 2013) (applying rule). Rule 26(a)(2) requires production of facts or data that the expert's staff considered as well. *See, e.g.*, *Derrickson v. Cir. City Stores, Inc.*, DKC 95-3296, 1999 WL 1456538, at *8 (D. Md. Mar. 19, 1999), *aff'd sub nom. Johnson v. Cir. City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000) (underlying data used by the expert's assistant to prepare materials for the expert's review must be disclosed, even though expert did not consider that data); *Sher v. Raytheon Co.*, 8:08-CV-889-T-33AEP, 2010 WL 11507787, at *2 (M.D. Fla. Aug. 13, 2010)(mandating disclosure of files relied upon by expert's assistants that the expert himself did not review); *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013) (where the evidence suggested that expert was not familiar with the data that assistant relied upon in helping prepare the expert's report, opposing party had the right to obtain that underlying

data *and* depose the assistant). The term "considered" is broadly interpreted to require disclosure of all information a testifying expert or his staff "generates, reviews, reflects upon, reads, and/or uses in connection with the formulation of" the expert opinions in the case, "even if such information is ultimately rejected." *In re Benicar*, 319 F.R.D. 139, 141 (D.N.J. 2017).

If there is any doubt or ambiguity about whether sought-after materials may have informed the expert's opinion, including by impacting his/her assistant's work on that opinion, then the materials must be produced. "[I]f the subject matter of the materials sought to be protected relates to the facts and opinions the expert expresses in his report, **a court should order disclosure when there is at least an ambiguity as to whether the materials informed the expert's opinion**." *Robocast*, 2013 WL 12155813, at *3 (emphasis added); *Ansell Healthcare Products LLC v. Reckitt Benckiser LLC*, 15-CV-915-RGA, 2017 WL 6328149, at *2 (D. Del. Dec. 11, 2017) (same). Indeed, "[w]hen the subject matter in the material at issue directly relates to an opinion in the expert's report, there **will** be an ambiguity." *Ansell Healthcare*, 2013 WL 12155813 at *3 (emphasis added).

The Delaware District Court's decision in *Robocast* is instructive. There, as in the current case, the plaintiff's expert had conducted preliminary surveys on the same topic as his proffered survey. 2013 WL 12155813, at *1. It was undisputed that the expert had (1) deleted the preliminary surveys prior to sitting down to

prepare his report, and (2) did not recall the results of the preliminary survey. *Id.* at

*2. Nonetheless, the court stated:

> There is a so-called "bright line" rule that has developed in connection
> with determining the extent of the discoverability of pre-report expert
> activity under Rule 26(a)(2)(B). That "rule" requires disclosure by a
> testifying expert of all information, whether privileged or not, that the
> expert "generates, reviews, reflects upon, reads and/or uses in
> connection with the formulation of his opinions, even if the testifying
> expert ultimately rejects the information . . . **In fact, if the subject
> matter of the materials sought to be protected relates to the facts
> and opinions the expert expresses in his report, a court should
> order disclosure when there is at least an ambiguity as to whether
> the materials informed the expert's opinion.**

*Id.* at 3 (quoting *Synthes Spine Co. v. Walden*, 232 F.R.D. 460, 464 (E.D. Pa.

2005)) (emphasis added). The court noted that the presumption of disclosure

requires production of any pilot surveys because a survey expert inevitably

"relie[s] upon not just the questions, but the results" of any prior survey to "fine-

tune" his disclosed survey. *Id.* at *2. The court required "all of the prior surveys,

including both their questions and their answers" to be immediately produced. *Id.*

Sher is also instructive. There, the expert had relied upon case summaries

prepared by his assistants. 2010 WL 11507787 at *2. It was undisputed that the

expert had not himself reviewed the underlying files from which those summaries

were prepared. *Id.* Nonetheless, the Court mandated disclosure of those underlying

files: "Although the [c]ourt accepts Dr. Kilpatrick's assertion that he relied only

upon the case summaries in forming his opinion, **it is apparent that his staff**

**relied upon the [underlying] files in preparing those summaries**.” *Id.* at *2

(emphasis added). The court noted that withholding documents that the expert's

assistants had relied upon “would unfairly hinder [the other party] from

challenging the results of those studies, and ultimately from effectively challenging

Dr. Kilpatrick's opinion in this case.” *Id. See also Derrickson*, 1999 WL 1456538,

at *8 (requiring disclosure of data relied upon by expert's assistant because without

that information the defendant could not effectively “tear down [p]laintiffs' case”).

 *Robocast*, *Sher*, and *Derrickson* make clear that where the expert's staff's

work forming the basis of the expert's report was informed by documents or data,

those documents and data **must** be produced regardless of whether the expert

personally reviewed them or was even aware of them. Disclosure of such

documents are required to challenge the bases of the expert's opinions.

 Dr. Van Liere admitted at his deposition that Dr. Iyengar and Ms. Singer

participated in the design of the surveys that formed the basis for his expert

opinions in this case. Ex. C (Van Liere Dep. at 20:1-8, 21:1-9). Glico does not

deny that the Pilot Surveys tested the identical issue as the Van Liere Surveys,

namely, whether there is a likelihood of confusion between POCKY and PEPERO

products and that Dr. Iyengar and Ms. Singer were aware of the design and results

of the Pilot Surveys. *See* Dkt. 208. At the very least, these facts create “an

ambiguity” as to whether the Pilot Surveys “informed the expert's opinion,”

mandating disclosure of documents and testimony related to those surveys. *Robocast*, 2013 WL 12155813, at *3 (mandating production); *Ansell Healthcare*, 2017 WL 6328149, at *3 (same).

That is particularly true because Dr. Van Liere has a reputation for lack of candor when it comes to his surveys. In the *Alzheimer's* case last year, Dr. Van Liere was retained as a confusion survey expert. 307 F. Supp. 3d at 277. Just as here, NERA conducted a pilot survey, and Dr. Iyengar and Ms. Singer assisted Dr. Van Liere with designing his proffered survey, including selecting a control that would yield a higher rate of net confusion. *Id.* Just as here, Dr. Van Liere claimed that he was not made aware of the results of the pilot survey. *Id.* But at trial he was forced to concede that the pilot survey likely influenced his proffered survey via the knowledge of his NERA staff, i.e. Dr. Iyengar and Ms. Singer. *Id.* The district court found that the control ultimately used in the proffered survey "artificially inflated the net confusion numbers" and Dr. Van Liere could not credibly explain why changes were made between the pilot survey and his reported survey. *Id.* at 277. The district court concluded that Dr. Van Liere and NERA used the pilot survey for the "improper purpose" of manipulating the proffered survey in order to get a more favorable result. *Id.* at 36. In other words, the district court found that the knowledge of pilot surveys by Dr. Van Liere's staff influenced Dr. Van Liere's

21

expert opinions, **despite** his testimony—like his testimony here—that he himself never reviewed those pilot surveys. *Id.*

Dr. Van Liere and NERA's work on the *Alzheimer's* case was contemporaneous with his work here. In both cases, Dr. Van Liere used the same NERA staff members. In both cases, that staff conducted or were informed of the results of pilot surveys. In both cases, Dr. Van Liere himself claimed to have no knowledge of the pilot surveys. It is therefore at least "ambigu[ous]" whether here—as in *Alzheimer's*—the staff used their knowledge of the Pilot Surveys in designing the surveys that Van Liere relied upon for his expert opinions in this case. Indeed, given Dr. Van Liere's conspicuous silence in his declaration on the question of who selected the control for his surveys, it is likely that, just as in *Alzheimer's*, the controls were influenced by NERA's Pilot Surveys.

As explained above, "an[y] ambiguity as to whether the materials informed the expert's opinion" **must be resolved in favor of producing the documents**. *Robocast*, 2013 WL 12155813, at *3 (mandating production of pilot surveys); *Ansell Healthcare*, 2017 WL 6328149, at *2 (rejecting privilege claims). Lotte is entitled to documents concerning the Pilot Surveys and to interrogate Dr. Van Liere's staff about their knowledge of the Pilot Surveys to assess the reliability, probative value, and weight of Dr. Van Liere's opinions. *See Sher*, 2010 WL 11507787, at *2; *Derrickson*, 1999 WL 1456538, at *8. The Magistrate Judge

erred by failing to recognize that the above-described facts created at the very least an "ambiguity" that required disclosure.

## II.   THE MAGISTRATE JUDGE ERRED BY CREDITING DR. VAN LIERE'S DECLARATION OVER HIS EARLIER SWORN DEPOSITION TESTIMONY

The Magistrate Judge refused to compel the production of the pilot surveys and deposition testimony relating to them on the ground that Dr. Iyengar and Ms. Singer's work on the Van Liere Surveys was "limited" and administrative in nature. Dkt. 293 at 3-4 (the assistants performed more "ministerial tasks"). This finding was based on Dr. Van Liere's declaration stating that his staff's efforts on his surveys were limited to "check[ing] for wording issues, review[ing] the accuracy of skip instructions (that is, instructions to skip or change the order of questions), and assist[ing] with other quality control issues." Dkt. 208-2 ¶ 6. But the Magistrate Judge failed to consider Dr. Van Liere's testimony at his deposition weeks prior to his Declaration where he stated under oath that Dr. Iyengar and Ms. Singer were responsible for **"survey design"** in addition to these various quality control tasks. Ex. C (Van Liere Dep. 20:1-8, 21:1-9 (emphasis added)). Indeed, at his deposition, Dr. Van Liere testified that his surveys were a collaborative effort with Dr. Iyengar and Ms. Singer and that "we" (meaning himself and his staff) carried out all the tasks related to designing and running the surveys. *See, e.g.*, Ex.

C at 22:24 ("**we** use coders"), 23:22-23, 24:1-2 ("as **we're** finishing up, **we** proof

the project"), 27:6, 26:17-18, 27:12, 27:14-15).

Courts are not bound to accept the self-serving representations of an expert

or party as to what documents informed the expert's report. *Sher*, 2010 WL

11507787, at *1 ("[E]ven if an expert avers under oath that he did not actually

consider certain materials in forming his opinion, that will not control."); *U.S. v.

Dish Network, L.L.C.*, 297 F.R.D. 589, 596 (C.D. Ill. 2013) ("A court should not

solely credit the subjective representations of the expert when determining what

the expert 'considered.'"). Instead, as explained above, "any ambiguity" must be

resolved in favor of disclosure. *Robocast*, 2013 WL 12155813, at *3; *Ansell

Healthcare*, 2017 WL 6328149, at *2. That is especially true where, as here, the

expert's self-serving representations contradict his earlier deposition testimony.

Here, there is at the very least an "ambiguity" as to Dr. Iyengar and Ms.

Singer's role in preparing the Van Liere Surveys. Ms. Singer is a senior analyst

and Dr. Iyengar holds a PhD. in sociology and is a recognized survey expert in her

own right. Ex. L (NERA webpage). It is not credible that these highly-educated

(and expensive) experts performed solely ministerial functions related to the

surveys that Van Liere is relying upon for the basis of his opinions in this case.

Further, NERA's time records reveal that its staff (including Dr. Iyengar and Ms.

Singer) spent about 25 hours on this project between July and October 2017, while

Dr. Van Liere spent **one hour**. Ex. H (NERA invoices, specifically NERA000918;

NERA000920). NERA staff spent over 40 hours preparing the Van Liere Surveys

in January and February of 2018, while Dr. Van Liere himself devoted **zero time**

to the task. *Id.* at NERA0000922-23. It is not credible that this time was spent on

quality control of **Dr. Van Liere's** work, when Dr. Van Liere himself had not done

any work.[4] Plainly, Dr. Iyengar and Ms. Singer had a much more substantial role in

designing the Van Liere Survey than Dr. Van Liere gives them credit for. *See*

*Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D.N.Y. 2002) (denying

protective order as to deposition of expert's assistant where the assistant

"performed more than half of the total 329.25 hours it took to generate the expert

report, and accounted for more than half of the $61,305.00 fee."). Finally, Dr. Van

Liere testified at his deposition that both Dr. Iyengar and Ms. Singer participated in

"survey design." Ex. C (Van Liere Dep. 20:1-8, 21:1-9).  This was the same way

he described their efforts in preparing the survey in *Alzheimer's*. Ex. M (Van Liere

Dep. in *Alzheimer's* case 31:11-19). There, the court held that the staff's

---

[4] In his declaration, Dr. Van Liere states that he conducted 15-20 hours of work on
the survey for which he did not bill. Dkt. 208-2 ¶ 9. But Dr. Van Liere did not
produce any invoices separate from NERA's invoices, despite Defendants' request
for such documents. Dkt. 202 Ex. G (Van Liere Subpoena No. 8). In any case,
NERA staff devoted over two times as many hours to preparing the report as the
number asserted by Dr. Van Liere. *See* Ex. H (NERA invoices). *See Herman*, 207
F.R.D. at 31 (denying protective order as to deposition of expert's assistant where
the assistant "performed more than half of the total 329.25 hours it took to generate
the expert report[.]").

knowledge of pilot surveys **had** influenced Dr. Van Liere's expert report. 307 F. Supp. 3d at 277. There is at least an "ambiguity" that the same is true here, and that is sufficient to require disclosure.

Alternatively, Lotte should at a minimum have the opportunity to depose Dr. Iyengar and Ms. Singer about the substance and nature of their work on the Van Liere Surveys. *See, e.g.*, *Lee Valley Tools,* 288 F.R.D. at 266 (permitting deposition of expert's assistant); *Herman*, 207 F.R.D. at 31 (same where assistant billed more than half of all hours in preparing the report); *Apple Inc. v. Amazon.com, Inc.,* No. 11-1327, 2013 WL 1320760, at *4 (N.D. Cal. Apr. 1, 2013) (permitting deposition of assistants on the extent of their participation in preparing survey expert's report). If that deposition testimony corroborates Dr. Van Liere's deposition testimony that those assistants helped to design his surveys, then Lotte could request that the Court compel the production of the Pilot Surveys and testimony relating to those surveys if Glico remained unwilling to produce the materials. *See, e.g., Apple,* 2013 WL 1320760, at *4.

As Judge Chasanow explained in *Derrickson*, 1999 WL 1456538 at *8, in finding exceptional circumstances[5] for deposing the expert's assistant:

---

[5] Because Dr. Iyengar and Ms. Singer worked on Dr. Van Liere's report, Lotte contends that they do not qualify as non-testifying experts, and thus "exceptional circumstances" are unnecessary to compel their depositions. Nonetheless, "exceptional circumstances" exist as they did in *Derrickson*, because Lotte has no

Defendant is not engaging in the sort of free riding that Rule 26(b)(4)(B) was meant to prevent. The purpose of Rule 26(b)(4)(B) is to prevent a party from building its own case through its opponent's diligence. **In this instance, Defendant does not seek to build its own case with Dr. Medoff's work but rather seeks to tear down Plaintiffs' case**. That is entirely proper. . . . **Only Dr. Medoff's assistant knows what he did to the data, and because that information is exclusively within the assistant's cognizance, Defendant is entitled to it under Rule 26(b)(4)(B).**

## CONCLUSION

Rule 26(a) requires NERA to disclose the Pilot Surveys and their results, and all documents upon which those surveys were based and to designate a corporate representative to testify regarding those surveys. These documents are not privileged, and Glico, Dr. Van Liere, and NERA know it. Just last year, Dr. Van Liere and NERA produced these same documents in the *Alzheimer's* case, and that Court relied on those documents and Dr. Van Liere's evasive testimony in according Dr. Van Liere's survey in that case minimal weight. 307 F. Supp. 3d at 277 ("Based on the substance of his answers and his demeanor on the witness stand, the Court did not find Dr. Van Liere candid on the subject of the pre-test surveys.").

---

other way of learning of Dr. Iyengar and Ms. Singer's knowledge of the Pilot Surveys and how that influenced their work on the Van Liere Surveys.

The Magistrate Judge committed reversible error by failing to ascribe to Dr. Van Liere the knowledge of his staff, who Dr. Van Liere testified helped him to "design" his surveys. Lotte requests that this Court order the production of materials and testimony concerning the Pilot Surveys so that Lotte can fairly assess the Van Liere Surveys. At the very least, and as a preliminary step, the Court must order the depositions of Dr. Iyengar and Ms. Singer, which will corroborate Dr. Van Liere's deposition testimony that they provided substantive assistance in designing his surveys. Lotte could then return to Court to secure the production of the Pilot Surveys and testimony regarding those surveys in the event Glico remained unwilling to voluntarily produce such evidence.

Dated:  February 28, 2019            Respectfully submitted,


                                              By: /s/Riley T. Orloff

Riley T. Orloff  (RO4865)
McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY  10173-1922
rorloff@mwe.com
Tel:  212.547.5683
Fax: 212.547.5444

John J. Dabney (*admitted pro hac vice*)
Mary D. Hallerman (*admitted pro hac vice*)
Katie Bukrinsky (*admitted pro hac vice*)
Rebecca H. Duttry  (*admitted pro hac vice*)
McDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
jdabney@mwe.com,
mhallerman@mwe.com,
kbukrinsky@mwe.com, rduttry@mwe.com
Tel:  202.756.8000
Fax:  202.756.8087

*Attorneys for Lotte America and Lotte*
*Confectionary*

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on February 28, 2019 a true and correct copy of the

foregoing document was served on the following counsel of record via email:

Roy H. Wepner
Charles P. Kennedy
Natalie S. Richer
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ  07090-1497
Tel: 908.654.5000
Fax: 908.654.7866
Email:  rwepner@lernerdavid.com; ckennedy@lernerdavid.com;
nricher@lernerdavid.com
Steven Levitan
HOGAN LOVELLS US LLP
4085 Campbell Avenue, Suite 100
Menlo Park, CA  94025
Tel: 650.463.4000
Fax:650.463.4199
Email: steve.levitan@hoganlovells.com
Birte Hoehne Mahyera
HOGAN LOVELLS US LLP
3 Embarcadero Center, Suite 1500
San Francisco, CA 94111
Tel: 415.374.2300
Fax: 415.374.2499
Email: birte.hoehne-mayhera@hoganlovells.com

Anna Kurian Shaw
Katherine Bastian Phillips
Lauren B. Cury
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Tel.: 202.637.5600
Fax: 202.637.5910

Email: anna.shaw@hoganlovells.com; katherine.bastian@hoganlovells.com;
lauren.cury@hoganlovells.com

/s/ Katie Bukrinsky